Edgar Aguilasocho, Esq.
Mario Martinez, Esq.
Martinez Aguilasocho Law, Inc.
P.O. Box 1998
Bakersfield, CA 93303
eaguilasocho@farmworkerlaw.com

Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001
kcholera@cov.com
*pro hac vice applications forthcoming

*Attorneys for Plaintiffs*

*(additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS, *et al.*, | Civil Case No.: |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| UNITED STATES DEPARTMENT OF LABOR; | |
| LORI CHAVEZ-DEREMER, in her official capacity as Secretary of Labor; | |
| LORI FRAZIER BEARDEN, in her official capacity as Acting Assistant Secretary for Employment and Training | |
| Defendants. | |

Plaintiffs United Farm Workers, UFW Foundation, Irene Mendoza, Claudia Garcia, Cristano Serrano, Yesenia Contreras Cervantes, Jose Cruz, Jane Doe I, Jane Doe II, John Doe I, Francisco Alvares Flores, Juan Manuel Flores Ayala, Aaron Grimaldo, Margaret DeAnda Magallon, Carina Martinez, Evelyn Medina, Isabel Rinton Panfilo, Celest Whittle, Fortino Lopez, and Jesus Lopez, by and through their attorneys, for their Complaint against the United States Department of Labor, Lori Chavez-DeRemer, in her official capacity as Secretary of Labor, and Lori Frazier Bearden, in her official capacity as Acting Assistant Secretary for Employment and Training allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

**INTRODUCTION**

1.     The Department of Labor ("DOL"), by statute, may authorize U.S. employers to hire temporary foreign farmworkers, but only if doing so "will not adversely affect the wages and working conditions of workers in the United States similarly employed."[1] To comply with this "no adverse effect" requirement, DOL has historically set a minimum wage that U.S. employers must generally pay temporary foreign farmworkers, one that estimates the amount U.S. farmworkers would have received in the market absent the H-2A program. Without that minimum wage, U.S. employers could (and likely would) pay temporary foreign farmworkers a significantly lower amount, undercutting—*i.e.*, adversely affecting— the wages of U.S. workers that perform the same jobs. DOL recently issued an interim final rule—titled *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States* ("IFR")[2]—drastically cutting the minimum wage that U.S. employers must pay foreign farmworkers, all while costs and wages in other sectors have sharply increased. By DOL's own admission, DOL engineered the IFR to reduce wages paid to temporary foreign

---

[1] 8 U.S.C.A. § 1188(a)(1)(B).

[2] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 90 Fed. Reg. 47914, 47952 (Oct. 2, 2025).

farmworkers and, in turn, U.S. workers—the precise workers whose wages and working conditions federal law protects. In short, the IFR has created the "adverse effect" that DOL is tasked with preventing. The IFR is unlawful, and the Court must set it aside.

2.    Agricultural work is some of the most hazardous, physically demanding work in the United States.[3] It is also some of the most important work. Agricultural workers ensure our nation's food supply at the risk of their own health and safety, toiling under extreme and dangerous conditions. Through their work, farmworkers contribute to economic growth and food security.[4] Yet agricultural workers themselves face economic insecurity, with roughly 21% of farmworkers earning below the poverty level.[5] The agricultural sector and related industries contributed 5.5% to U.S. GDP in 2023 and provided 10.4% of U.S. employment in 2022.[6] Direct on-farm employment accounted for roughly 2.6 million of these jobs, amounting to about 1.2% of U.S. employment. Employment in agriculture- and food-related industries also supported another 19.6 million jobs. The remaining agriculture-related industries together added another 3.5 million jobs. Without farmwork, the United States would suffer devastating economic consequences and food shortages.[7]

3.    Although Congress has allowed foreign workers to fill these jobs for decades through the H-2A foreign guestworker visa program when employers can establish that an insufficient number of U.S. farmworkers are available, it has charged DOL with ensuring the economic security of U.S. farmworkers. Indeed, DOL is statutorily required to ensure that the use of H-2A workers will not "adversely affect the

---

[3] *Id.*

[4] Econ. Rsch. Serv., *Ag and Food Sectors and the Economy*, U.S. Dep't of Agric. (Jan. 8, 2025), https://perma.cc/VBG6-7BCF.

[5] Findings from the National Agricultural Workers Survey (NAWS) 2021–2022: A Demographic and Employment Profile of United States Crop Workers, Rsch. Report No. 17, U.S. Dep't of Agric. (Sep. 2023), https://perma.cc/4K4Q-PWAS (hereinafter "NAWS Survey").

[6] Econ Rsh. Serv., *supra* note 4.

[7] 90 Fed. Reg. at 47920.

wages and working conditions of workers in the United States similarly employed."[8] This prohibition is critical because, unlike other foreign worker visa programs, the H-2A program has no cap on the number of work visas that may be issued thereunder. Thus, without the "no adverse effect" requirement, employers would be incentivized to hire a significant number of temporary foreign farmworkers at a wage rate far lower than what U.S. workers would have otherwise received for similar employment.

4.      DOL has historically enforced the "no adverse effect" requirement by publishing a state or region-specific minimum wage that temporary foreign farmworkers must be paid so as not to artificially lower the wages of domestic farmworkers—the Adverse Effect Wage Rate ("AEWR"). The AEWRs have typically been calculated based on reliable data on average wages paid to farmworkers in the relevant sectors.

5.      But now, DOL has modified how it calculates AEWRs, untethering them from market data on average wages. On October 2, 2025, DOL published the IFR in the Federal Register, announcing changes to its methodology for setting AEWRs under the H-2A program. By DOL's own admission, the IFR deliberately *lowers* AEWRs (and thus many farmworker wages), and effects a transfer of wealth from the workers to their employers. Worse, it has done so through an IFR that went into effect immediately, without notice and comment. The IFR will reduce the wages of H-2A workers and thereby "adversely affect" the wages of U.S. workers similarly employed.

6.      The IFR is unlawful and must be set aside under the Administrative Procedure Act ("APA").

7.      First, the IFR contravenes DOL's statutory mandate to ensure that the employment of H-2A workers will not adversely affect the wages of similarly employed U.S. workers. Indeed, the IFR *creates* an adverse effect on those wages by significantly lowering the AEWRs, which will in turn put

_____

[8] 8 U.S.C.A. § 1188(a)(1)(B).

downward pressure on the wages of U.S. workers who work, and will continue to work, similar jobs, often on the same contract as the H-2A workers. Thus, by allowing employers to hire H-2A workers at even lower wages, the IFR all but ensures that many U.S. farmworkers will receive lower wages. As DOL recognizes, under the Immigration and Nationality Act ("INA"), DOL is obligated to protect U.S. workers' wages from the impacts of H-2A hiring, and thus the IFR conflicts with that statute.

8.      Second, the IFR is arbitrary and capricious. For one, DOL fails to adequately consider the adverse effects the IFR will have on U.S. farmworker wages. Indeed, rather than protect U.S. farmworker wages, the IFR lowers AEWRs—and, consequently, the wages of many U.S. farmworkers—in a number of ways. For example, previously, the AEWRs were based on the *average wages* received by farmworkers in the relevant farming sectors. Under the IFR, however, the AEWRs for most agricultural positions will likely fall far below those average wages. The IFR calls for H-2A positions to be classified into two tiers: Skill Level I (for standard agricultural jobs) and Skill Level II (for more highly skilled agricultural jobs). Most H-2A positions are likely to be classified as Skill Level I, and the AEWRs for Skill Level I positions will be equal to only the *17th wage percentile* for the relevant farming sectors. Stated differently, whereas many AEWRs were previously equal to the average wage in a given sector, they will now be less than the amount that *83%* of farmworkers receive in that sector.

9.      Furthermore, H-2A AEWRs will now also be reduced by a significant percentage due to a "housing deduction." By statute and regulation, U.S. employers must provide H-2A employees with free housing.[9] Critically, until now, that housing never impacted the applicable AEWRs. The IFR, however, appears to reduce AEWRs for all, or nearly all, H-2A workers to account for the housing that employers are legally obligated to provide H-2A workers. The IFR contemplates that this "housing deduction" could,

---

[9] 8 U.S.C. § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations"); 20 C.F.R. § 655.122(d) (2025) ("The employer must provide housing at no cost to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day.").

in some circumstances, reduce an AEWR by a staggering 30%. This reduction appears to reduce AEWRs even for positions that will ultimately be filled by farmworkers who do not use employer-provided housing. These are only a few examples of how the IFR drastically cuts the AEWRs.

10.     The IFR is arbitrary and capricious also because it fails to properly consider serious reliance interests held by both U.S. and foreign farmworkers. Sharply (and promptly) reducing farmworker wages through an IFR will severely impact farmworkers—some of the most vulnerable members of our society and many of whom already live in poverty.[10] The individual Plaintiffs alone will struggle to secure safe and proper housing, pay their grocery bills, and cover necessary medical and childcare expenses. These wage cuts will also occur as inflation continues to rise, further magnifying the impact that this IFR will have on farmworkers.

11.     Third, DOL failed to comply with the APA's notice-and-comment requirements by using an interim final rulemaking without good cause. This caused immediate disruption to farmworkers, whose wages will be lowered with no notice. The "good cause" justifications on which DOL relies do not support the finding that a notice and public procedure are "impracticable, unnecessary, or contrary to the public interest."[11]

12.     The IFR is unlawful. As more U.S. employers start applying for H-2A visas subject to the new AEWRs set by the IFR, the IFR's impact on farmworker wages will continue to spread. Emergency relief is required to stymie that impact and protect U.S. farmworkers from the irreparable harm they will suffer if they must work for sub-market wages.

---

[10] NAWS Survey, *supra* note 5.

[11] 5 U.S.C. § 553(b)(B).

**JURISDICTION AND VENUE**

13.     This action arises under the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and its implementing regulations.

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331. Because this suit seeks relief other than money damages and instead challenges Defendants' unlawful actions, the United States has waived sovereign immunity from this suit. 5 U.S.C. § 702.

15.     The Court is authorized to award the requested declaratory and injunctive relief, and set aside the IFR, under 5 U.S.C. §§ 702, 703, 705, and 706; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1988; and through the equitable powers of this Court.

16.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and several Plaintiffs, including United Farm Workers, Yesenia Contreras Cervantes, Carina Martinez, and Evelyn Medina reside in this District.

17.     Plaintiffs have standing to bring this case. Defendants' actions—unless halted by this Court—will cause an imminent, concrete, and irreparable injury to the individual Plaintiffs and UFW's members.

**PARTIES**

18.     The United Farm Workers ("UFW") is the nation's first and largest farmworker labor union, founded in 1962 by César Chávez, Dolores Huerta, and others. UFW represents thousands of farmworkers across the country and is dedicated to improving wages, working conditions, and economic stability for agricultural workers. UFW's members include thousands of farmworkers employed under collective bargaining agreements, and many of those members spend part of each year working for employers that do not have a collective bargaining agreement. UFW also has direct members, farmworkers

who pay membership dues but do not currently work under collective bargaining agreements, and their wages will be depressed if the IFR remains in effect. UFW assists workers with enforcing their rights, engages in collective bargaining, and supports workers during workplace disputes, health and safety issues, wage theft, and labor violations. A core function of the UFW is to advocate for better wages for its members as part of its negotiations with employers for collective bargaining agreements, including renegotiating new terms. A lower AEWR will directly undermine its ability to achieve this objective by providing more leverage to employers in those negotiations. DOL's IFR will directly and immediately harm UFW and its members. Wage cuts of even one or two dollars per hour destabilize the incomes of farmworkers who already live at or near subsistence levels. When wages drop, UFW must divert significant staff time and resources to respond to urgent worker needs—helping workers avoid eviction, food insecurity, loss of transportation, and gaps in medical care. These impacts interfere with UFW's core mission and require the organization to redirect resources to address the economic disruption caused by the IFR. These harms are immediate, concrete, and irreparable. Moreover, the issue of fair wages for agricultural labor and services is directly germane to UFW's purpose as a farmworker union. UFW's headquarters are located in Keene, California.

19.    The UFW Foundation is a nonprofit organization and DOJ-accredited immigration legal services provider that serves over 100,000 farmworkers and immigrant community members annually. The UFW Foundation also has direct members, farmworkers who pay membership dues and rely on its services even when they do not work under collective bargaining agreements, and those members will face lower wages if the IFR remains in effect. UFW Foundation provides immigration services, emergency assistance, worker-rights education, and support for families experiencing financial instability, housing insecurity, food insecurity, or workplace abuses. The IFR will significantly increase the demand for UFW Foundation's services. Because many farmworkers live at or below the poverty line, reductions in wages immediately translate into inability to pay rent, buy food, afford transportation to work, purchase school

supplies for children, or cover out-of-pocket medical costs. UFW Foundation will be forced to divert limited resources from ongoing programs to handle emergency food assistance requests, crisis rent support, and increased casework arising from workers losing income. These harms impair UFW Foundation's ability to carry out its mission and impose real, immediate, and irreparable burdens on the organization and the communities it serves.

20.     Irene Mendoza is a U.S. citizen farmworker who has worked in packing, sorting, and picking green beans and potatoes for the last four years. She currently lives and works in Weslaco, Texas, and has also traveled to work in Wisconsin, Minnesota, Michigan, and Texas. For her last hourly wage, she was promised $20 but was only paid $17 in Michigan. Under this IFR, her actual, received hourly wage could be cut to $13.78, signifying a wage cut of $3.22. The IFR's wage cuts will harm her ability to pay for food, housing, and transportation in some of the states where she travels to work. She would have to get a second job. The cuts would prevent her from being able to afford a wide array of needed expenses like health care, everyday living costs, and her children's school expenses. She has worked in corresponding employment with H-2A workers.

21.     Claudia Garcia is a U.S. citizen farmworker in Salinas, California, who has worked in lettuce for the last five years. She was last paid $19.97 per hour, the previous California AEWR. Under this IFR, her hourly wage could be cut to $16.50, California's minimum wage, signifying a wage cut of $3.47. The wage cuts from the IFR would make her unable to cover basic necessities like rent. She would need to get a second job to cover basic needs like rent, food, gas, and other bills, at the expense of her health, her ability to spend time with her family, and the well-being of her children.

22.     Cristano Serrano is a U.S. citizen farmworker in Sunnyside, Washington, who has 45 years of experience in apples, cherries, asparagus, and tractor driving. He was most recently paid $20 per hour. Under this IFR, his hourly wage could be cut to $16.53, signifying a wage cut of $3.47. The IFR's wage cuts would make it more difficult to cover basic necessities like food and medicine to treat his asthma,

which he has developed from his agricultural work and exposure to chemicals from so many years of agricultural work. He has worked in corresponding employment with H-2A workers.

23.     Yesenia Contreras Cervantes is a U.S. farmworker in Modesto, California, who has worked in cherries, tomatoes, and apricots for the last 12 years and seven months. Through piece wage rate, she has received as high as $30.58 per hour. Under this IFR, her per hour wage could be cut to $16.50, signifying a wage cut of $14.08. The IFR's wage cuts would make her unable to pay bills, rent, food, gas, utilities, childcare, and healthcare costs. She would need to get a second job. The cuts would cause her not to have enough to take her children to school or cover costs for medicine.

24.     Jose Cruz is a U.S. farmworker in Washington with 26 years of experience with grapes. Recently, he was mostly paid the hourly wage of $20.93. Under this IFR, his hourly wage could be cut to $16.66, signifying a wage cut of $4.27. The IFR's wage cuts would cause him to seek a second job. He is also concerned that employers being able to pay H-2A workers less would cause them to prefer H-2A workers over a domestic worker like himself.

25.     Jane Doe I is a U.S. farmworker in Indio, California, who has also worked in Delano, California, with 15 years of experience in grapes, onions, radishes, peaches, and dates. As a single mother, the wage cuts would harm her by making her unable to pay for rent, food, gas, and other basic needs. She would need to get another job. She has worked in corresponding employment with H-2A workers. She is seeking anonymity because she fears employer retaliation.

26.     Jane Doe II is a U.S. farmworker who has worked in a nursery in Georgia. The IFR's wage cuts will harm her ability to afford costs for food, rent, and other needs. She would need to work additional hours in order to cover the lost wages she would suffer as a result of wage cuts. She is seeking anonymity because she fears retaliation.

27.     John Doe I is an H-2A worker in Park Hills, Missouri who has worked for the last four years in zucchini, yellow squash, acorn squash, and spaghetti squash, eggplant, okra, tomatoes. He was

most recently paid $17.83 per hour. Under this IFR, his hourly wage could be cut to $13.75, signifying a wage cut of $4.08. The IFR's wage cuts would cause him to not have enough money to afford food and essentials for his work like clothes to protect himself from the sun, gloves, and glasses. The cuts would negatively impact his ability to support his family, including his mother in the U.S. Additionally, they would affect his ability to pay for transportation to get food and go to the store. His new wages would not be enough to cover his needs, his family's needs, allow his children to study, or cover medical expenses in the U.S. He requests anonymity because he fears that his employer will retaliate against him by not recalling him next season.

28.     Francisco Alvares Flores is a U.S. farmworker in Indio, California, who has worked with the crops of grapes, chilies, cilantro, spinach, and broccoli for 39 years. He was most recently paid $17.50 per hour. Under this IFR, his hourly wage could be cut to $16.50, signifying a wage cut of $1.00. He was already struggling to maintain basic necessities, and the IFR's wage cuts will further challenge him in covering rent, food, payments for his vehicle, and bills. The wage cuts would cause him to have to get a second job and limit his spending on necessities, which he can barely cover now. He is concerned that cuts to his wages with cause him to be homeless. The cuts will harm his ability to support his family, pay for school, and cover medical expenses.

29.     Juan Manuel Flores Ayala is a U.S. citizen farmworker in Coachella, California, who has worked with grapes, peaches, nectarines, and various kinds of vegetables for 38 years. The IFR's wage cuts would impact his ability to access food, utilities, clothes, shoes, car and insurance payments. The cuts would cause him to need another job and to move from where he currently lives. They would impact his ability to pay child support and support his family.

30.     Aaron Grimaldo is a U.S. farmworker with 12 years of experience in picking and packing potatoes and transporting produce from fields to warehouses. He currently lives in Weslaco, Texas, but has also worked in Wisconsin, Minnesota, and Michigan. For his last hourly wage, he was promised $20

but only paid $17.50 in Michigan. Under this IFR, his actual, received hourly wage could be cut to $13.78; signifying a wage cut of $3.72 The IFR's wage cuts would cause him not to be able to pay for food and gas for transportation. He would have to make cuts to groceries, gas, and other necessities. He would likely have to move due not to being able to afford rent where he currently lives.

31.     Margaret DeAnda Magallon is a U.S. citizen farmworker in Kalamazoo, Michigan, with one year of experience with apple and blueberry crops. The IFR's wage cuts threaten to cause her to have to work extra hours, get a second job, and possibly seek food banks for assistance.

32.     Carina Martinez is a U.S. citizen farmworker in Fresno, California, with four years of experience in packaging grapes and onions. Wage cuts from the IFR threaten her ability to pay for food, rent, and health insurance. She has worked in corresponding employment with H-2A workers.

33.     Evelyn Medina is a U.S. citizen farmworker in Arvin, California, with ten years of experience working with onions. The IFR's wage cuts would affect her ability to afford rent, food, gas, and other essentials. She would have to take a second job to pay for bills and food. The cuts would also affect her ability to go to college.

34.     Isabel Rinton Panfilo is a U.S. citizen farmworker in Oxnard, California, with experience in the strawberry fields. Through a piece wage rate, she has received as high as $19.35 per hour. Under this IFR, her wage per hour could be cut to $16.50, signifying a wage cut of $2.85. The IFR's wage cuts would limit her ability to cover expenses like food, rent, childcare, and the support that she provides to her family. The wage cuts would cause her to not have enough for basics like going to the laundromat to wash clothes and being able to afford medical appointments. She would need another job and to move if she wanted to cover rent, food, transport, and other necessities.

35.     Celeste Whittle is a U.S. citizen farmworker with three years of experience with blueberries, packing, and sorting. She currently lives and works in Weslaco, Texas, and has also worked in Michigan. The IFR's wage cuts would cause her struggle to pay bills and make her fall behind on

payments. They would cause her difficulty in having enough to eat, forcing her family to rely on food donations. The cuts would make it more difficult for her to afford school supplies and uniforms for her two children. And she would suffer delays in paying property and vehicle taxes, resulting in additional financial penalties, making it even harder to achieve financial security and stability. The wage cuts would likely cause her to move in with family members. They would also likely cause her to seek a second job. The wage cuts would force her to limit spending on essential household and hygiene items, including toilet paper, menstrual products, grooming supplies for her children, and other basic necessities. Her children suffer from allergies that require the use of specific cleaning products and hypoallergenic materials. With a reduction in wages, obtaining these specialized products would become even more challenging, potentially compromising her family's health and living conditions. She has worked in corresponding employment with H-2A workers.

36.     Fortino Lopez is a U.S. farmworker with 40 years of experience in grapes in Washington. He was most recently paid $20.90 per hour. Under this IFR, his hourly wage could be cut to $16.53, signifying an hourly wage cut of $4.37. These wage cuts would affect his ability to afford food and support his family, including helping his son attend college. He might need to take another, non-agricultural job.

37.     Jesus Lopez is a U.S. farmworker with 40 years of experience in grapes in Washington. His most recent hourly wage rate was $18.88. Under this IFR, his hourly wage could be cut to $16.53, signifying an hourly wage cut of $2.35. These wage cuts would impact his ability to afford basic needs like transportation and cause him to reduce his spending and seek another job.

38.     Defendant United States Department of Labor is a federal agency of the United States. It is responsible for setting minimum wages under the H-2A foreign guestworker visa program and certifying that employers are permitted to hire foreign guestworkers under that program.

39.     Defendant Lori Chavez-DeRemer is the United States Secretary of Labor. The Secretary is ultimately responsible for all functions of the United States Department of Labor, including setting

minimum wages under the H-2A foreign guestworker visa program and certifying that employers are permitted to hire foreign guestworkers under that program. She is sued in her official capacity.

40.    Defendant Lori Frazier Bearden is the Acting Assistant Secretary for Employment and Training. The Assistant Secretary for Employment and Training is responsible for overseeing and managing various employment and training programs with the Department of Labor, including administering the H-2A foreign guestworker visa program, reviewing applications, and issuing temporary labor certifications. She is sued in her official capacity.

## FACTS

### A.   Background

### 1.    *Congress enacted the H-2A program that permits employers to hire temporary foreign farmworkers, but only if, among other requirements, doing so will not adversely affect the wages of similarly employed U.S. workers.*

41.    The origins of the H-2A temporary agricultural guestworker program trace back to 1942 with the Bracero program, a bilateral agreement between the U.S. and Mexico to allow the entry of Mexicans into the U.S. for temporary work during the World War II labor shortage.[12] During this time, the Bracero program "was the chief source of foreign labor in the United States."[13] "From the beginning of the Federal Government's involvement in the lawful importation of foreign agricultural workers . . . the Government has sought to protect similarly employed U.S. workers from the adverse effect such employment would have on their wages."[14] Nevertheless, empirical evidence shows that the program did significantly affect the wages of U.S. agricultural workers.[15]

---

[12] 54 Fed. Reg. 28039 (July 5, 1989).

[13] Robert C. McElroy & Earle E. Garett, USDA Econ. Research Serv., *Termination of the Bracero Program: Some Effects on Farm Labor and Migrant Housing Needs*, Agric. Econ. Rep. No. 77 (June 17, 1965).

[14] 54 Fed. Reg. at 28039.

[15] *See, e.g.*, Cong. Rsch. Serv., *The Effects on U.S. Farm Workers of an Agricultural Guest Worker Program* 4–5 (Dec. 28, 2009), https://perma.cc/M4P2-97G3.

42.     In 1952, Congress passed the Immigration and Nationality Act ("INA").[16] The INA created a broad class of temporary, non-immigrant "H" visas for admission of foreign workers to provide temporary or seasonal labor in sectors of the economy with shortages of U.S. workers.[17] At that time, the INA did not distinguish between agricultural and non-agricultural workers.[18] Instead, the INA provided generally for admission to the United States of a person "having a residence in a foreign country which he has no intention of abandoning . . . who is coming temporarily to the United States to perform . . . temporary services or labor, *if unemployed persons capable of performing such service or labor cannot be found in this country*."[19] And "[s]ince at least 1953, 'employers seeking to import foreign nationals to work in various crop activities . . . were required to pay not less than a wage established by DOL.'"[20] In the 1960s, establishment of Adverse Effect Wage Rates ("AEWRs") became more formalized for the H-2 program.[21]

43.     The Immigration Reform and Control Act of 1986 ("IRCA") altered the H-2 program by distinguishing between agricultural (H-2A) and non-agricultural (H-2B) workers.[22] Notably, the IRCA sets no numerical cap on the number of H-2A visas that may be issued.[23] IRCA further required that employer H-2A visa petitions certify that (1) there are not enough qualified U.S. workers available to fill the seasonal agricultural positions, and (2) similarly employed U.S. workers' wages and working

---

[16] P.L. 82-414, 66 Stat. 163 (1952).

[17] *See Id.*

[18] *Id.*

[19] *Id.* (emphasis added).

[20] 90 Fed. Reg. at 47916 (quoting 54 Fed. Reg. at 28039).

[21] *See, e.g.*, 29 Fed. Reg. 19101 (Dec. 30, 1964).

[22] Pub. L. 99-603, 100 Stat. 3445.

[23] *Id.*

conditions will not be adversely affected.[24] Moreover, under IRCA, the Secretary of Labor must issue findings "that aliens not be admitted under [the H-2A program] unless there are not sufficient workers in the United States who are able, willing, and qualified to perform the labor or service needed and that the employment of the aliens in such labor or services *will not adversely affect the wages* and working conditions of workers in the United States similarly employed."[25]

44.    Absent the "no adverse effect" requirement, employers would have every incentive to hire H-2A workers at sub-market wages. Many temporary foreign farmworkers would accept substandard wage rates given the costs and conditions in their own countries. Further, H-2A workers are generally vulnerable, giving them little bargaining power and ensuring that their wages will remain depressed. H-2A workers are dependent on their employers for their visa status and work and must keep their employers satisfied if they wish to remain in the United States, making them highly unlikely to seek higher wages or complain about working conditions.[26] Further, employers enjoy tax savings if they employ H-2A workers because they do not need to pay Federal Insurance Contributions Act and Federal Unemployment Tax Act taxes on their wages.[27] These dynamics would make H-2A workers more appealing than similar U.S. workers.

### 2.    DOL has adopted a series of methodologies for calculating the AEWRs applicable to the relevant farmworker positions.

45.    To implement IRCA's "no adverse effect" requirement, DOL has historically set AEWRs that strive to "approximate the equilibrium wage that would result absent an influx of temporary foreign

---

[24] *Id.*

[25] *Id.* (emphasis added).

[26] *Second Class Workers: Assessing H2 Visa Programs Impact on Workers: Hearing before the House Education and Labor Subcommittee on Workforce Protections*, 118th Cong. (2022) (statement of Teresa Romero, President, United Farm Workers) (hereinafter "Romero").

[27] 26 U.S.C. §§ 3121(b)(1), 3306(c)(1)(b).

workers" and thus "put incumbent farm workers in the position they would have been in but for the H–2A program."[28]

46.    On July 5, 1989, DOL issued a regulation stating that employers that utilize the H-2A program must pay a wage that is the highest of (1) the AEWR, (2) the prevailing wage rate, (3) an agreed-upon collective bargaining wage, or (4) any applicable minimum wage.[29] The 1989 methodology based the AEWR on the "level of actual average hourly agricultural wages for each State, as surveyed by the U.S. Department of Agriculture."[30] The survey in question was the Agricultural (Farm) Labor Survey ("FLS"). In the 1989 Rule, DOL noted that this was "the best available data on hourly wages in the agricultural sector."[31] It reiterated this point in the 2010 Rule.[32]

47.    DOL has relied on the FLS, almost without interruption, since 1989.[33] Indeed, in 2011, DOL began funding the FLS.[34]

48.    DOL at times has modified the AEWR methodology. In 2008, for example, it established more localized wages and introduced skill levels, before reversing course in 2010 because "the 2008 Final Rule . . . led to significant decreases in farm worker wage[s]."[35]

---

[28] 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).

[29] *See* 20 C.F.R. 655.120(a). There was a previous version of the regulation that also relied on the Farm Labor Survey issued in 1987, 52 Fed. Reg. 20496 (June 1, 1987), but this rule was invalidated by a court in *AFL-CIO v. Brock*, 668 F. Supp. 31 (D.D.C. 1987).

[30] 54 Fed. Reg. at 28038.

[31] *Id.* at 28041.

[32] 75 Fed. Reg. at 6891–92.

[33] *United Farm Workers v. U.S. Dep't of Lab.*, 509 F. Supp. 3d 1225, 1231 (E.D. Cal. 2020).

[34] *Id.*

[35] 75 Fed. Reg. at 6893.

49.     In 2020, the U.S. Department of Agriculture ("USDA") announced that it was suspending the FLS, and DOL established a final rule that would calculate the AEWRs without the FLS.[36] The rule would have frozen wages for two years, and subsequently would have based calculations on the Employment Cost Index—"an index that measures the change in the cost of labor by surveying various private industries, but notably excluding farms and agricultural workers."[37] Both the suspension of the FLS and the interim final rule were enjoined and ultimately abandoned.[38]

50.     In 2023, DOL published a final rule altering the methodology for calculation of the AEWR.[39] This rule based each AEWR on the highest annual average hourly gross wage in the state or region reported from either the USDA FLS or the Bureau of Labor Statistics' Occupational Employment and Wage Statistics ("OEWS") survey broken down by Standard Occupational Classification ("SOC") for the covered job duties, depending on which survey was used for that SOC.[40] The rule was challenged in court, and ultimately vacated in August of this year.[41] Shortly after vacatur of the 2023 rule, DOL announced that it would revert to the 2010 AEWR methodology to set AEWRs.

### 3.     *For decades, the average wage rate for farmworkers has steadily increased.*

51.     Although the regulatory framework has changed through time, the upward trend in average wages for farmworkers in the relevant sectors—and thus, AEWRs—has remained consistent. Until now,

---

[36] 85 Fed. Reg. 70445 (Nov. 5, 2020).

[37] *UFW*, 509 F. Supp. 3d at 1233.

[38] *Id.* at 1255; *United Farm Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020).

[39] 88 Fed. Reg. 12760 (Feb. 28, 2023).

[40] *Id.*

[41] *Teche-Vermilion Sugar Cane Growers Ass'n Inc. v. Chavez-Deremer*, No. 6:23-cv-00831 (Aug. 26, 2025).

the AEWR has consistently increased since 2010.[42] For example, in California, the rate was $5.90 in 1990; by 2000, it was $7.27, and by 2008 it had increased to $9.72.[43] The most recent rate was $19.97.[44] In Michigan and Minnesota, the 1990 rate was $4.45 and the 2008 rate was $10.01.[45] The most recent rate in Michigan was $18.15.[46] These increases are comparable to and indeed reflect increasing farmworker wages for non-H-2A workers, and even increasing farmworker wages in Mexico.[47]

52.    Since the 1990s, the AEWRs have generally increased over time, and they have increased on average by about 4% per year.[48] If the new AEWR was based off of the FLS survey data collected in April 2025, the AEWR would increase by 3%.[49]

53.    Additionally, the AEWRs generally exceed applicable minimum wages. For example, in 2008, in Indiana, Nebraska, North Dakota, and South Dakota, the AEWR exceeded the state minimum wage by $4.05 per hour.

54.    It is unsurprising that farmworkers would command competitive wages. As the IFR acknowledges: "[A]gricultural work requires a distinct set of skills and is among the most physically demanding and hazardous occupations in the U.S. labor market. These essential jobs involve manual labor,

---

[42] Peter Feather, *The Adverse Effects Wage Rate Used for the H-2A Program*, Univ. of Cal. Davis (May 21, 2025), https://perma.cc/CE3Y-ZD49.

[43] William G. Whittaker, Cong. Rsch. Serv., RL32861, Farm Labor: The Adverse Effect Wage Rate (AEWR) (2008).

[44] Lucas Smith & Richard Stup, *Major H-2A Wage Changes: Overview of New AEWR Methodology*, Corn. Agric. Workforce Dev. (last visited Nov. 20, 2025), https://perma.cc/952N-SVJN.

[45] Whittaker, *supra* note 43.

[46] Smith & Stup, *supra* note 44.

[47] *See* Elizabeth Weber Handwerker, Cong. Rsch. Serv., R48614, Rising Agricultural Wages: Context for Congressional Interest in the H-2A Visa Program (2025).

[48] Zachariah Rutledge et al., *H-2A Adverse Effect Wage Rates and U.S. Farm Wages*, Am. J. Agric. Econ. (June 9, 2025), https://perma.cc/6EFE-UJ2T.

[49] *April Hired Workers Up 3 Percent; Gross Wage Rate Increased 3 Percent from Previous Year*, U.S. Dep't of Agric. (May 21, 2025), https://perma.cc/JA5F-9BBN.

long hours, and exposure to extreme weather conditions—particularly in the cultivation of fruit, tree nuts, vegetables, and other specialty crops for which production cannot be immediately mechanized."[50]

55.     As AEWRs have increased, so too have agricultural profits. For example, according to the USDA: "Net farm income, a broad measure of profits, is forecast at $179.8 billion for calendar year 2025," and "[a]fter adjusting for inflation, net farm income is forecast to increase by $48.8 billion (37.2%) in 2025 relative to 2024. With this expected increase, 2025 net farm income would remain above its 20-year average (2005–24) in inflation-adjusted dollars."[51]

**B.    The IFR adopted a new methodology that drops AEWRs and likely depresses the wages of many U.S. farmworkers.**

56.     On October 2, 2025, DOL published the IFR, which instituted a new AEWR methodology that went into effect immediately.[52]

57.     In the IFR, DOL fundamentally altered the methodology for calculating AEWRs, ensuring that they will not protect U.S. farmworker wages from the adverse effects of H-2A hiring.

58.     The IFR not only requires DOL to generally look to a data source—the OEWS survey—that currently does not even survey farm establishments, but it also institutes a number of changes that significantly lower AEWRs. Under the IFR, AEWRs will fall far below the wages similarly employed U.S. workers would be expected to receive but for the H-2A program, thus all but guaranteeing a substantial drop in the wages of most of those U.S. workers.

59.     Multiple features of the IFR are arbitrary and capricious.

***1.    The IFR relies on a tiered wage system that depresses AEWRs.***

60.     The IFR adopted an arbitrary dual-tier system that will depress AEWRs.

---

[50] 90 Fed. Reg. at 47922.

[51] U.S. Dep't of Agric., Econ. Rsch. Serv. *Farm Sector Income & Finances: Highlights from the Farm Income Forecast* (Sept. 3, 2025), https://perma.cc/TLB7-N7MG.

[52] 90 Fed. Reg. at 47914.

61.     At the outset, to determine the AEWR for any particular H-2A position under the IFR's methodology, the position must first be classified under the Office of Management and Budget's Standard Occupation Classification ("SOC") system. The SOC classifies jobs into occupation categories based on the duties associated with those jobs.[53] When an employer applies for authorization to fill a particular position with H-2A workers, it provides a written description of responsibilities and duties for that position, which is then used to determine the SOC code that will apply to that position.

62.     Although there are hundreds of SOC codes, there are five (the "Big Five") that encompass the most common H-2A occupations.[54] The Big Five are: (1) farmworkers and laborers, crop, nursery and greenhouse workers, (2) farmworkers, farm, ranch, and aquaculture animals, (3) agricultural equipment operators, (4) packers and packagers, hand, and (5) graders and sorters, agricultural products.[55]

63.     The IFR adopts two tiers within each SOC category: Skill Level I and Skill Level II.

64.     Skill Level I jobs are those which, in theory, are more entry-level positions that require workers with limited to no formal education or specialized training credentials and require extensive oversight.[56] Skill Level I jobs also (again, in theory) typically require workers with little to no work-related experience or may require a short demonstration on how to perform the job.[57]

65.     Skill Level II jobs require workers with more training credentials (and possibly licensures or certificates), require performance of more complex tasks, and typically require some supervisory duties.[58]

---

[53] *See generally*, 2018 Standard Occupational Classification System, U.S. Bureau of Lab. Stat., https://perma.cc/2PU5-XXG7; All Occupations, O*Net OnLine, https://perma.cc/VM6N-9BY8.

[54] 90 Fed. Reg. at 47935.

[55] *Id.*

[56] *Id.* at 47932.

[57] *Id.*

[58] *Id.*

66.     The IFR adopts an arbitrary standard for determining which Skill Level applies to a particular job. The IFR classifies H-2A jobs as either a Skill Level I or Skill Level II position "based on the totality of the circumstances of an employer's job offer,"[59] a malleable standard that allows employers to classify a job as a Skill Level I position even if the job requires the performance of many complicated tasks.

67.     Additionally, because Skill Level II positions may require *formalized* training, positions filled by farmworkers with decades of experiences may nevertheless be classified as Skill Level I positions because they require no formal, specialized training and credentials. In fact, many agricultural jobs will fall within the Skill Level I classification precisely because training credentials and certificates are not typically required for agricultural jobs. DOL has thus previously opined that "[b]y their very existence . . . multiple wage rates . . . stratify wages and inappropriately allow employers to force much of the wage-earning workforce into a lower wage."[60]

68.     A Skill Level determination is based on the employer's description of the position in the job order, without regard for the experience or training of the worker that will eventually fill the position. Thus, though there may be no meaningful difference between the employees filling certain Skill Level I positions and those filling certain Skill Level II positions, those positions will still be classified differently. In fact, many Skill Level I positions may be filled by workers who possess skills and experience that exceed those of many who fill Skill Level II positions.

---

[59] *Id.* at 47933.

[60] 75 Fed. Reg. at 61580.

69.     On information and belief, most H-2A workers will likely be classified as Skill Level I. Indeed, in calculating the economic effects of its methodology, the IFR appears to estimate that *92%* of H-2A positions will be placed in the Skill Level I category.[61]

70.     The IFR adopts an arbitrary standard for determining the AEWR that applies to each Skill Level group in each SOC Code. In particular, those positions that fall within Skill Level I will qualify for an AEWR that is set at only the *17th percentile* of wages for the relevant sector. Stated differently, the AEWR for a Skill Level I position within a Big Five SOC category will be lower than the wages earned by *83%* of farmworkers holding positions within that category.

71.     Those holding Skill Level II positions fare better, but not by much. Those positions within Skill Level II for any Big Five SOC category will qualify for an AEWR that is set at the 50th percentile of wages for that category. Thus, although those in Skill Level II are presumed to have formalized training and often take on more significant, managerial roles, their AEWR rate will equal the average wage paid to all workers within the Big Five categories—including workers occupying Skill Level I positions.

72.     The difference in AEWRs between Skill Level I and Skill Level II workers can vary; in Montana, for example, it is over $5.[62]

73.     This tiered system ensures that AEWRs will in no way resemble the market rates for the relevant farmworker positions. Again, most H-2A positions (possibly 92%) are expected to be classified as Skill Level I, and yet the AEWR for those positions will not equal even the average wage for positions within the applicable SOC code, but rather a wage that is earned by the *bottom 17%* of farmworkers occupying positions in that SOC code. And those positions classified under Skill Level II, by contrast,

---

[61] 90 Fed. Reg. at 47955 (calculating the "total wage" under the IFR's methodology based on a "weighted average of . . . entry-level and experienced wages, with 92% weight on the entry level wage," where "Entry Level" is understood to mean "Skill Level I").

[62] *Id.* at 47926–27.

will receive only the average wage for all positions in the applicable SOC code, rather than the elevated wage that one would expect for Skill Level II positions.

74.    The IFR's two-tier system is effectively a mechanism to depress farmworker wages.

2.    ***The IFR appears to apply an across-the-board housing deduction to AEWRs for H-2A workers, reducing them by up to 30%.***

75.    By statute and regulation, U.S. employers that hire H-2A workers are required to provide them with housing.[63] As made expressly clear in existing regulations, employers "must provide housing *at no cost* to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day."[64] Thus, the employers may not deduct, from farmworker wages, the costs spent on housing for farmworkers.[65]

76.    The IFR, however, flouts existing regulations. Now, DOL will apply a downward Adverse Compensation Adjustment ("Adjustment" or "housing deduction") to AEWRs for foreign guestworkers sponsored under the Application for Temporary Employment Certification.[66]

77.    DOL calculates the downward Adjustment by relying on the so-called Fair Market Rents ("FMR") for a four-bedroom housing unit available from the Department of Housing and Urban Development ("HUD").[67] Notably, HUD's website clarifies that these rates are not true FMRs due to outlier rental rates in some areas.[68]

---

[63] 8 U.S.C. § 1188(c)(4).

[64] 20 C.F.R. § 655.122(d)(1)

[65] *Id.*

[66] 90 Fed. Reg. at 47926.

[67] *Id.* at 47948.

[68] 50th Percentile Rent Estimates, Dep't of Hous. and Urb. Dev. Off. Pol'y Dev. & Rsch. (2025), https://perma.cc/4AUZ-PBQK.

78.     This Adjustment can be significant, ranging from a $0.71 per hour in Puerto Rico to $3.18 per hour in Hawaii.[69] The IFR caps this adjustment at an astonishing 30%—*i.e.*, in some circumstances, an AEWR can suffer a nearly one-third reduction.[70]

79.     This Adjustment is likely to exceed the value of the housing that H-2A workers receive from their employers. For example, the Adjustment is calculated by determining how much would have to be deducted per hour to cover housing *assuming the H-2A laborer works a 40-hour workweek*.[71] The Adjustment, however, will apply each and every hour that the H-2A laborer works, even if she works more than 40-hours in a given week, producing a windfall for the employer. In fact, DOL currently appears to be authorizing the use of H-2A labor for job-orders that, on their face, require more than 40 hours per week.

80.     Further, DOL does little to confirm that the value of housing provided to H-2A workers is comparable to the value of a four-bedroom unit available from HUD.

81.     It appears that this housing deduction could apply to any and all AEWRs for H-2A workers, regardless of whether those AEWRs apply to positions that are ultimately filled by H-2A workers who reside in employer-provided housing. When employers seek authorization to use H-2A labor to fill particular positions—and when appropriate AEWRs are assigned to those positions—the employers generally do not know which particular H-2A workers will occupy those positions (and thus, at that stage, they cannot confirm that those workers will need employer-provided housing).

82.     In practice, it appears that the housing deduction under the IFR has thus far been applied broadly to all, or nearly all, AEWRs for H-2A workers.

---

[69] 90 Fed. Reg. at 47926–27.

[70] *Id*. at 47948 ("the standard hourly adjustment factor will not exceed 30 percent of the hourly AEWR determined for the employer's job opportunity").

[71] *Id*. at 47949.

83.   The downward Adjustment will obviously undercut and adversely affect the wages paid to similarly employed U.S. workers. It drastically reduces the amount that U.S. employers must pay H-2A guestworkers, which in turn will likely adversely impact the wages of similarly employed U.S. workers.

84.   DOL attempts to justify the downward Adjustment by stating that, if H-2A workers receive free temporary housing, without a corresponding downward adjustment to the AEWR, they are compensated at a rate that exceeds the wage of comparable U.S. workers. But that has it backwards: if H-2A workers are compensated at a higher level—because they receive free temporary housing and a salary matching the AEWR (with no housing deduction)—they are more expensive vis-à-vis U.S. workers, making the latter more attractive to employers.

85.   Paradoxically, by sparing employers from having to truly provide H-2A workers with free housing, the IFR protects the *employers* (rather than U.S. workers) from the "adverse effects" of hiring H-2A workers.

86.   Further, existing regulations still require employers to provide housing at no cost to non-H-2A workers "in corresponding employment who are not reasonably able to return to their residence within the same day."[72] The IFR's regulatory changes do not affect this requirement. Thus, if employers must provide housing at no cost to U.S. farmworkers, but can deduct that cost from H-2A workers' wages, the IFR disincentivizes the hiring of U.S. farmworkers, adversely affecting their wages and working conditions.

*3.     DOL's new methodology for calculating AEWRs relies on survey data that currently does not cover farm establishments.*

---

[72] 20 C.F.R. § 655.122(d)(1).

87.    The IFR requires DOL to rely on the OEWS survey even though it does not accurately capture the market rates that U.S. laborers would receive for the relevant farmworker positions. That survey currently only "covers wage and salary workers in nonfarm establishments."[73]

88.    The OEWS survey is a semi-annual survey of *non-farm* employers completed by the Bureau of Labor Statistics and State Workforce Agencies to obtain occupational employment and wage rate estimates. The OEWS estimates are based on a sample of about 1.1 million establishments collected over a 3-year period.[74] For example, the May 2024 OEWS estimates were produced by a model-based estimation method using three years of OEWS data.[75] That data is based on employment and wage information collected from *non-farm* establishments like farm labor contractors.[76] Significantly, the OEWS survey sample is drawn from the database of businesses reporting to the state unemployment insurance programs, where many farm establishments are exempt from coverage. The survey publishes wage estimates by occupation for a wide array of local, state, and national geographic areas across all non-farm industries, but does not publish wage estimates within the "Crop Production" or "Animal Production" industries that were previously covered by the FLS.[77]

89.    The FLS previously surveyed farm establishments, like farm operators, landscape architects, and other agricultural businesses to provide comprehensive and representative data to calculate AEWRs. The OEWS survey has never surveyed farm establishments.

---

[73] U.S. Bureau of Lab. Stat., *Occupational Employment and Wage Statistics* (last updated Apr. 2, 2025), https://perma.cc/F844-CEBR.

[74] *Id.*

[75] *Id.*

[76] 90 Fed. Reg. at 47919.

[77] *Id.* at 47930.

90.    The OEWS wage data available for agricultural workers comes only from non-farm establishments, such as labor contractors that support farm establishments.[78]

91.    DOL acknowledges that the OEWS survey has never been used to survey farm establishments and will need to be modified in concert with the USDA to collect more representative data starting in 2026.[79] Though the OEWS survey may start collecting data from farm establishments in 2026, the IFR states that "the expanded OEWS survey collection may start to reflect occupational employment and wage information into the . . . AEWRs from farm establishments" only "on and after *the May 2027 release*."[80] Furthermore, the OEWS data is based on a three-year reporting cycle, meaning it is unclear how it can produce accurate farm wages before 2029.[81] Nonetheless, the IFR called on DOL to calculate AEWRs using OEWS data starting immediately, even though it is unrepresentative of farm establishments and farmworkers.

### 4.    The IFR alters how SOC Codes are assigned based on a new "Primary Duty" test.

92.    When an employer submits a job order as part of an H-2A application, DOL and state workforce agencies ("SWA") will determine which SOC code applies to the position based on its job description. Under the 2023 AEWR rulemaking, if a job order included duties or responsibilities corresponding with multiple SOC codes, DOL would assign the SOC code with the highest AEWR.[82]

93.    The IFR modified the standards associated with assigning SOC codes to farmworker positions. The IFR adopted a new "primary duty" test under which DOL and SWA assigns an SOC code to a position based on duties the workers are expected to perform for the majority, over 50%, of the

---

[78] *Id.* at 47929.

[79] *Id.* at 47931–32.

[80] *Id.* at 47929.

[81] *Id.* at 47949.

[82] *Id.* at 47918.

workdays during the contract period.[83] Thus, if a job order requires a farmworker to spend 49% of her time performing tasks that fall under an SOC code that is subject to a higher AEWR, and 51% of her time performing tasks that fall under an SOC code that is subject to a lower AEWR, the job *as a whole* will be assigned the SOC code to which the lower AEWR applies (even though the job requires a substantial amount of work that would be classified under a higher-paid SOC code).

94.     This primary duty test—or 49% test—will depress the wages for H-2A positions that involve complex work that would otherwise be assigned SOC codes that qualify for higher AEWRs. The primary duty test will consequently adversely affect the wages of similarly employed U.S. workers who also perform complex work.

95.     For example, certain SOC codes—like those for tractor-trailer truck drivers, construction workers, shuttle drivers, and carpenters—generally qualify for AEWRs that are higher than those applicable to the AEWRs for the Big Five codes. U.S. workers that hold positions requiring them to spend a meaningful amount of time on tasks falling within those higher-paying SOC codes could be adversely affected by the primary duty rule because employers could hire H-2A workers to perform those same tasks, but pay them based on the lower, Big Five AEWR simply by structuring the H-2A job description so that it technically requires the job holder to spend 51% of their time on Big Five agricultural tasks.

96.     At bottom, the IFR, through several arbitrary mechanisms, will materially lower AEWRs. In fact, DOL concedes that many farmworkers will face reduced wages under the IFR. The IFR explicitly acknowledges that changing the methodology will lead to a reduction in AEWRs. This will lower wages for H-2A workers which, in turn, will likely also reduce the wages of the "similarly employed" U.S.

---

[83] *Id.* at 47940; 20 CFR § 655.120(b)(7).

workers whose wages DOL is statutorily required to protect from adverse effects caused by the H-2A program.[84]

97.    The IFR will lead to AEWRs that are below the market rates that, but for the H-2A program, U.S. farmworkers would have received for filling the jobs at issue. In fact, the IFR effectively concedes that the AEWRs in place just before the IFR went into effect were likely also below the relevant market rates. The IFR notes that recent efforts to "enforce immigration laws" have resulted in "labor shortages" because the "agricultural sector . . . long depended on a workforce with a high proportion of illegal aliens."[85] "[E]conomic theory holds that, under conditions of an emerging labor shortage, the previously observed wage (prevailing local wage) may not reflect the equilibrium [*i.e.*, the market] wage" and so "the observed wage would increase by any amount sufficient to attract more workers until supply and demand were met in equilibrium."[86] To put it differently: if there are not enough U.S. workers willing to accept positions previously occupied by foreign farmworkers who lacked work authorization, then that means the wages being offered to those U.S. workers are below the market rates. In a standard market, the expected outcome would be an *increase in wages*. Those increased wages would then, in turn, place upward pressure on the AEWRs (since the AEWRs, in theory, are supposed to be based on data concerning market rates). The IFR, however, takes the precise opposite approach: rather than increase AEWRs so that they more likely track the appropriate market rates, it *decreases* the AEWRs, and allows employers to pay foreign workers those sub-market rates—all to the detriment of U.S. farmworkers. The IFR deliberately reduces AEWRs and thus necessarily creates a significant risk of adverse effects on the wages of similarly employed U.S. workers.

---

[84] 90 Fed. Reg. at 47928.

[85] *Id*. at 47921–22.

[86] 75 Fed. Reg. at 6891.

### C. The IFR will significantly and irreparably harm both H-2A workers and similarly employed U.S. workers.

98.     There are roughly 2.4 million farmworkers in the United States, and approximately 315,000 temporary foreign guestworkers hired through the H-2A program.[87] Many U.S. workers work alongside H-2A workers at H-2A program employers, and their wages are often determined by the AEWRs established under the H-2A program. The AEWR is meant to protect U.S. workers' wages from decreasing in response to an influx of foreign guestworkers, but DOL's new methodology takes away that protection.

99.     The IFR—which governs the wages of H-2A workers—and its tiered system will significantly reduce the wages of H-2A workers, which in turn will likely result in similarly employed U.S. workers being paid materially less than they would have been under the regulatory regime preceding the IFR. For example, a job order with SOC 45-2092 for Farmworkers and Laborers, Crop, Nursery, and Greenhouse Occupational Title has an OEWS mean of $16.39 in North Carolina, a major H-2A user state. But the Skill Level I wage rate would be $12.78, a 22.03% drop. As another example, a shuttle driver in the Fort Myers area of Florida would have an average wage of $16.16 based on May 2024 OEWS data.[88] However, the average wage decreases to $12.55 if the shuttle driver is designated Skill 1. If the majority of time is spent performing basic farm labor—which, under the primary duty rule, would result in a different SOC classification—the rate would be $12.47 if designated Skill Level I and $15.06 if designated Skill Level II.

---

[87] Farm Labor, U.S. Dep't of Agric. (Sept. 12, 2025), https://perma.cc/HSP4-Y3HC.

[88] *Occupational Employment and Wage Statistics Query System*, U.S. Bureau of Lab. Stat. (Apr. 3, 2024), https://perma.cc/L2X2-35TZ.

100.    These changes are exemplified by the chart below, reflecting information compiled by Cornell University, which shows how sweeping the decreases will be[89]:

| State | Previous AEWR | New AEWR for Domestic Employees in Corresponding Employment | | Adverse Compensation Adjustment | New AEWR w/ Adverse Compensation Adjustment for H-2A | |
|---|---|---|---|---|---|---|
| | | Skill Level I | Skill Level II | | Skill Level I | Skill Level II |
| New York | $18.83 | $15.68* (NYS minimum wage will apply in 2026: $16.00 in upstate and $17.00 in NYC/Long Island) | $18.75 | ($2.40) | $13.28* (NYS minimum will apply in 2026: $16.00 in upstate and $17.00 in NYC/Long Island) | $16.35* (This wage will apply in upstate, NYC/Long Island will be required to pay the regional minimum wage of $17.00 in 2026) |
| California | $19.97 | $16.45* (CA minimum of $16.90 will apply effective Jan. 1, 2026) | $18.71 | ($3.00) | $13.45* (CA minimum of $16.90 will apply effective Jan. 1, 2026) | $15.71* (CA minimum of $16.90 will apply effective Jan. 1, 2026) |
| Florida | $16.23 | $12.47* (FL minimum of $14.00 will apply) | $15.06 | ($2.29) | $10.18* (FL minimum of $14.00 will apply) | $12.77* (FL minimum of $14.00 will apply) |
| Georgia | $16.08 | $12.27 | $16.22 | ($1.75) | $10.52 | $14.47 |
| Massachusetts | $18.83 | $15.29 | $17.57 | ($2.42) | $12.87 | $15.15 |
| Michigan | $18.15 | $13.78 | $17.47 | ($1.32) | $12.46*(MI minimum of $12.48 may apply) | $16.15 |
| New Jersey | $17.96 | $16.05 | $19.41 | ($2.28) | $13.77* (NJ minimum of $14.20 will apply effective Jan. 1, 2026) | $17.13 |
| North Carolina | $16.16 | $12.78 | $16.39 | ($1.69) | $11.09 | $14.70 |
| Pennsylvania | $17.96 | $13.88 | $17.99 | ($1.52) | $12.36 | $16.47 |
| Washington | $19.82 | $16.53* (WA minimum of $17.13 will apply effective Jan. 1, 2026) | $19.00 | ($2.49) | $14.04* (WA minimum of $17.13 will apply effective Jan. 1, 2026) | $16.51* (WA minimum of $17.13 will apply effective Jan. 1, 2026) |
| Wisconsin | $18.15 | $13.29 | $18.22 | ($1.29) | $12.00 | $16.93 |

---

[89] Smith & Stup, *supra* note 44.

101.    These decreases go directly against the historical trend of farmworker market wages and thus undermine the AEWR's core objective of preventing an adverse effect on U.S. farmworkers. From 1996 to 2022, on average, the AEWR increased across the different regions of the United States by 4% every year.[90] In the IFR itself, DOL calculates that the national average of the AEWR has more than doubled from 2005 ($8.56) to 2025 ($17.74).[91] From 2019 onward, the average annual increase to the AEWR was 5.5%.[92] An AEWR *freeze* of one year (let alone a drop) would reduce the growth of wages paid to non-H-2A farmworkers by as much as $475 million.[93]

102.    The IFR admits that those reduced wages will likely result in "wage transfers to employers," *i.e.*, employers will benefit under the IFR by paying farmworkers less.[94] Altogether, the IFR results in "annualized transfers" of $2.46 billion from H-2A workers to H-2A employers, and a total transfer of $17.29 billion over the next ten years.[95] Thus, DOL recognizes that H-2A workers will lose $2.46 billion per year in wages under its new rule—a wage transfer from the average H-2A worker of $5,513 per year.[96]

103.    In California, the IFR would cut the AEWR from $19.97 to $13.45. In Georgia, the IFR would cut the AEWR from $16.08 to $9.98. In Michigan, the IFR would cut the AEWR from $18.18 to $12.46. In Texas, the IFR would cut the AEWR from $15.79 to $9.97. In Washington, the IFR would cut the AEWR from $19.82 to $14.04. In Missouri, the IFR would cut the AEWR from $18.65 to $13.28.

---

[90] Rutledge, *supra* note 48.

[91] 90 Fed. Reg. 47923.

[92] *Id.*

[93] Rutledge, *supra* note 48.

[94] 90 Fed. Reg. at 47928.

[95] *Id.* at 47952.

[96] *Id.* at 47959.

104.    The IFR acknowledges that it will likely impact serious reliance interests held by U.S. agricultural workers.[97] Wage cuts of three to four dollars per hour will directly and negatively impact the individual plaintiffs' ability to pay for basic needs like food, rent, transportation, gas, childcare, healthcare costs, utilities, school supplies for children, utilities and other bills. Farmworkers who already have difficulty making ends meet[98] will experience significant hardship. They will have to work longer hours, take a second job, or relocate just to afford basic necessities.

105.    These wage cuts will exacerbate an already precarious economic situation of U.S. farmworkers. In California, DOL data shows that, prior to this IFR, 23% of farmworkers had incomes below the poverty level.[99] DOL data shows that, before the IFR, nationwide, one-fifth of farmworkers had family incomes below the poverty level.[100] Seventeen percent of farmworkers reported that they or someone in their household had received some form of benefit from a contribution-based program in the previous two years, while 64% said someone in their household had received some form of benefit from a needs-based program in the previous two years.[101] Other localized studies show that between 47 and 82% of farmworker households experience food insecurity.[102] These difficulties of being able to afford basic needs like food, rent, transportation, healthcare, and other basic necessities will be dramatically increased by the wage cuts of the IFR.

---

[97] *Id.* at 47927–28.

[98] NAWS Survey, *supra* note 5.

[99] California Findings from the National Agricultural Workers Survey (NAWS) 2015–2019: A Demographic and Employment Profile of California Workers, Rsch. Report No. 15, U.S. Dep't of Agric. (Jan. 2022), https://perma.cc/X3FW-ASGJ.

[100] NAWS Survey, *supra* note 5.

[101] *Id.*

[102] Ali Reznickova, *How Many Farmworkers Are Food Insecure? It's Hard to Tell*, The Equation (Nov. 21, 2022), https://perma.cc/3TQX-JUEZ.

106.    Plaintiffs, including U.S. workers similarly employed as H-2A workers and in corresponding employment with H-2A workers, would have their wages directly cut by the IFR, making it more difficult to provide for themselves and their families. They report that wage cuts would cause them to not be able to afford food, requiring them to seek food banks and donations and other forms of assistance. They report that wage cuts would cause them to be unable to pay their rent and fear homelessness once they suffer these cuts. One plaintiff reports that the wage cuts will force her to skip meals for her and her four children. Many report that they will have to reduce their expenses because they will not have enough money for food. Many report that the wage cuts would make it impossible or more difficult to pay for the above expenses in addition to not being able to afford college education for themselves and for their children. Others report having to cut expenses for children like school supplies and uniforms. Others report that they would be unable to make child support payments. They would not be able to support their families, including elderly parents with medication costs. Many report that the IFR's wage cuts will cause them to get a second job and work additional hours at their current agricultural job. Many also report that the IFR's wage cuts will cause them to move because they will no longer be able to afford the rent where they currently live.

107.    DOL's attempt to address U.S. farmworkers' reliance interests is incoherent. For example, DOL states that it "has no evidence of the existence of a substantial population of U.S. workers who are willing and able to accept wage rates that are reasonable and proportionate to agricultural work but are deterred from entering agricultural work by AEWR-priced H-2A workers."[103] As an initial matter, wage rates that DOL and U.S. employers believes are "reasonable and proportionate to agricultural work" are not, however, the same as market wage rates. DOL does not, and cannot, dispute that many U.S. workers

---

[103] *Id.* at 47928.

would take agricultural positions if provided with adequate compensation.[104] In any event, DOL does not dispute that there currently are U.S. farmworkers who are "willing and able" to perform agricultural work at the AEWRs applicable prior to the IFR, and the IFR will suddenly and drastically reduce their compensation. The IFR itself concedes that "the overall impact of [its] new methodology will be a reduction in the . . . minimum hourly wage rate floors for H-2A workers and *workers in corresponding employment* that are likely to result in wage transfers to employers."[105]

108.    DOL also states that any "reliance interest [in the prior methodology] is vitiated by the USDA's discontinuation of the FLS: even if the Department did nothing, the FLS will cease, thus making any reliance interest on it misplaced."[106] But U.S. agricultural workers were reliant on the prior AEWRs, not necessarily the FLS data that initially gave rise to those AEWRs. Even without the FLS, DOL did not have to adopt an IFR that drastically reduced the AEWRs. DOL could have adopted the OEWS as the wage data source without adopting many of the other measures in the IFR—such as the tier system and housing deduction—that artificially depress the AEWRS. DOL also could have simply continued the prior AEWRs while constructing a new methodology—one informed by a notice-and-comment process—that actually tracks market rates. The IFR accepts that much: it notes that DOL actually did "consider[] . . . relying on the 2024 AEWRs," but DOL ultimately "rejected" that option.[107] In the absence of USDA continuing the FLS, which was conducted in April and October of every year, DOL could have based the AEWR on the FLS conducted in April 2025, which would increase the AEWR by 3%, or, alternatively,

---

[104] *See* Casey Gannon & Molly Reinmann, *Agriculture secretary says there will be 'no amnesty' for migrants, adults on Medicaid can replace them in workforce*, CNN (July 8, 2025), https://perma.cc/769U-KWE2 (USDA Secretary Brooke Rollins stating "[w]hen you think about it, there are 34 million able-bodied adults in our Medicaid program. There are plenty of workers in America….").

[105] 90 Fed. Reg. at 47928. (emphasis added).

[106] *Id.*

[107] *Id.* at 47926.

base the AEWR on the average annual increase to the AEWR over the last five years, which would increase the AEWR by 5.5%.[108]

109.    Relying on the OEWS survey, tiered-wage system, housing deduction, and primary duty test allows (and incentivizes) employers to hire H-2A foreign guestworkers at wages that fall far below fair market rates. Those depressed wages will likely impact similarly employed U.S. farmworkers. DOL made this change to the AEWR methodology without a thorough consideration of the adverse effects these changes would have on serious reliance interests held by U.S. agricultural workers.

## CLAIMS FOR RELIEF

## COUNT ONE (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706)

### *The IFR is not in accordance with law*

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    The APA requires this Court to hold unlawful and set aside any agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

112.    The IFR contravenes the INA's mandate that DOL ensure that the hiring of H-2A workers "will not adversely affect the wage and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B).

113.    DOL relies on AEWRs to comply with the aforementioned statutory requirement.

114.    However, rather than protect similarly employed U.S. farmworkers from adverse wage effects caused by H-2A labor, the IFR *creates* those adverse wage effects. By admission, it lowers the AEWRs, thus allowing employers to now pay H-2A workers less than what U.S. farmworkers were previously earning, on average, for the same positions—putting downward pressure on the wages of those

---

[108] *April Hired Workers Up 3 Percent; Gross Wage Rate Increased 3 Percent from Previous Year*, *supra* note 49; 90 Fed. Reg. at 47923.

U.S. farmworkers. The IFR adversely affects the wages and working conditions of similarly employed U.S. workers and is therefore not in accordance with law.

115.    For these reasons and others, the IFR must be enjoined and "set aside," in whole or in part, as an agency action that is not in accordance with law." 5 U.S.C. § 706(2)(A).

116.    An injunction that universally bars DOL from enforcing the IFR, or the unlawful parts of the IFR, is necessary and appropriate. There is no reasonable and practical way to limit relief to only the named Plaintiffs. The IFR injures Plaintiffs by placing downward pressure on wages in the relevant markets at large, which in turn threatens the individual Plaintiffs' wages (and the wages of UFW's members). An universal injunction against the IFR would shield Plaintiffs from the IFR's market impacts.

117.    Furthermore, to the extent DOL continues to authorize the issuance of H-2A visas, it must adopt a regulation that allows DOL to fulfill its statutory obligation of ensuring that the employment of H-2A workers "will not adversely affect the wage and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B); *see also* 5 U.S.C. § 706 (a court may "compel agency action unlawfully withheld").

118.    Despite the FLS's suspension, there are multiple ways in which DOL can calculate AEWRs so as to ensure that the employment of H-2A workers will not "adversely affect" the wages of similarly employed U.S. workers. First, DOL can endeavor to restart the FLS survey, or a variation of that survey. Second, to the extent DOL wishes to utilize OEWS data, it can begin using that data once it starts reporting wages based on data collected from farm establishments and, in the meantime, utilize AEWRs based on the last available FLS data (adjusting them, as necessary, to account for the rate at which those AEWRs would likely have increased if updated FLS data were available). Even assuming that DOL has discretion in determining which data source it will rely on, that discretion would not be without limits: DOL is legally obligated to use some data source that will allow it to fulfill its obligation of ensuring that the employment of H-2A workers will not depress similarly employed U.S. workers. Moreover, regardless of the data DOL

uses, DOL can abandon the arbitrary "two-tier" system, the unjustifiable housing deduction, and the primary duty rule.

**COUNT TWO (VIOLATION OF ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706)**

***The Interim Final Rule Is Arbitrary and Capricious***

119.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

120.    The APA requires this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action that is not the product of reasoned decision-making is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy that core requirement, an agency must provide a reasoned explanation for the change, awareness that the agency is changing its position, and a consideration of the impact these changes will have on "serious reliance interests." *FCC v. Fox Television Stations Inc.*, 556 U.S. 502, 514.

121.    The Interim Final Rule fails this statutory requirement for several reasons.

122.    First, DOL fails to properly analyze the adverse economic effects of the new AEWR methodology on U.S. workers' wages. Considering the protection of the U.S. farmworkers is the central purpose of the AEWR and is required by the INA, the Interim Final Rule "failed to consider an important aspect of the problem" before it. *State Farm*, 463 U.S. at 43. This omission makes the rule arbitrary and capricious.

123.    DOL has repeatedly recognized that, to protect the wages of U.S. farmworkers from "adverse effects," the AEWRs must track the market rates that those farmworkers would receive absent any H-2A labor.

124.    The IFR, however, untethers DOL's AEWR methodology from any measure of actual market wages paid to farmworkers. In fact, as explained above, market rates were likely higher than the

pre-IFR AEWRs, and yet the IFR drops the AEWRs even further—ensuring that they will remain below the market rates.

125.    The IFR contains a number of features that ensure that it cannot track the actual market rates applicable to the agricultural jobs at issue.

126.    For one, the IFR adopts a tiering system that will ensure that the AEWRs for most positions will likely be less than the amount that 83% of farmworkers currently receive in the relevant agricultural sectors. In particular, DOL has adopted two tiers for each SOC Code: Skill Level I and Skill Level II. Any position classified as Skill Level I will be assigned an AEWR equal to only the 17th wage percentile for the relevant agricultural sector. And even in those positions classified as Skill Level II—positions that, in theory, are senior level because they involve managerial responsibilities and formal credentials—the AEWRs will equal only the 50th wage percentile for the relevant agricultural sectors (*i.e.*, the average wage for all employees in those sectors, regardless of whether they hold entry level or managerial positions). These Skill Level tiers will obviously depress wages given that, under the prior system, the AEWRs for *all* positions were equal to the average wages paid to workers in the relevant sectors.

127.    On information and belief, most positions will be classified as Skill Level I. The Skill Level assignment depends on the written description of the position provided by the employer, rather than the qualities of the H-2A employee that ultimately occupies the position. And Skill Level II designations may hinge on whether agricultural positions require formalized credentials, and most of them will not. Additionally, employers naturally have an incentive to classify positions as Skill Level I since it will then subject those positions to lower AEWRs.

128.    Additionally, the housing deduction will likewise reduce AEWRs. It appears that most AEWRs will be reduced—by an amount that, in some circumstances, may equal 30% of the relevant AEWR—to account for housing that employers have to offer H-2A employees for free.

129.    Moreover, the IFR's new methodology uses a faulty data source. The IFR relies on the OEWS survey of non-farm establishments to calculate AEWRs for farmworkers. This decision contradicts the IFR's emphasis elsewhere regarding the need to use a more reliable, accurate, and robust set of wage data. Despite acknowledging its obligation to rely on wage rates from the farm labor market to set AEWRs, DOL chooses to calculate AEWRs using a survey that it admits does not currently survey farm establishments. Agency actions are arbitrary and capricious when they rely on reasoning that is "internally inconsistent and inadequately explained." *Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (quoting *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015)).

130.    For these reasons, and others, the IFR does not adequately consider the adverse impact that its new methodology will have on U.S. farmworkers.

131.    Second, the IFR is arbitrary and capricious also because it fails to adequately acknowledge and consider the reliance interests held by U.S. workers. The IFR suddenly dropped AEWRs, which will drop wages for many similarly employed U.S. farmworkers, all without properly considering how it would impact their livelihoods.

132.    When serious reliance interests could be impacted by an agency's change of course, an agency is required to "assess whether there were reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Security v. Regents of the University of California*, 591 U.S. 1, 33 (2020). The agency must address *why* the policy shift outweighs the reliance interests and explain good reasons for reaching the conclusion that those interests were insufficient. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007); *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 628 F. Supp.3d 243, 261 (D.D.C. 2022) (citing *MediNatura, Inc v. Food & Drug Administration*, 998 F.3d 931, 942-43 (D.D.C. 2021)).

133.    Here, as explained above, the IFR hardly addressed the serious reliance interest of U.S. farmworkers.

134. For these reasons and others, the Final Rule must be enjoined and "set aside," in whole or in part, as an agency action that is "arbitrary and capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

135. An injunction that universally bars DOL from enforcing the IFR, or the unlawful parts of the IFR, is necessary and appropriate. There is no reasonable and practical way to limit relief to only the named Plaintiffs. The IFR injures Plaintiffs by placing downward pressure on wages in the relevant markets at large, which in turn threatens the individual Plaintiffs' wages (and the wages of UFW's members). An universal injunction against the IFR would shield Plaintiffs from the IFR's market impacts.

136. Furthermore, to the extent DOL continues to authorize the issuance of H-2A visas, it must adopt a regulation that allows DOL to fulfill its statutory obligation of ensuring that the employment of H-2A workers "will not adversely affect the wage and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(B); *see also* 5 U.S.C. § 706 (a court may "compel agency action unlawfully withheld").

137. Despite the FLS's suspension, there are multiple ways in which DOL can calculate AEWRs so as to ensure that the employment of H-2A workers will not "adversely affect" the wages of similarly employed U.S. workers. First, DOL can endeavor to restart the FLS survey, or a variation of that survey. Second, to the extent DOL wishes to utilize OEWS data, it can begin using that data once it starts reporting wages based on data collected from farm establishments and, in the meantime, utilize AEWRs based on the last available FLS data (adjusting them, as necessary, to account for the rate at which those AEWRs would likely have increased if updated FLS data were available). Even assuming that DOL has discretion in determining which data source it will rely on, that discretion would not be without limits: DOL is legally obligated to use some data source that will allow it to fulfill its obligation of ensuring that the employment of H-2A workers will not depress similarly employed U.S. workers. Moreover, regardless of the data DOL

uses, DOL can abandon the arbitrary "two-tier" system, the unjustifiable housing deduction, and the primary duty rule.

## COUNT THREE (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §553)

### *DOL Violated The APA's Requirement Of Notice-And-Comment Rulemaking*

138.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

139.    The APA generally requires agencies to provide public notice and opportunity for comment before they issue rules that bind the public with the force and effect of statutes.

140.    The APA permits agencies to skip notice-and-comment procedures when they "for good cause find" that compliance with ordinary rulemaking procedures would be "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

141.    DOL promulgated the IFR without following the APA's required notice-and-comment procedures and failed to satisfy the "good cause" exemption needed to circumvent them.

142.    First, DOL is incorrect that the government's crackdown on illegal immigration, which allegedly created a shortage of labor, somehow meets the good cause requirement. To the extent there was a labor shortage, employers could have sought, and DOL could have authorized, more H-2A labor *under the pre-existing AEWRs*; there is no reason to reduce the AEWRs, much less through an expedited IFR. In fact, to the extent there was a labor shortage, it is unclear how offering workers less money would resolve it. As DOL previously explained: "a basic principle of economic supply-and-demand theory is that in market economies, shortages signal that adjustments should be made to maintain equilibrium" and "[t]herefore, *compensation should rise* to attract more workers where employers are experiencing a shortage of available workers in a particular region or occupation."[109]

---

[109] 80 Fed. Reg. 62958, 62992 (Sept. 16, 2025) (emphasis added).

143.    Second, DOL claims that, since USDA has ceased the FLS survey, there was a regulatory void that required DOL to institute an imminent replacement regulation. But this purported "regulatory void" argument would at most justify a narrow interim final rule that allows DOL to rely on another data source; it does not justify all of the provisions found in the IFR. Indeed, most of the methodological changes in the IFR—*e.g.*, the Skill Level tiers and the housing deduction—are entirely unrelated to the cessation of the FLS, and thus any "regulatory void" would not justify implementing those changes without the use of notice and comment.

144.    Since DOL suspended the notice-and-comment requirement without "good cause" for doing so, the agency violated the APA's requirement to provide additional notice of its proposed rule and an opportunity for public comment, *see* 5 U.S.C. § 553(b), (c).

145.    Absent satisfaction of the "good cause" exception, the IFR is unlawful.

146.    The IFR must be vacated because DOL promulgated it without additional notice and comment, and fails to satisfy the "good cause" exemption.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully seek the following relief:

147.    Preliminary and permanent injunctive relief preventing Defendants from implementing or otherwise taking any action to enforce the challenged regulation in the IFR;

148.    An order vacating and setting aside the challenged regulation;

149.    A declaration that the challenged regulation is unlawful under the APA;

150.    Preliminary and permanent injunctive relief compelling Defendants to adopt a methodology for calculating AEWRs that complies with applicable law;

151.    An order awarding Plaintiffs their costs and attorney's fees; and

152.    Any and all other such relief as the Court may deem appropriate.

Dated: November 21, 2025                    Respectfully submitted,

/s/ Edgar Aguilasocho
Mario Martinez, Esq.
Edgar Aguilasocho, Esq.
Martinez Aguilasocho Law, Inc.
P.O. Box 1998
Bakersfield, CA 93303
(661) 859-1174
mmartinez@farmworkerlaw.com
eaguilasocho@farmworkerlaw.com
info@farmworkerlaw.com

/s/ Kuntal Cholera
Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
kcholera@cov.com
tplotkin@cov.com
mandrewslee@cov.com
ccoleburn@cov.com
liwilliams@cov.com
*pro hac vice applications forthcoming

Lori Johnson*
Rebecca Rosefelt*
Farmworker Justice
1126 16th St. NW, Suite 507
Washington, DC 20036
(202) 800-6000
ljohnson@farmworkerjustice.org
*pro hac vice applications forthcoming

Verónica Meléndez (SBN 294106)
Cecilia Guevara Langberg (SBN 307159)
California Rural Legal Assistance Foundation
2210 K Street, Suite 201
Sacramento, CA 95816
(916) 446-7905
vmelendez@crlaf.org

cguevarazamora@crlaf.org

*Attorneys for Plaintiffs*