Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Sela Carrington**
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
kcholera@cov.com
*Admitted pro hac vice
**Pro hac vice application forthcoming

*Attorneys for Plaintiffs*

*(additional counsel listed on signature page)*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| UNITED FARM WORKERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR;<br><br>LORI CHAVEZ-DEREMER, in her official capacity as Secretary of Labor;<br><br>LORI FRAZIER BEARDEN, in her official capacity as Acting Assistant Secretary for Employment and Training<br><br>Defendants. | Civil Case No.: 1:25-cv-1614<br><br><br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECTION 705 STAY AND PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.     Congress instituted the H-2A program to allow U.S. employers to hire seasonal foreign laborers, but only if U.S. laborers were unavailable and the wages of similarly-employed U.S. workers would not be adversely affected by the use of H-2A labor. ............................................................................................... 3

    B.     In 2020, DOL issued a regulation that would have lowered AEWRs, but it was found unlawful, and enjoined, by this Court........................................................ 4

    C.     In October, DOL suddenly and drastically changed its methodology for calculating AEWRs.................................................................................... 5

LEGAL STANDARD..................................................................................................... 8

ARGUMENT ................................................................................................................. 9

    A.     Plaintiffs have a strong likelihood of success on the merits of their APA claims.. 9

        1.     The IFR is arbitrary and capricious, and contrary to law. .......................... 9

        2.     The IFR is procedurally defective............................................................. 20

    B.     The IFR will irreparably harm Plaintiffs, and the balance of the equities favors issuing emergency relief. ....................................................................... 22

    C.     Remedy ...................................................................................................... 23

        1.     Plaintiffs are entitled to a stay under 5 U.S.C. § 705............................... 24

        2.     Plaintiffs are entitled to a universal preliminary injunction against the IFR. ...................................................................................................... 24

        3.     Any relief must require DOL to promptly begin calculating AEWRs pursuant to a lawful methodology............................................................. 25

CONCLUSION............................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Fed'n of Gov't Emp. v. Block*,
655 F.2d 1153 (D.C. Cir. 1981).............................................................................................21

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Brock*,
835 F.2d 912 (D.C. Cir. 1987)..........................................................................................10, 11

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ...............................................................................................22

*Assurance Wireless USA, L.P. v. Reynolds*,
100 F.4th 1024 (9th Cir. 2024) ...........................................................................................8, 9

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .................................................................................................20

*City of Columbus v. Kennedy*,
796 F. Supp. 3d 123 (D. Md. 2025) .......................................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................................................................................................................18

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021)..................................................................................................................9

*Garcia v. Stewart*,
531 F. Supp. 3d 194 (D.D.C. 2021) .........................................................................................3

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ............................................................................................8, 24

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007)................................................................................................................18

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) ...............................................................................................25

*Mendoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) ...............................................................................................23

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)........................................................................................................9, 10, 17

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .................................................................................................18

*Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*,
  749 F. Supp. 3d 697 (2024) .................................................................................5

*Teche Vermilion Sugar Cane Growers Ass'n Inc.* v. *Su*,
  No. 6:23-cv-00831-RRS-CBW (W.D. La. Aug. 21, 2025), ECF No. 87 .................................5

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) .................................................................................18

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) (Kavanaugh, J., concurring) .................................................24

*UFW v. Perdue*,
  No. 20-cv-01452, 2020 WL 6318432 (E.D. Cal. Oct. 8, 2020).................................4

*UFW v. DOL*,
  509 F. Supp. 3d 1225 (E.D. Cal. 2020)............................................... *passim*

*UFW v. DOL*,
  598 F. Supp. 3d 878 (E.D. Cal. 2022)........................................................5

*United States v. Rare Breed Triggers, LLC*,
  690 F. Supp. 3d 51 (E.D.N.Y. 2023) ......................................................23

*Washington v. DeVos*,
  481 F. Supp.3d 1184 (W.D. Wash. 2020)..................................................23

**Statutes**

8 U.S.C. § 1182.................................................................................17

8 U.S.C. § 1188.........................................................................3, 7, 13

Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, 701 *et seq.* ..................................... *passim*

**Other Authorities**

20 C.F.R. § 655 ..................................................................... *passim*

75 Fed. Reg. 6884 .......................................................................4, 11, 13, 15

76 Fed. Reg. 3452 .................................................................................12

80 Fed. Reg. 62958 .................................................................................21

85 Fed. Reg. 70445 .................................................................................4

88 Fed. Reg. 12760 .........................................................................5, 12, 15

90 Fed. Reg. 45986 .................................................................................12

90 Fed. Reg. 46027 ...............................................................................................................17

90 Fed. Reg. 47914 ................................................................................................ *passim*

**INTRODUCTION**

U.S. farmworkers are among the most vulnerable members of our society. Although many already work for poverty-level wages, those wages would depress further if employers could freely hire foreign laborers who are willing to perform similar work for sub-market wages. To address this issue, and protect U.S. farmworkers, Congress enacted a statute allowing U.S. agricultural employers to hire seasonal foreign laborers only if, among other things, doing so will not adversely affect the wages of similarly employed U.S. workers. Congress tasked the Department of Labor ("DOL") with enforcing that "no adverse effect" requirement. To fulfill that mandate, DOL has historically set minimum wages for temporary foreign farmworkers that approximate the wages U.S. employees would otherwise receive for performing similar work ("Adverse Effect Wage Rates," or "AEWRs"). The AEWRs help ensure that employers cannot hire temporary foreign farmworkers at sub-market wages that would, in turn, depress the wages of similar U.S. workers.

DOL, however, recently issued an interim final rule ("IFR") drastically changing its methodology for calculating AEWRs so that they no longer track applicable market rates. Under the IFR, AEWRs will drop significantly, thus depressing U.S. farmworker wages—all while inflation continues to tick up and the agricultural sector continues to see record profits. DOL attempted a similar maneuver in 2020, and this Court stepped in, enjoining DOL's attempt to abdicate its responsibility to U.S. farmworkers. The IFR here is even more egregious than the 2020 rule. This Court must intervene again.

First, plaintiffs are likely to succeed on the merits of their claims that the IFR is unlawful under the Administrative Procedure Act ("APA"). For one, the IFR is arbitrary and capricious and contrary to law. DOL is statutorily obligated to protect U.S. worker wages from the adverse effects of H-2A labor. Multiple features of the IFR, however, will necessarily drop AEWRs far below the applicable market rates, thus producing the very adverse effects DOL is tasked with preventing. For example, although AEWRs were previously based on the *average wages* received by farmworkers in the relevant sectors—

a sensible measure of the "market rate"—under the IFR, the AEWRs for most farmworker positions equal only the *17th wage percentile* in the relevant sectors. It gets worse. Under the IFR, AEWRs will be reduced even further to account for temporary housing that, under applicable law, employers must provide H-2A workers for free. In some circumstances, this "housing deduction" can reduce AEWRs by a whopping *30%*. These are only two examples of the multiple ways in which the IFR severs any meaningful connection between AEWRs and market wages.

The IFR is also arbitrary and capricious because DOL was required to, but did not, adequately consider the reliance interests of U.S. farmworkers. By immediately slashing AEWRs, the IFR will result in a sudden and drastic decrease in farmworker wages. This pay cut will meaningfully impact farmworkers' lives, making it difficult for them to cover necessary costs for health care, food, and housing. Finally, the IFR is procedurally defective because it was issued without the required notice-and-comment process. Any regulation that has an impact on the rights and obligations of parties cannot be issued unless the public has first had an opportunity to submit comments. An agency can sidestep that process only if extraordinary circumstances—*e.g.*, an imminent threat to public safety—require immediate action, and those circumstances are not present here. Plaintiffs are thus likely to prevail on the merits of their APA claims.

Additionally, absent emergency relief, Plaintiffs will suffer irreparable harm, and the balance of the equities favors emergency relief. As explained above, the immediate and significant reduction in AEWRs will materially impact the lives of many farmworkers, including the individual Plaintiffs. DOL can articulate no meaningful, countervailing interest that outweighs that impact. Accordingly, the Court should stay or preliminarily enjoin DOL's implementation of the IFR. The Court should also order DOL to promptly begin calculating AEWRs that actually approximate market rates for U.S. farmworkers.

**BACKGROUND**

A.    **Congress instituted the H-2A program to allow U.S. employers to hire seasonal foreign laborers, but only if U.S. laborers were unavailable and the wages of similarly-employed U.S. workers would not be adversely affected by the use of H-2A labor.**

Under the Immigration Reform and Control Act of 1986 ("IRCA"), agricultural employers may hire foreign temporary workers through "H-2A" petitions, but only if the Secretary of Labor certifies that: "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services" at issue and "(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1). Unlike other guestworker programs, the H-2A program has no cap on the number of foreign laborers permitted under the program.

To implement IRCA's "no adverse effect" requirement, DOL requires agricultural employers to pay H-2A workers the highest of (i) the AEWR, (ii) any applicable State minimum wage, (iii) any available prevailing wage rate,[1] or (iv) any agreed-upon collective-bargaining wage. *See* 20 C.F.R. 655.120(a). The highest available rates are generally the AEWRs, which are state or region-specific minimum wages set at least annually by DOL to ensure that the employment of H-2A workers will not artificially lower the wages of similarly employed domestic farmworkers. *See* 90 Fed. Reg. 47914, 47916–17 (Oct. 2, 2025); *UFW v. United States Dep't of Lab.*, 509 F. Supp. 3d 1225, 1231 (E.D. Cal. 2020) ("The AEWR . . . is the primary wage rate under the H-2A program because it is higher than the other wages in most circumstances" and so "the AEWR determines the wages of approximately 92 percent of the farmworkers working for H-2A program employers."). DOL has explained that, to comply with the "no

---

[1] A prevailing wage rate is a local (often crop- or task-specific) wage rate calculated by State workforce agencies ("SWAs") using State-based surveys. *See Garcia v. Stewart*, 531 F. Supp. 3d 194, 215 (D.D.C. 2021). Note that though there will always be a DOL-generated AEWR for each H-2A position, there will not always be a State-provided "prevailing wage rate" because "[m]any SWAs . . . declin[e] to conduct prevailing wage surveys at all." *Id.* at 201.

3

adverse effect" requirement, the AEWRs have "approximate[d] the equilibrium wage that would result absent an influx of temporary foreign workers" and thus "put incumbent farm workers in the position they would have been in but for the H-2A program." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010). With a few discrete exceptions, AEWRs have generally been based upon farmworker wage data collected by the U.S. Department of Agriculture ("USDA") through the Farm Labor Survey ("FLS"), which "provide[d] the basis for employment and wage estimates for all workers directly hired by the United States farms and ranches (excluding Alaska)." National Agricultural Statistics Service, Farm Labor Methodology and Quality Measures at 1 (May 21, 2025), https://perma.cc/J422-2EBT.

For decades, AEWRs, like wages in general, have steadily increased over time. In particular, since the 1990s, AEWRs have increased on average by about 4% per year. *See* Zachariah Rutledge et al., *H-2A Adverse Effect Wage Rates and U.S. Farm Wages*, Am. J. Agric. Econ. (June 9, 2025), https://perma.cc/6EFE-UJ2T. And more recently—from 2019 to 2025—AEWRs have increased annually by around 5.5%. *See* 90 Fed. Reg. at 47923. If the new AEWRs were based off of the FLS survey data collected in April 2025, those AEWRs would increase by 3%. *See April Hired Workers Up 3 Percent; Gross Wage Rate Increased 3 Percent from Previous Year*, U.S. Dep't of Agric. (May 21, 2025), https://perma.cc/JA5F-9BBN.

**B.      In 2020, DOL issued a regulation that would have lowered AEWRs, but it was found unlawful, and enjoined, by this Court.**

Towards the end of the first Trump Administration, USDA suspended the FLS,[2] and DOL subsequently issued a final rule (the "2020 Rule") that would have produced lower AEWRs. In particular, the 2020 Rule, among other things, froze most AEWRs for two years. 85 Fed. Reg. 70445 (Nov. 5, 2020). UFW challenged the 2020 Rule, and this court held that it was likely to succeed on the merits of its claim

---

[2] This suspension of the FLS was enjoined. *See UFW v. Perdue*, No. 20-cv-01452, 2020 WL 6318432 (E.D. Cal. Oct. 8, 2020).

4

that the rule was arbitrary and capricious. *See UFW*, 509 F. Supp. 3d at 1225. The Court agreed with UFW that, by generally freezing AEWRs for two years, the Rule "sever[ed] the relationship between the AEWR and current farm labor market conditions" and "intentionally depresse[d] and stagnate[d] the wages of" U.S. farmworkers. *Id.* at 1237–39. The Court also explained that "DOL failed to analyze the economic harm to U.S. farmworkers of [the] Rule." *Id.* at 1243. Later, the Court issued a final judgment vacating the 2020 Rule on the same grounds.[3] *UFW v. DOL*, 598 F. Supp. 3d 878 (E.D. Cal. 2022).

**C.   In October, DOL suddenly and drastically changed its methodology for calculating AEWRs.**

On October 2, 2025, DOL published the IFR, which instituted a new AEWR methodology that went into effect immediately without notice-and-comment. *See* 90 Fed. Reg. 47914. The new methodology made several significant changes which, by DOL's admission, will collectively decrease AEWRs. *See* 90 Fed. Reg. at 47928 ("The Department acknowledges that the overall impact of this new methodology will be a reduction in the AEWRs, or minimum hourly wage rate floors for H-2A workers and workers in corresponding employment that are likely to result in wage transfers to employers.").

First, the IFR changes the wage data source used to calculate AEWRs. On August 31, 2025, USDA again discontinued the FLS, and the IFR thus declares that DOL will now rely on state-level wage data collected by the Bureau of Labor Statistics' Occupational Employment and Wage Statistics ("OEWS") survey. *See* 90 Fed. Reg. at 47920–25; 20 C.F.R. 655.120(b)(1). That data consists of wage estimates derived from a semi-annual survey of *non-farm* employers, though the IFR indicates that OEWS will begin collecting data from farm establishments in 2026. *See id.* at 47925. The OEWS organizes its wage

---

[3] Note that DOL issued a new AEWR rule in 2023, 88 Fed. Reg. 12760 (Feb. 28, 2023), which was likewise enjoined, *Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*, 749 F. Supp. 3d 697 (2024). That rule has now been vacated. *See* Judgment, *Teche Vermilion Sugar Cane Growers Ass'n Inc.* v. *Su,* No. 6:23-cv-00831-RRS-CBW (W.D. La. Aug. 21, 2025), ECF No. 87. According to the IFR, the 2023 rule and the 2010 rule overlapped substantially. *See* 90 Fed. Reg. at 47952 n.189 (the 2010 rule and the 2023 rule "used the same methodology to set the AEWR for the vast majority of job[s]").

5

data into Standard Occupation Classification ("SOC") codes established by the Office of Management and Budget. Each SOC code represents a separate occupational category. For example, there are five SOC codes that encompass most H-2A positions (the "Big Five"): (1) farmworkers and laborers, crop, nursery, and greenhouse workers; (2) farmworkers, farm, ranch, and aquaculture animals; (3) agricultural equipment operators; (4) packers and packagers, hand; and (5) graders and sorters, agricultural products.[4] *Id.* at 47918 n.41. Each requested H-2A position is classified into an SOC code based on the duties associated with that job. *Id.* at 47937.

In deciding which OEWS data is relevant to any given H-2A position, DOL must first determine the applicable SOC code. To do so, DOL generally relies on the written job description produced by the employer. *Id.* at 47938. In the event an H-2A position involves multiple responsibilities that can be classified under multiple SOC codes, the IFR states that the position, as a whole, will be subject to the SOC code applicable to the duties that the person(s) occupying the position will perform for the majority (over 50%) of the workdays during the contract period. *Id.* at 47939; 20 C.F.R. 655.120(b)(7).

Second, in addition to changing the wage data source used to generate AEWRs, the IFR also changes *how* wage data is used to generate AEWRs. Prior to the IFR, the AEWR for any given position was equal to the average wage in the relevant sector (calculated using the available wage data). *See* 90 Fed. Reg. at 47917 (AEWRs were previously set to the "the average wage of farmworkers" in the relevant sectors). The IFR changes that through its new "two-tier" system. Specifically, the IFR adopts two tiers within each SOC code: Skill Level I and Skill Level II. *Id.* at 47926. Skill Level I jobs are those which DOL considers more "entry-level" and which require workers with limited to no formal training or credentials. *Id.* Skill Level II positions, however, generally do require formal training or credentials and

---

[4] Until this IFR, there was a sixth SOC code, "Agricultural Workers, All Others" included in the SOC group. The IFR eliminates this SOC code altogether.

often involve supervisory duties. *Id.* The IFR itself provides no criteria for determining whether a particular job opportunity falls under Skill Level I or II, though the IFR's preamble suggests that an amorphous "totality of the circumstances of an employer's job offer" standard will be used to classify jobs into one of those two tiers. *Id.* at 47932–34. Further, it appears that classification will be based on the written job descriptions, rather than the qualifications of the workers that eventually fill those positions. *Id*. The IFR estimates that 92% of H-2A positions will be considered Skill Level I. *See id.* at 47955.

Importantly, the AEWR for Skill Level I positions will not equal the average wage for the relevant SOC code, but rather the 17th wage percentile for that code. *Id.* Put differently, although 92% of H-2A workers are expected to receive the Skill Level I AEWR, this will be lower than the wages earned by 83% of farmworkers covered by the relevant SOC codes. Meanwhile, the AEWRs for the most skilled H-2A workers, those in Skill Level II positions, will equal the average wage for the relevant SOC code, even though, in theory, those are senior-level positions. *See id.* at 47933.

Third, even after identifying the appropriate SOC code and Skill Level tier for a particular position, the IFR decreases the AEWR even further through a "housing adjustment." By statute and regulation, U.S. employers must provide H-2A employees with free housing.[5] Although that free housing requirement remains in effect, the IFR nonetheless further reduces AEWRs for H-2A positions to account for the purported value of that housing. 90 Fed. Reg. at 47948. DOL estimates the value of that housing by looking to the so-called Fair Market Rents ("FMR") for a four-bedroom housing unit available from the Department of Housing and Urban Development ("HUD"), even though DOL does nothing to verify that H-2A housing is in any way comparable to a HUD four-bedroom unit. *Id.* DOL deducts, from the AEWR

---

[5] 8 U.S.C. § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations"); 20 C.F.R. § 655.122(d) (2025) ("The employer must provide housing at no cost to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day.").

per-hour rate, an amount sufficient to cover the estimated weekly housing cost assuming the H-2A laborer works a 40-hour workweek; *e.g.*, if the weekly housing cost is estimated at $100, the per-hour housing deduction will equal $2.50. *Id.* at 47949. That AEWR deduction, however, applies to every hour worked even if the laborer works more than 40 hours per week. The only limit on the housing deduction is that it cannot exceed 30% of the AEWR—*i.e.*, almost a third of their wages. *Id.* at 47948.

Accordingly, by instituting a number of changes—including changing the data source, instituting the two-tier system, and applying a housing deduction—the IFR drastically changes how AEWRs are calculated, with the "overall impact" being a reduction in AEWRs and thus a reduction in wages for similarly employed U.S. workers. *Id.* at 47928.

**LEGAL STANDARD**

"[S]tays under [section 705 of] the APA turn on the same factors as preliminary injunctions." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025).[6] "To qualify for [a preliminary] injunction" or a Section 705 stay, "the moving party must establish a likelihood of success on the merits, that it will suffer irreparable harm in the absence of injunctive relief, that the balance of the equities tips in its favor, and that the public interest supports relief." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024). "As to the merits, [Ninth Circuit] cases . . . permit[] plaintiffs to satisfy this requirement with a 'serious question' on the merits when the balance of hardships tips sharply in their favor." *Id.* "Serious questions are issues that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Id.* "The final two injunction factors—the balance of equities and the public interest—merge where a government agency is a party." *Id.*

---

[6] Internal citations and quotation marks are omitted throughout this brief unless otherwise stated.

**ARGUMENT**

**A.    Plaintiffs have a strong likelihood of success on the merits of their APA claims.**

The IFR violates the APA. First, it is arbitrary and capricious, and contrary to law, because DOL was obligated to, but did not, properly consider (i) whether the IFR's new methodology would protect U.S. farmworker wages from the adverse effects of H-2A labor and (ii) the reliance interests of U.S. farmworkers. Second, the IFR is procedurally defective because it was improperly issued without a notice-and-comment process.

        1.       <u>The IFR is arbitrary and capricious, and contrary to law.</u>

An agency action is arbitrary and capricious under the APA, and thus unlawful, if the agency failed to "act[] within a zone of reasonableness and, in particular, has" failed to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, to survive arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action" and "[i]n reviewing that explanation, the Court must determine "whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

DOL committed a "clear error of judgment" in issuing the IFR for at least two reasons. First, DOL did not adequately consider whether the IFR will fulfill DOL's statutory obligation to protect U.S. farmworker wages from the adverse effects of H-2A labor. Indeed, to the contrary, the IFR deliberately slashes AEWRs to well below market levels, thus creating those very adverse effects. Second, DOL failed to properly consider reliance interests held by U.S. workers.

        *a.*       *The IFR deliberately slashes AEWRs, creating the precise "adverse effects" on U.S. farmworker wages that DOL is statutorily required to prevent.*

As explained above, to comply with statutory "mandate that foreign workers not adversely affect the wages of United States workers," DOL sets "minimum wage requirements" for H-2A workers; *i.e.*, AEWRs. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987); *see*

*supra* at p. 9. Those "wage levels" are "designed to approximate the rates that would have existed had there been no increase in labor supply from foreign labor." *Brock*, 835 F.2d at 913. Here, DOL has offered no "satisfactory explanation" for how, under the IFR, AEWRs will serve their intended purpose: to protect U.S. farmworker wages from the adverse effects of the H-2A program. *State Farm*, 463 U.S. at 43. In fact, multiple features of the IFR, by design, significantly depress AEWRs, placing downward pressure on (and thus adversely affecting) the wages of similarly-employed U.S. farmworkers. First, the IFR creates an arbitrary "tier" system under which the AEWRs for the majority of H-2A positions will be equal to only the 17th wage percentile in the relevant sectors. Second, the IFR applies a large "housing deduction" to AEWRs, which will drop them even further. And third, the IFR immediately shifts to a new wage data source which, in the near term, does not even include data from farm establishments.

*The Tier System.* The IFR creates a two-tier system engineered to slash AEWRs for most H-2A positions. As explained above, to determine the AEWR for any given position, that position must first be assigned an SOC code. Then, under the IFR, the position must be classified into one of two tiers: Skill Level I or Skill Level II. Although the IFR provides no set criteria for making that classification, the IFR suggests that Skill Level I positions are those that require no formalized training or certification, even though they may very well involve complex tasks requiring highly skilled workers. *See supra* at pp. 6–7. Skill Level II positions, by contrast, are those more managerial positions that generally do require some formalized training or certification. *See supra* at p. 7. The IFR estimates that roughly 92% of H-2A positions will be classified as Skill Level I positions. *See* 90 Fed. Reg. at 47955; *see also* 85 Fed. Reg. at 70462 ("[DOL's] practical experience has demonstrated that use of a []tiered wage structure in the H–2A program leads to the overwhelming majority of H–2A job opportunities being classified at a level I wage"). Indeed, the most common farmworker positions will presumably all be classified under Skill

Level I, including line-level crop, nursery and greenhouse workers and hand packers and packagers.[7] *See id.* at 47935; *UFW*, 509 F. Supp. 3d at 1239 ("[L]ower-skill work, which is field and livestock work, make up most H-2A job opportunities.").

Alarmingly, under the IFR, the AEWRs for all Skill Level I positions—the overwhelming majority of H-2A positions—will equal only the 17th wage percentile for positions within the relevant SOC codes. Thus, for example, *all* Skill Level I positions within the Big Five SOC codes will receive AEWRs greater than only 17% of Big Five positions, even when those positions are filled with experienced farmworkers.[8] That is a radical departure from the prior methodology under which AEWRs equaled the average wage for the relevant occupational categories. *See supra* at pp. 6–7. And AEWRs will consequently drop significantly. For instance, the AEWR for a Big Five position in California was previously $19.97, but will now drop to $16.45 (a nearly 18% reduction) if classified as Skill Level I. *See* Compl. ¶ 100. Likewise, the AEWR for a Big Five position in Georgia was previously $16.08, but it will now drop to $12.27 if classified as Skill Level I—a nearly 24% decline. *See id.* The IFR provides no coherent explanation for how these new AEWRs, set to only the 17th wage percentile, "approximate[] the rates that would have existed" for *all* Skill Level I positions absent the H-2A program. *Brock*, 835 F.2d at 913.

Nor could it. DOL itself previously explained that "use of the *mean wage*"—not the 17th percentile wage—"best meets the Department's obligation to protect workers in the United States similarly employed against the adverse effects on their wages that could be caused by the employment of foreign

---

[7] DOL has previously opined that a tier-system for H-2A jobs would make little sense because there are generally no material skill-level differences between those jobs. *See* 75 Fed. Reg. at 6900 (rejecting skill-level tier system in part because "the Department [found] that the notion of meaningful skill differences among agricultural workers is unfounded;" "[m]ost of the occupations and activities relevant to the H-2A program involve skills that are readily learned in a very short time on the job, skills peak quickly, rather than increasing with long-term experience, and skills related to one crop or activity are readily transferred to other crops or activities").

[8] *See, e.g.,* Decl. of Claudia Garcia, ¶¶ 2, 9 (U.S. farmworker with 25 years of experience who anticipates future positions that would likely be classified as Skill Level I under the IFR).

workers" because "[t]he mean provides equal weight to the wage rate received by each worker in the SOC code across the wage spectrum and represents the average wage paid to workers to perform jobs in the SOC codes." 88 Fed. Reg. 12760, 12774 (Feb. 28, 2023). DOL noted that it has therefore had "a long-standing practice of using the average or mean wage to determine the AEWR in the H-2A program." *Id.* Notably, DOL previously conceded that "*[s]etting the AEWR below the mean in the relatively less skilled agricultural SOC codes that predominate in the H-2A program may have a depressive effect on the wages of workers in the United States similarly employed.*" *Id.* (emphasis added).

The IFR tries to justify its policy change by noting that an AEWR "computed at the equivalent of the 17th [wage] percentile . . . is similar to the" prevailing wages "for other nonimmigrant and immigrant visa programs administered by the Department," referring at least to the H-1B program. 90 Fed. Reg. at 47932-33. The IFR, however, omits a key distinction: the H-1B program—which concerns skilled non-agricultural positions—utilizes a *four-tier* system where the "prevailing wage" for only the *fourth tier* is "approximately the 17th percentile of the OEWS wage distribution for the relevant occupation in the relevant location." 90 Fed. Reg. 45986, 45990 (Sept. 24, 2025). Here, by contrast, there are only two tiers, the bottom tier will likely encompass roughly 92% of all positions, and yet that entire tier will receive AEWRs equal to the 17th wage percentile for the relevant occupational categories.[9]

Moreover, DOL previously acknowledged that it should not incorporate the H-1B program's four-tier system into the H-2A companion program—the H-2B program (which concerns temporary non-agricultural work)—because doing so would create adverse effects on U.S. worker wages. Specifically, DOL estimated that "almost 75 percent of [H-2B] jobs" would be "classified at a Level I wage," and noted that basing the prevailing wages for all of those jobs "on the mean of the bottom one third"—*i.e.*, roughly

---

[9] Note that, unlike with the H-2A program, there is a cap on the number of workers who may be hired through the H-2B program. *See* 75 Fed. Reg. at 6895.

12

the 17th percentile—would "adverse[ly] impact . . . those U.S. workers performing the same tasks and engaged in the same jobs." 76 Fed. Reg. 3452, 3463 (Jan. 19, 2011). DOL thus concluded that the "four-tier structure artificially lowers that wage to a point that it no longer represents a market-based wage for that occupation." *Id.* The same reasoning applies here: like with the H-2B program, most H-2A positions are likely to be Skill Level I positions, and setting AEWRs for all of those positions at the 17th wage percentile would adversely affect the wages of similarly-employed U.S. workers.

Furthermore, the IFR will likely give employers an incentive to structure positions so that they will fall under Skill Level I, even though they should qualify as Skill Level II positions. In determining the skill level tier for any particular position, DOL relies on the employer's written description of the position. 90 Fed. Reg. at 47934. Thus, to secure a lower, Skill Level I AEWR for a particular position, an employer need only frame that position's description so that it seemingly requires no formalized training, even though it ultimately will require—and may be filled by a farmworker who possesses—formalized, managerial training. *Cf.* 75 Fed. Reg. at 6898 ("applicants for H-2A workers" can show a "bias toward low skill job specifications"). Accordingly, the IFR's arbitrary two-tier system will adversely affect U.S. farmworker wages.[10]

*Housing Adjustment.* The IFR further tanks AEWRs by broadly applying an arbitrary "housing deduction." Employers have long been required to provide housing "at no cost" to H-2A workers (and U.S. workers in corresponding employment) who are not reasonably able to return to their residences at the end of the workday. 20 C.F.R. § 655.122(d)(1); *see* 8 USCA § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations."). As noted above, the IFR upends this longstanding requirement

---

[10] Strangely, for positions classified under Skill Level II—in theory, the senior-level managerial positions—the AEWRs will equal only the average wage for positions within the relevant SOC codes. The IFR offers no coherent explanation for that decision either. If Skill Level II positions require formalized training and involve managerial functions, they would presumably merit salaries above the average wages in the relevant SOC codes.

13

by calling for a reduction in AEWRs to purportedly account for the value of that housing. *See supra* at pp. 7–8; 20 C.F.R. § 655.120(b)(3) (applying the downward housing adjustment to "H-2A workers sponsored under the Application for Temporary Employment Certification"). That housing deduction will push AEWRs further below market levels. For example, the IFR itself projects that, in California and Florida, the housing deduction can reduce an AEWR by roughly 18%. *See* 90 Fed. Reg. at 47927. And the IFR contemplates that the housing deduction could even reach 30%. *See supra* at p. 8.

Worse, the housing deduction will almost certainly overshoot the value of the housing H-2A workers ultimately receive. The methodology used to calculate the per-hour AEWR deduction assumes a 40-hour workweek; *i.e.*, it determines the amount that must be deducted per-hour for 40 hours to cover a week's worth of housing. Farmworkers (including H-2A workers[11]), however, often work more than 40 hours per week,[12] and the deduction will apply to all of those hours, not just the first 40 hours. The IFR also calculates the housing deduction based on the "Fair Market Rent" for a four-bedroom unit from HUD, but makes no attempt to establish that H-2A housing is comparable in quality to that type of HUD unit.[13]

DOL tries to justify the housing deduction by essentially arguing that the "free housing" requirement for H-2A workers unfairly privileges those workers over U.S. workers. *See* 90 Fed. Reg. at 47948. That explanation makes little sense. First, by lowering the AEWRs, the housing deduction will in

---

[11] *See e.g.*, H-2A Job Order H-300-25305-354421, posted November 12, 2025, https://seasonaljobs.dol.gov/api/job-order/H-300-25305-354421, attached hereto as Ex. 1 (anticipating 66 hours of work per week, while deducting the housing adjustment from H-2A worker wages).

[12] *See* Decl. of Irene Mendoza, ¶ 3 ("I have generally worked around 11–14 hours a day, often for many hours without breaks. In my experience, it is common for me and other similar farmworkers to work more than 40 hours per week."); Decl. of Aaron Grimaldo, ¶ 3 ("I have generally worked over 10–12 hours a day").

[13] H-2A housing is generally inferior to a typical HUD unit. *See* Agricultural Workers Advocacy Coalition, Comment Letter on Interim Final Rule, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States (Nov. 25, 2025) ("[H-2A living] conditions are not remotely equivalent to the housing quality, privacy, amenities, square footage, or safety that the HUD Fair Market Rent metric assumes"), https://perma.cc/A5RX-97KQ.

turn place downward pressure on the wages of similarly-employed U.S. farmworkers. That will harm the very U.S. farmworkers that the housing deduction is purportedly trying to serve. Further, the premise of DOL's argument is wrong: the free housing requirement also applies to domestic workers in corresponding employment who cannot reasonably return to their homes at the end of the workday. *See* 20 C.F.R. § 655.122(d)(1). Finally, the housing deduction will actually disadvantage U.S. farmworkers. It will lower the AEWRs applicable to H-2A workers, making them cheaper than similar U.S. farmworkers, thus creating a strong incentive for employers to hire H-2A workers over U.S. workers. Accordingly, the housing deduction further (and needlessly) depresses AEWRs.

*Data Source.* The IFR also cannot ensure that its AEWRs will approximate the market wages of U.S. farmworkers because it relies on a data source that currently does not even contain wage data from farm establishments. *See supra* at pp. 5–6. DOL previously generated AEWRs using FLS wage data, which was based on surveys of actual farm establishments. *See supra* at p. 4. DOL therefore repeatedly championed FLS data, claiming that it provided accurate estimates of market wages. *See* 90 Fed. Reg. at 47929; 75 Fed. Reg. at 6898; 88 Fed. Reg. at 12794. The IFR, however, now shifts to OEWS data, which currently does *not* survey wages from farm establishments. *See* 90 Fed. Reg. at 47931–32. DOL previously admitted that that "the [OEWS] survey is not an appropriate data source for ensuring that the importation of guest workers does not adversely affect U.S. workers" because it "does not gather data directly from farmers." 75 Fed. Reg. at 6901. DOL further explained that OEWS data on farmworker wages comes "from non-farm establishments whose operations support farmer production" and the "workers employed by support services establishments are less educated and less likely to be U.S. citizens than employees of farm establishments, and therefore typically have substantially lower wage rates." *Id.* Thus, for example, FLC employees in California have been paid only around 70% of the wages received by other

15

farmworkers.[14] Similar trends can be seen nationwide.[15] FLC wages are thus not a reliable basis to calculate the market rates for farmworkers in all relevant sectors.

Indeed, the IFR appears to acknowledge that OEWS data, in its current form, is insufficient. It notes that DOL intends to work to ensure that, in the future, OEWS data will incorporate data from farm establishments. *See* 90 Fed. Reg. at 47931–32. However, the IFR anticipates that farm establishment data will be collected for OEWS purposes starting only in May 2026. *See id.* And even then, it is unclear whether OEWS data will truly incorporate farm establishment data at that point. OEWS surveys create estimates by averaging wage rates from a three-year period; thus, it appears farm establishment data will have to be collected for three years (2026, 2027, and 2028) before it will be included in OEWS data.[16] The earliest the OEWS survey could provide data based on farm establishment surveys may therefore be 2029. Until then, OEWS data could generate inaccurate estimates for farmworker market wages.

Not only is the OEWS data generally insufficient, the IFR, in certain circumstances, will deliberately rely on the wrong OEWS data. As explained above, in certain circumstances, an H-2A job may involve multiple tasks that can be classified under different SOC codes. *See supra* at p. 6. Rather than

---

[14] *See* Daniel Costa, *EPI Comment on DOL's Interim Final Rule Modifying the AEWR Methodology for H-2A Farmworkers*, Econ. Pol'y Inst. (Dec. 1, 2025), https://perma.cc/6FB6-QYVK. *See also* Rural Migration News, *California: FLC Employment Down and Wages Up in 2020*, U.C. Davis (July 16, 2021) (https://perma.cc/Q8M4-ERNB).

[15] *Compare* Quarterly Census of Employment and Wages, *Private, NAICS 111 Crop production, All Counties 2025 First Quarter, All establishment sizes*, Bureau of Lab. Stats. (last visited Dec. 16, 2025), https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=1&year=2025&qtr=1&own=5&ind=111&supp=0 (finding in the 1st Quarter of 2025 directly hired farmworkers averaged a weekly wage of $838) *with* Quarterly Census of Employment and Wages, *Private, NAICS 115115 Farm labor contractors and crew leaders, All Counties 2025 First Quarter, All establishment sizes*, Bureau of Lab. Stats. (last visited Dec. 16, 2025), https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=1&year=2025&qtr=1&own=5&ind=115115&supp=0 (finding in the 1st Quarter of 2025 FLC hired employees averaged $620 in weekly wages).

[16] *See* Costa, *supra* n. 14. *See also Survey Methods and Reliability Statement for the May 2023 Occupational Employment and Wage Statistics Survey*, Bureau of Lab. Stats. (last visited Dec. 16, 2025), https://perma.cc/47ZV-NQD9.

pull data from all relevant SOC codes, the IFR requires that the entire job be subject to the SOC code applicable to the task that consumes over 50% of the job. *See id.* That can further depress AEWRs. For example, suppose an H-2A position calls for the jobholder to spend 51% of his time doing ranch farmwork and 49% of his time working as a heavy truck driver. The FLS notes that the median wage for the ranch farmworker SOC code has been $17.38 per hour, whereas the median wage for the heavy truck driver SOC code has been far higher, at $27.62 per hour. *See* 90 Fed. Reg. at 47935. Under the IFR, the AEWR for that position as a whole—including the heavy truck driving tasks—will be based only on data for the ranch farmworker SOC code, thus obviously underestimating the true market rate for that job. The IFR therefore does not base AEWRs on appropriate data.

* * * * *

At bottom, the IFR deliberately (and significantly) decreases AEWRs, allowing U.S. agricultural employers to hire an unlimited supply of foreign labor at sub-market, exploitative wages, all to avoid having to hire U.S. farmworkers at fair wages. DOL thus cannot "articulate a satisfactory explanation" for how the AEWRs will serve their intended purpose: to protect U.S. farmworker wages from the adverse effects of the H-2A program. *State Farm*, 463 U.S. at 43. Indeed, the IFR is even more problematic than the 2020 Rule that this Court previously found unlawful. That rule merely froze AEWRs for a limited period of time; the IFR, by contrast, reduces them, even though AEWRs are expected to (and generally do) rise annually. *See supra* at pp. 4–5.

Notably, the Administration has taken a different approach with respect to the H-1B program which, unlike the H-2A program, is reserved for white-collar jobs such as computer engineering positions. Similar to the H-2A program, companies may hire foreign workers under the H-1B program if it "will not adversely affect the working conditions of workers similarly employed." 8 U.S.C. § 1182(n)(1)(A). In a proclamation issued less than two weeks prior to the IFR's release, the President asserted that "[t]he H-1B nonimmigrant visa program . . . has been deliberately exploited to replace, rather than supplement,

17

American workers with lower-paid" foreign workers. Proclamation No. 10973, 90 Fed. Reg. 46027 (Sep. 24, 2025). The President stated that "some employers . . . have abused the H-1B" program "to artificially suppress wages, resulting in a disadvantageous labor market for American citizens." *Id.* The proclamation thus called for *higher* mandatory rates for H-1B workers in order to protect American workers in white-collar positions. *See id.* The same economic reasoning should apply to the H-2A program. Nevertheless, while the Administration has sought to protect high-earning U.S. workers from the effects of foreign labor, it has inexplicably failed to provide low-income farmworkers the same protection. There is no rational explanation for the difference in treatment. The IFR is therefore arbitrary and capricious.

Furthermore, the arguments set forth in this subsection also show that Plaintiffs are likely to prevail on their statutory claim that the IFR conflicts with the INA because it creates the very "adverse effects" on U.S. worker wages that Congress requires DOL to prevent. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007) ("The APA empowers [courts] to set aside an agency decision that is contrary to governing law.").

b. *DOL failed to properly consider the reliance interests of U.S. farmworkers.*

DOL failed to adequately consider the reliance interests of U.S. farmworkers—the central group DOL is statutorily obligated to protect. When serious reliance interests could be impacted by an agency action, the agency is required to "assess whether there were reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). The agency must address *why* the benefits of the policy shift outweigh the reliance interests. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). Merely saying something "was considered is not enough to show reasoned analysis." *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021).

Here, the IFR minimizes U.S. workers' reliance interests by stating that there is "no evidence" of a substantial population of U.S. workers that would accept agricultural work but for H-2A workers, and

that any such "reliance interest [in the prior methodology] is vitiated by the USDA's discontinuation of the FLS." 90 Fed. Reg. at 47928. Both arguments fail. The first response ignores the thousands of U.S. workers who currently do accept farmworker positions[17] and who, in light of the IFR, will experience dramatic reductions to what DOL concedes are already "low wages." *Id.* at 47948. The second response misunderstands the reliance interests. U.S. farmworkers were not just relying on a methodology that depended on FLS data; they relied on a methodology that, unlike the IFR, based AEWRs on actual market rates. By deliberately slashing AEWRs to sub-market levels, and thus depriving many U.S. farmworkers of key wage protections, the IFR will make it difficult for those farmworkers to cover necessary life expenses, including costs for health care, food, and housing.[18]

The IFR does not grapple with these reliance interests. It acknowledges that it will reduce U.S. farmworker wages, resulting in a wage transfer from "corresponding workers, not only H-2A workers," 90 Fed. Reg. at 47956, but it makes no attempt to quantify the impact on U.S. farmworkers, instead asserting that DOL "lacks sufficient information about the number of corresponding workers or their wage structures to measure these impacts." 90 Fed. Reg. at 47956. As this Court previously found under nearly identical circumstances, such a meager assessment of the IFR's effect on the key statutorily protected group—U.S. workers—is insufficient. *See UFW*, 509 F. Supp. 3d at 1244–45 (determining that the 2020 Rule's statement that DOL "does not have sufficient information about the number of workers in

---

[17] When submitting H-2A job orders in 2024, employers estimated needing 91,895 U.S. workers in addition to the H-2A workers they requested. *See* IFR Comment Letter from CATA, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 14 (Dec. 1, 2025), https://perma.cc/U4J9-VS5K, attached hereto as Ex. 2.

[18] *See* IFR Comment Letter from State Attorneys Generals including Rob Bonta, California Attorney General, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 19 (Dec. 1, 2025), https://perma.cc/H99A-4RVH, attached hereto as Ex. 3; IFR Comment Letter from Migration That Works, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States (Dec. 1, 2025), https://perma.cc/VDR3-D9XP, attached hereto as Ex. 4 .

corresponding employment affected and their wage structure to reasonably measure the wage transfer to or from these workers" failed to adequately analyze harm to U.S. farmworkers). This failure to meaningfully analyze harms on U.S. workers renders the IFR arbitrary and capricious.[19] Plaintiffs are therefore likely to succeed on their APA arbitrary-and-capricious claim.

        2.        The IFR is procedurally defective.

The IFR is unlawful because it was issued without the required notice-and-comment process. The APA requires that, prior to promulgating rules, an agency must "give interested persons an opportunity to participate in the rule making through submission of" comments. *See* 5 U.S.C. § 553(b), (c). The notice-and-comment procedure can be bypassed if an agency, "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). "[T]he good cause exception goes only as far as its name implies: It authorizes departures from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (alteration in original). "Good cause is to be narrowly construed and only reluctantly countenanced." *Id*. "[T]he good cause exception is usually invoked in emergencies, and an agency must overcome a high bar to do so." *Id*.

Here, DOL fails to overcome the high bar of showing that it had good cause for bypassing the notice-and-comment process. DOL relies on two arguments to try and show good cause. Neither has merit. First, DOL argues that increased enforcement of immigration law has created a "current and imminent labor shortage" since farms were relying on undocumented laborers. 90 Fed. Reg. at 47920. But it is unclear how drastically reducing AEWRs is necessary to cure any labor shortage. DOL fails to explain

---

[19] In fact, the Economic Policy Institute estimates that the IFR will result in annual wage losses of $2.7 billion for U.S. farmworkers. *See* Daniel Costa & Ben Zipperer, *Trump's New H-2A Wage Rule Will Radically Cut the Wages of All Farmworkers*, Econ. Pol'y Inst. (Nov. 26, 2025) https://perma.cc/SF4E-M7W5.

why farms could not simply hire more H-2A workers based on AEWRs that actually approximate relevant market rates.[20] Alternatively, those farms could also address any labor shortage by doing what employers generally do in that circumstance: increase wages in order to draw more U.S. workers. *See* 80 Fed. Reg. 62958, 62992 (Oct. 16, 2015) ("[A] basic principle of economic supply-and-demand theory is that in market economies, shortages signal that adjustments should be made to maintain equilibrium" and thus "compensation should rise to attract more workers where employers are experiencing a shortage of available workers").

Second, DOL also tries to justify bypassing notice-and-comment by referring to USDA's cessation of the FLS. 90 Fed. Reg. at 47926. But the FLS's discontinuance could, at most, justify an immediate regulation that selects a new data source (*i.e.*, the IFR provision selecting OEWS data as the new source for calculating AEWRs). The FLS's discontinuance, however, does not justify bypassing notice-and-comment for the other IFR provisions that DOL admits are "untethered from the continued use of annual FLS wage data," *id.* at 47920, including those creating an arbitrary two-tier system and imposing the housing deduction. DOL had to, but did not, utilize notice-and-comment before instituting those provisions. *See Am. Fed'n of Gov't Emp. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) ("[D]etailed regulations which respond . . . to much more than the exigencies of the moment must be promulgated through public procedures before they are chiseled into bureaucratic stone."). Those provisions are thus unlawful. Plaintiffs are therefore likely to succeed on their APA notice-and-comment claim.

---

[20] Further, DOL provides no evidence at all that a material decline in the use of unauthorized farmworkers has occurred or will occur. 90 Fed. Reg. at 47921. The IFR states that there has been a "near total cessation of illegal inflow" of immigrants, *id.* at 47921, but, according to the NAWS survey relied upon throughout the IFR, the vast majority of farmworkers (excluding H-2A workers) are not recent immigrants: only 5% of *foreign-born* farmworkers had arrived into the United States within the last year. NAWS, at 1. The IFR further relies on an academic model of a "hypothetical decision to heighten immigration enforcement actions," but this model of hypothetical actions is not evidence of a present labor shortage. 90 Fed. Reg. at 47922.

21

**B.**     **The IFR will irreparably harm Plaintiffs, and the balance of the equities favors issuing emergency relief.**

The IFR's express purpose is to reduce farmworker wages by reducing the AEWR,[21] which in turn will cause significant and irreparable harms. *See* Decl. of Irene Mendoza, ¶¶ 11–12 (describing how wage cuts will make the health care that she needs to prevent heart failure and subsequent death unaffordable); Decl. of Claudia Garcia, ¶ 10 (IFR wage cuts caused will limit Ms. Garcia's ability to pay for food and educational expenses); Decl. of Fortino Lopez, ¶ 8 (IFR wage cuts may prevent Mr. Lopez from purchasing adequate food and health care for his family); Decl. of Crisanto Serrano, ¶ 11; Decl. of Jose Cruz, ¶ 8; Decl. of Aaron Grimaldo, ¶ 10. Importantly, this Court has previously noted that "[t]he irreparable nature of [these] injur[ies] is heightened by [farmworkers'] fragile socioeconomic position." *UFW*, 509 F. Supp. 3d at 1249.

Additionally, the wage cuts occasioned by lower AEWRs may force the individual Plaintiffs to look for employment in other sectors. As this court has acknowledged, lowering the costs of H-2A labor will incentivize employers to rely more on the H-2A workers and less on U.S. farmworkers, many of whom simply could not afford to work for wages based on sub-market AEWRs. *See UFW*, 509 F. Supp. 3d at 1249. And the Ninth Circuit has held that loss of a job opportunity constitutes irreparable harm that cannot be remedied by damages. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (holding that plaintiffs' "diminished [] opportunity to pursue [their] chosen professions" because they were unable to "remain[] in good jobs where they faced possible promotion" and "prevented [] from

---

[21] 90 Fed. Reg. at 47922–23 ("[T]he Department anticipates negative impacts for certain populations associated with this regulation."); *id.* at 47956 ("The decrease (or increase) in the AEWRs also represents a wage transfer from corresponding workers, not only H-2A workers."); *id.* at 47952 ("With illegal border crossings at record lows—agricultural employers, who have historically been incentivized to rely on such workers because of high AEWRs mandated to use the H-2A program, will experience economic harm.").

applying for desirable entry-level jobs" constituted irreparable harm). The IFR will thus inflict irreparable harms on Plaintiffs.

Moreover, the balance of the equities favors emergency relief here. For one, "[t]here is generally no public interest in the perpetuation of unlawful agency action" and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. DeVos*, 481 F. Supp. 3d 1184, 1197 (W.D. Wash. 2020). Further, the IFR offers no evidence-backed justification for its methodological changes that would outweigh the harms inflicted on vulnerable U.S. farmworkers. For example, the IFR claims that it spares growers from increased labor costs due to increased immigration enforcement. *See* 90 Fed. Reg. at 47921. But that is not a legitimate interest that should discourage emergency relief here. Growers should be paying the market rate for farmworkers, not the rate they illegally paid to undocumented workers. *See United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 121 (E.D.N.Y. 2023) ("[A]ny harm appears to stem from defendants' own wrongful conduct" and in "such circumstances, the Court cannot say the harm to defendants outweighs the harm to plaintiffs."); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1170 (9th Cir. 2002) (describing the hiring of undocumented workers by growers as "[a] scheme [] to gain an illegal commercial advantage" that hurt American farmworkers). And the IFR offers no evidence indicating that U.S. agricultural employers, as a general matter, cannot afford to pay farmworkers an appropriate, market-based rate. Thus, the balance of equities and public interest weigh in favor of preliminary relief.

**C.    Remedy**

The Court should stay the IFR under 5 U.S.C. § 705 and issue a universal preliminary injunction against the IFR. The Court must also order DOL to then promptly generate AEWRs pursuant to a lawful methodology.

23

1.    *Plaintiffs are entitled to a stay under 5 U.S.C. § 705.*

If Plaintiffs satisfy the preliminary injunction factors, this Court may issue a "§ 705 Stay [that] pauses the" implementation of the IFR "during the pendency of this litigation in a manner similar to a preliminary injunction." *Immigrant Defs. L. Ctr. v. Noem*, 145 F. 4th 972, 983 (9th Cir. 2025). A §705 stay would functionally "set aside" (*i.e.*, vacate) the rule on a temporary basis. *See Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring) ("To be sure, in the wake of the Court's decision . . . in cases under the Administrative Procedure Act, plaintiffs may [still] ask a court to preliminarily 'set aside' a new agency rule.").

2.    *Plaintiffs are entitled to a universal preliminary injunction against the IFR.*

The Court should also preliminarily enjoin implementation of the IFR in full. A universal injunction is appropriate if it is necessary to provide the plaintiffs with complete relief. *See Trump*, 606 U.S. at 851–52 (successful plaintiffs are entitled to injunctions that provide them with full relief, and those "party-specific injunctions" may potentially "advantag[e] nonparties"). Here, a universal injunction is necessary to provide Plaintiffs with complete relief. First, UFW has members in most States. *See* Decl. of Teresa Romero, President of UFW, ¶ 5. Second, many individual Plaintiffs have traveled, and are willing to again travel, to different States for work. Thus to provide them with complete relief, the injunction would have to prevent the IFR from depressing wages for positions across the country that Plaintiffs would potentially pursue. Third, there is no practical way to craft a party-specific injunction. The individual Plaintiffs' injuries here stem from the broader market effects of lower AEWRs. Specifically, lower AEWRs will generally enable U.S. employers to fulfill their labor needs at lower wages, which will incentivize use of the H-2A program to the detriment of U.S. workers and will bring down market rates for positions across the country. Only a categorical injunction can prevent that impact.

In fact, an attempt to craft a narrower injunction would be impractical. For example, an injunction that only bars enforcement of the IFR in the markets where Plaintiffs reside would place those markets at

24

a significant disadvantage. Those markets would be subject to labor costs higher than every other market in the United States, making it difficult for employers in those affected markets to compete and thus potentially precluding them from hiring any farmworkers. Accordingly, any injunction against the IFR must and should apply universally. *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 176 (D. Md. 2025) ("The complicated interplay between the ACA and numerous market actors would make it exceedingly difficult if the challenged provisions went into effect for some of the population served by. [sic] the Exchange but were stayed as to others.").

> 3. *Any relief must require DOL to promptly begin calculating AEWRs pursuant to a lawful methodology.*

A stay of, or injunction against, the IFR would require DOL to generate AEWRs pursuant to a different methodology. Given that the FLS has been discontinued, Plaintiffs acknowledge that DOL may not be able to revert to the 2010 Rule which governed AEWR calculations immediately prior to the IFR. To the extent DOL cannot promptly institute a new, permanent methodology, it must adopt an interim methodology for calculating lawful AEWRs pending its issuance of a more permanent methodology. *See Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("[T]he district court has broad discretion in fashioning a remedy."). For example, DOL can revert to the FLS-based AEWRs in place immediately prior to the IFR and apply an upward adjustment that accounts for the degree to which the AEWRs likely would have increased if the FLS had not been discontinued, which this Court ordered DOL to do when it enjoined the 2020 Rule. Whichever route DOL selects, its new methodology—permanent or interim— must generate AEWRs that will actually approximate the wages that U.S. farmworkers in the relevant markets would have received absent the H-2A program. *See supra* at p. 4.

**CONCLUSION**

The Court should grant Plaintiffs' Motion for a Section 705 Stay and Preliminary Injunction. A Proposed Order is attached.

DATED: December 22, 2025

Respectfully submitted,

/s/ *Kuntal Cholera*
Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Sela Carrington**
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
kcholera@cov.com
tplotkin@cov.com
mandrewslee@cov.com
ccoleburn@cov.com
liwilliams@cov.com
scarrington@cov.com
*Admitted *pro hac vice*
** *Pro hac vice* application forthcoming

Mario Martinez, Esq.
Edgar Aguilasocho, Esq.
Martinez Aguilasocho Law, Inc.
P.O. Box 1998
Bakersfield, CA 93303
Phone: 661-859-1174 | Fax: 661-840-6154
mmartinez@farmworkerlaw.com
eaguilasocho@farmworkerlaw.com
info@farmworkerlaw.com

Lori Johnson*
Rebecca Rosefelt*
Farmworker Justice
1126 16th St. NW, Suite 507
Washington, DC 20036
ljohnson@farmworkerjustice.org
rrosefelt@farmworkerjustice.org
*Admitted *pro hac vice*

Verónica Meléndez (SBN 294106)
Cecilia Guevara Langberg (SBN 307159)
California Rural Legal Assistance Foundation
2210 K Street, Suite 201
Sacramento, CA 95816
Tel: (916) 446-7905
Fax: (916) 446-3057

vmelendez@crlaf.org
cguevarazamora@crlaf.org

*Attorneys for Plaintiffs*