# Exhibit 3



State of California
## Office of the Attorney General

### ROB BONTA
*ATTORNEY GENERAL*

December 1, 2025

**<u>Submitted By Electronic Filing</u>**

The Honorable Lori Chavez-DeRemer
U.S. Secretary of Labor
U.S. Department of Labor
Frances Perkins Building
200 Constitution Avenue NW
Washington, DC 20210

RE:    <u>Interim Final Rule, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 20 Fed. Reg. 47914 (Oct. 2, 2025) (DOL Docket No. ETA-2025-0008)</u>

Dear Secretary Chavez-DeRemer:

We, the undersigned Attorneys General of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Washington (the "State AGs") submit this comment letter, opposing the U.S. Department of Labor's (the "DOL") October 2, 2025 publication of the Interim Final Rule ("IFR"), *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*. The H-2A visa program provides U.S. farmers with a means to hire agricultural workers from other countries on a temporary basis when domestic workers are in short supply. The IFR puts into immediate effect, without the notice-and-comment process required by the Administrative Procedure Act ("APA"), a significant reduction to the Adverse Effect Wage Rate ("AEWR"), which lowers the wages of workers employed under the H-2A program. The IFR rolls back without good cause wage protections instituted since 1986 for farm laborers who bring food to homes across the nation. Moreover, in slashing wages for guest workers, it promises to undercut the wages of domestic workers, precisely the result that Congress instituted the AEWR to prevent. Instead, the IFR aims to transfer $2.46 billion annually from workers' wages to employers' pockets.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 2

H-2A workers and their domestic counterparts are an important portion of the agricultural labor force of the States represented by the undersigned State AGs.[1] We have a compelling interest to protect the accurate computation and implementation of agricultural wages so that both temporary and domestic farmworkers get their fair pay. The DOL has reported that the industry remains rife with wage theft and poor housing conditions. State AGs are concerned that despite these findings, the DOL shifts monetary gains to employers and away from workers rather than protect employees from continuous substandard treatment. In addition, the States will suffer direct impacts to their budgets because their State Workforce Agencies administer the H-2A program, performing the initial screening on every employer application and categorizing job postings by occupational classification.[2] The IFR projects that its wage cuts will greatly increase the use of the H-2A program in the coming decade, which will mechanically also increase the administrative burden imposed on State Workforce Agencies, without any additional funding from the DOL.

The State AGs urge the DOL to withdraw the IFR as it is arbitrary and runs antithetical to the DOL's statutory mission to promote and develop the welfare of wage earners.[3] This comment letter first reviews the background of the AEWR and the short-lived attempts to change the AEWR methodology. Second, the letter provides comments opposing the IFR for the following reasons: (1) the DOL evades the notice-and-comment process to effectuate a new AEWR methodology; (2) the DOL arbitrarily abandons the use of long-standing, farm-specific data to lower the AEWR; (3) the DOL arbitrarily creates a lower-paid job category to excuse further cuts in pay; (4) the DOL defies the purpose of the AEWR and undercuts the statute that mandates that employers must provide housing to temporary agricultural workers; (5) the DOL further lowers wages by creating an arbitrary "majority duties rule" for specialized labor; (6) by effectuating the rule in haste, the DOL ignores historic violations in the H-2A program to quickly backfill a workforce diminished by the President's immigration policies; and (7) the IFR will result in farmworkers being paid less than or close to the federal poverty line, inflicting direct financial injuries on our States.

## I.    BACKGROUND

### A.  Wages under the AEWR have historically relied on farm-specific data.

Under 20 C.F.R. § 655.120(a), an employer must pay H-2A workers and their domestic counterparts the highest of the (1) Adverse Effect Wage Rate ("AEWR"), (2) prevailing wage rate, (3) agreed-upon collective bargaining wage, (4) federal minimum wage, (5) state minimum wage, or (6) any other wage rate the employer intends to pay. Since 1987, the DOL has primarily established the AEWR through the Farm Labor Survey conducted by the U.S. Department of Agriculture (the "USDA") for non-range occupations, the most common of occupations in the

---

[1] Domestic counterparts to H-2A workers are referred to as "corresponding workers" under 20 C.F.R. 655 Subpart B and 29 C.F.R. Part 501. Corresponding workers are defined under 20 C.F.R. § 501(a) as U.S. workers who do the same work as the H-2A workers at the same locations as the H-2A workers during the pendency of the H-2A certification.

[2] *See* 20 C.F.R. § 655.121(e).

[3] Pub. L. No. 62-426, 37 Stat. 736 (1913).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 3

agricultural industry.[4, 5] The Farm Labor Survey collects data specifically from all farms and ranches from each state or region with $1,000 or more in agricultural sales.[6] The survey collects data quarterly on the number of workers, total hours worked, and total wages by type of work to compute the AEWR.[7] The AEWR is then published in the Federal Register.[8]

Except for brief periods under the 2008 and 2020 Final Rules, the DOL has established the AEWR primarily on the Farm Labor Survey conducted by the USDA.[9] From 1987 to 2008, the AEWR was based on this survey. For a short two-year period from 2008 to 2010, the DOL changed the computation of the AEWR by using data collected by the Occupational Employment Statistics administered by the DOL's Bureau of Labor Standards. The statistics derive from broader data from all occupations rather than farm-specific data. In 2010, the DOL reverted back to the Farm Labor Survey to calculate the AEWR after analyzing the effects of the 2008 rule and concluding that the Farm Labor Survey is the "authoritative source for data on agricultural wages."[10] Computation of the AEWR through the survey remained so until a short stint in 2020.[11] On November 5, 2020, during the first Trump administration, the DOL published a final rule that changed the AEWR methodology by relying on an index that excluded farms and agricultural workers. The first Trump administration prevented reliance on the Farm Labor Survey through the USDA's abrupt suspension of the Farm Labor Survey on September 30, 2020. The Eastern District of California's decision in *United Farm Workers v. Perdue* enjoined the USDA from suspending the Farm Labor Survey, and the court's decision in *United Farm Workers v. U.S. Department of Labor* enjoined the implementation of the 2020 Final Rule.[12] In both decisions, the court recognized that farmworkers across the country would suffer irreparable harm by the suspension of the Farm Labor Survey and the enactment of the 2020 rule since workers would suffer grave economic hardship by the decreased wages resulting from the 2020 AEWR methodology.[13] Therefore, until now, the DOL has continued using the Farm Labor Survey to compute the AEWR.

---

[4] 20 C.F.R. § 655.120(b)(1)(i)(A); *see also* 84 Fed. Reg. 36,168, 36,179 (Jul. 26, 2019) (noting that, in many areas, local prevailing wage surveys are not conducted for all agricultural occupations because the method is resource-intensive, so the prevailing wage rates do not exist for all H-2A occupations).

[5] 54 Fed. Reg. 29037, 28039-2040 (Jul. 5, 1989) (recognizing that the USDA's Farm Labor Survey determined the wage rates for foreign workers imported into the United States even during the H-2A program's predecessor, the Bracero program as described *infra* n. 15).

[6] U.S. Dept. of Agric., *Farm Labor Methodology and Quality Measures* (Nov. 20, 2024), https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Oct. 17, 2025).

[7] *Id.*

[8] 20 C.F.R. 655.120(b)(2).

[9] *See* 73 Fed. Reg. 77110 (Dec. 18, 2008); 85 Fed. Reg. 70455 (Nov. 5, 2020).

[10] 88 Fed. Reg. 12760, 12773 (Feb. 28, 2023) (citing 84 Fed. Reg. 36183-84, 36243 (Jul. 26, 2019)).

[11] 75 Fed. Reg. 6883 (Feb. 12, 2010).

[12] *United Farm Workers v. Perdue*, 2020 WL 6318432, at *17 (E.D. Cal. Oct. 28, 2020); *United Farm Workers v. United States Dep't of Lab.*, 509 F. Supp. 3d 1225, 1233 (E.D. Cal. 2020).

[13] *United Farm Workers v. Perdue* at *15 (E.D. Cal. Oct. 28, 2020); *United Farm Workers v. United States Dep't of Lab.* at 1252 (E.D. Cal. 2020).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 4

### B.  Federal statute has long required employers to cover H-2A housing costs.

Under the Immigration and Nationality Act ("INA"), as amended by the Immigration and Reform Control Act of 1986 ("IRCA"), "[e]mployers shall furnish housing in accordance with regulations."[14] The implementing regulation at 20 C.F.R. § 655.122(d)(1) requires employers to provide housing *at no cost* to H-2A workers, as well as corresponding workers who cannot reasonably return to their residence after a workday. The requirement has been in place since the DOL effectuated the rule in 1987.[15] Since then, the DOL has enforced civil money penalties and has ordered backpay if growers deducted housing costs from workers' wages.[16]

Section 655.122(d)(1), along with the adjoining regulations in 20 C.F.R. 655 Subpart B and 29 C.F.R. Part 501, institute robust protections against the poor conditions that historically plagued the farming industry since the implementation of the Bracero program.[17, 18] To prevent exploitation, the regulations mandate employers to specifically provide safe and healthy transportation, food, and housing for workers. By codifying the housing requirement under the INA, Congress intended to attract U.S. workers to farm labor without being adversely affected by known industry abuses.[19]

---

[14] 8 U.S.C. § 1188(c)(4).

[15] *See* 75 Fed. Reg. at 6909 (recognizing the employer-provided housing requirement has been in place since 1987 and reinstituting inspection and certification requirements in 2010).

[16] *See* 29 C.F.R. Part 501; *see also* U.S. Gov't Accountability Office, *H-2A Visa Program: Agencies Should Take Additional Steps to Improve Oversight and Enforcement*, GAO-25-106389, at 7, 29, 36, 52 (2024), https://www.gao.gov/assets/gao-25-106389.pdf (last visited Oct. 17, 2025).

[17] The Bracero program was born out of agreements between the United States and Mexico in 1917-1921 and 1942-1964 to establish a legal guestworker program for Mexican citizens to work on U.S. farms. The Bracero program was initially established to respond to labor shortages during war. Upon its termination in 1964, the program brought four million guestworkers to work in U.S. agriculture and railroads. Philip Martin, *Mexican Braceros and US Farm Workers*, Wilson Center (July 10, 2020), https://www.wilsoncenter.org/article/mexican-braceros-and-us-farm-workers (last visited Oct. 20, 2025); Philip Martin, *Promise Unfulfilled: Unions, Immigration, and the Farm Workers* (ILF Press 2003); "1942: Bracero Program," Library of Congress, https://guides.loc.gov/latinx-civil-rights/bracero-program (last visited Oct. 20, 2025).

[18] H.R. REP. 99-682(I), 84, 1986 U.S.C.C.A.N. 5649, 5688 (When considering amending the INA in 1986, the House Report by the Judiciary Committee recognized that the Bracero program is "likened by some to indentured slavery where employer exploitation was rampant and inhumane."); *see also* Ernesto Galarza, *Merchants of Labor: The Mexican Bracero Story—An Account of the Managed Migration of Mexican Farm Workers in California, 194201960* (McNally & Loftin 1964); *Harvest of Loneliness: The Bracero Program* (Gilbert G. Gonzalez, Vivian Price & Adrian Salinas, dirs., 2010); 89 Fed. Reg. 103202 (Dec. 18, 2024) (describing the flagrant wage theft, contract violations, and inhumane living and working conditions experienced by workers employed in the program).

[19] *See* U.S. Gov't. Accountability Off., *The H-2A Program: Protections for U.S. and Foreign Agricultural Workers* 2 (GAO/PEMD-89-3, Oct. 21, 1988); *see also* H.R. REP. 99-682(I), 84, 1986 U.S.C.C.A.N. 5649.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 5

    **C. Notice and comment are required for substantial rule changes absent narrow exemptions.**

    The APA requires agencies to provide formal notice-and-comment process prior to establishing a final rule implementing the laws passed by Congress. Agencies must provide the public with reasonable time to review the proposed rule and provide comments.[20, 21] Thereafter, agencies respond to those comments in any final rule.[22] The APA specifically requires that "[t]he required publication . . . shall be made not less than 30 days before its effective date."[23] Courts have ruled that "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comments."[24] Agencies have typically provided at least a 60-day comment period to "afford the public a meaningful opportunity to comment on any proposed regulation . . . [and] to explore . . . consensual mechanisms for developing regulations, including negotiated rulemaking."[25, 26]

    During the last attempt to lower the AEWR, the DOL abided by the timeframe permitted by the notice-and-comment process under the APA. Under the first Trump administration, the DOL published a Notice of Proposed Rulemaking, lowering the AEWR, on July 26, 2019 and allowed 60 days for the public to review the proposed rule and provide comments through September 24, 2019. The DOL reviewed a total of 83,532 public comments and published its final rule, incorporating responses to public comment, on November 5, 2020.[27]

    The APA's notice and comment requirements are subject to very narrow exemptions.[28] The good cause exemption allows an agency to bypass the APA's requirements when the notice and comment period is impracticable, unnecessary, or against the public interest.[29] The exemption is not an "escape clause[] that may be arbitrarily utilized at the agency's whim."[30]

---

[20] 5 U.S.C. § 553.

[21] Section 553 "serve[s] the laudable purpose of informing affected parties and affording them a reasonable time to adjust to the new regulation . . . The more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

[22] *See* 5 U.S.C. § 553(b)-(c).

[23] 5 U.S.C. § 553(d).

[24] *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984); *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)); *see also Centro Legal de la Raza v. Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021).

[25] Executive Order 12866 § 6(a), 58 Fed. Reg. 51735 (Oct. 4, 1993).

[26] *See*, *e.g.*, *State v. Biden,* 52 F.4th 362, 367 (8th Cir. 2022); *California v. Bernhardt*, 472 F. Supp. 3d 573 (N.D. Cal. 2020); *Defs. of Wildlife v. Browner*, 909 F. Supp. 1342, 1350 (D. Ariz. 1995).

[27] 85 Fed. Reg. at 70447-48.

[28] 5 U.S.C. § 553(a), (b)(A)-(B).

[29] 5 U.S.C. § 553 (b)(B).

[30] *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (citing S. Rep. No. 752, 79th Cong. 1944-46 at 200, 201).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 6

## II.      COMMENTS OPPOSING THE INTERIM FINAL RULE

The IFR at issue here is President Trump's second expedited attempt to lower wages in the H-2A program. The IFR intends to lower worker wages in four ways. First, the IFR implements a new AEWR methodology based on a semiannual survey typically conducted with nonfarm establishments. Second, the IFR establishes a two-tiered wage determination, cutting wages further for "entry-level" workers. Third, the IFR deducts from the AEWR an amount to cover the cost of housing, which employers have statutorily provided workers at no cost since 1987. Fourth, the rule ends the practice of paying workers a higher hourly AEWR for doing specialized jobs unless these duties encompass more than 50 percent of the workdays. The DOL provides inconsistent and arbitrary reasons to hastily abandon the long-standing methodology to compute the AEWR. And, in contrast to the previous rulemaking on this issue by the first Trump administration and in violation of the APA, the DOL has done this all without proper notice and comment through an interim final rule that was immediately effectuated.

### A.   The DOL evades the notice-and-comment process without good cause.

On October 2, 2025, the DOL effectuated the IFR without good cause to bypass the notice-and-comment period required under the APA. The good cause exception is "narrowly construed and only reluctantly countenanced."[31] This is a "high bar," as the exception is "essentially an emergency procedure."[32] Agencies must therefore establish that "delay would do real harm to life, property, or public safety."[33] The proffered reasons fall far short of that stringent standard.

The DOL claims that the APA's good cause exemption under Section 553(b)(B) allows it to institute the rule immediately because the USDA discontinued the Farm Labor Survey in August 2025, rendering impracticable an AEWR computation based on the survey.[34] That is no "emergency."[35] The agency had readily available alternatives, such as simply using the most recent iteration of the Farm Labor Survey, last published quite recently in May 2025, to determine AEWRs for calendar year 2026.

In addition, that basis for invoking the exemption is a self-manufactured exigency. As mentioned *supra*, the DOL failed in its attempt during the first Trump administration to suspend the survey. The court in *Perdue* recognized that the USDA and the DOL work in coordination so that the DOL can arrive at the most accurate wage rates reflective of the farm labor market; the DOL has even funded the Farm Labor Survey since July 2011 pursuant to a memorandum of understanding between the agencies.[36] The court concluded that the suspension of the survey

---

[31] *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).
[32] *U.S. v. Valverde*, 628 F.3d 1159, 1164–65 (9th Cir. 2010).
[33] *E. Bay Sanctuary Covenant v. Trump*, 932 F.2d 742, 777 (9th Cir. 2018).
[34] 90 Fed. Reg. at 47920.
[35] *Valverde*, 628 F.3d at 1165.
[36] *United Farm Workers v. United States Dep't of Lab.,* 509 F. Supp. 3d at 1231–32.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 7

would lead to inaccurate wage computations by the DOL.[37] For the same reasons, this second attempt to lower the AEWR through the IFR is unjustified. The IFR ignores the coordination between the USDA and the DOL to change the AEWR. Similar to the timeline during the first Trump administration, the DOL published the IFR just a month after the USDA canceled the Farm Labor Survey.[38] The purported impracticability of using the survey and the resulting need to base the AEWR on alternative data was a foreseeable and avoidable exigency that does not justify an emergency implementation of the IFR.

The DOL additionally claims that there is good cause to immediately circumvent the APA because there is harm to the public interest caused by "the current and imminent labor shortage exacerbated by the near total cessation of the inflow of illegal aliens."[39] This argument makes the fundamental error of confusing the public interest in the outcome of the rulemaking— a cut to farmworker wages—with the public interest in the APA's notice-and-comment requirement. It is the latter question that matters under the public-interest exception: "The public interest prong of the good cause exception is met only in the rare circumstance when ordinary procedures—generally presumed to serve the public interest—would in fact harm that interest."[40] The DOL has said nothing to explain why public-comment procedures would have any effect, positive or negative, on the statutory purposes of the H-2A visa program. Instead, the DOL makes a category error by focusing on the alleged ultimate effects of the IFR itself.

And, in any event, the DOL's explanation about the effects of the IFR also makes no sense. The DOL stakes out an illogical position that cutting wage rates by abandoning the Farm Labor Survey (and making the other changes to the AEWR) will serve "to assist employers in securing a reliable workforce alternative."[41] If "the agricultural sector is experiencing acute labor shortages," slashing farmworkers wages will only exacerbate that problem by making it even less attractive for any worker—foreign or domestic—to pursue these difficult jobs that "involve manual labor, long hours, and exposure to extreme weather conditions."[42] Moreover, the purported harm to the public interest is caused by the current administration's own immigration policies. As the IFR states, the current administration's aggressive approach to immigration enforcement has manufactured a potential labor shortage in the fields.[43] That enforcement in no way curtails access to H-2A workers, however, and if anything, facilitates employers' ability to successfully use H-2A workers as a "reliable workforce alternative" by eliminating competition from those who have violated the law by paying substandard wages to immigrants not legally allowed to work. It does not serve the public interest to allow an administration to manufacture a crisis and then exploit that alleged crisis to forgo lawful public-participation procedures.

---

[37] *United Farm Workers v. Perdue*, No. 120CV01452DADJLT, 2020 WL 6318432, at *8 ("[B]ecause the [Farm Labor Survey] is the only timely and reliable source of information on the size of the farm worker population, legal consequences would flow from an inaccurate tabulation of wage rates." (quotations omitted)).

[38] *See* 90 Fed. Reg. 42560 (Sept. 3, 2025); *see also* 80 Fed. Reg. 61719 (Sept. 30, 2020).

[39] 90 Fed. Reg. at 47920.

[40] *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012).

[41] 90 Fed. Reg. at 47922.

[42] *Id.*

[43] *Id.* at 47921, 47959.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 8

Hence, good cause does not exist to excuse the DOL from complying with the APA. Meaningful notice and comment are necessary especially because the IFR effectuates regulatory changes in a complex, long-established foreign worker program in an industry challenged with historic abuses that pre-date Congress' formation of the H-2A program.[44]

### B. The DOL arbitrarily eliminates long-standing, farm-specific data to transfer worker wages into employers' pockets.

The IFR's new AEWR methodology cuts worker wages by abandoning agricultural-specific data historically relied upon for the AEWR computation. The IFR aims to eliminate the computation of the AEWR based upon the USDA's Farm Labor Survey—a computation primarily used by the DOL since 1987—and solely relies upon the Occupational Employment and Wage Statistics ("OEWS") survey administered by the Bureau of Labor Statistics.[45] The OEWS is a semiannual survey on the wage and salary of workers typically in nonfarm establishments for approximately 830 occupations both in part-time and full-time employment.[46] The wage estimates are produced by using three years of OEWS data and is derived from a list maintained by State Workforce Agencies.[47] Contrastingly, the USDA has collected data for the Farm Labor Survey since 1910, collecting data from all farms and ranches from each state or region more often than the OEWS (every quarter as opposed to semiannually) to understand the number of hours and wages received by agricultural workers.[48] Prior rulemaking has recognized the following:

> [T]he [Farm Labor Survey] is a "superior wage source" . . . for field and livestock worker job opportunities for many reasons, including the comparatively broad geographic scope and the fact that "only the [Farm Labor Survey] directly surveys farmers and ranchers and the [Farm Labor Survey] is recognized by the BLS as the authoritative source for data on agricultural wages."[49]

The *Perdue* court also reasoned that because the Farm Labor Survey "is the only timely and reliable source of information on the size of the farmworker population, legal consequences would flow from an inaccurate tabulation of wage rates."[50]

The IFR provides a surface-level analysis to explain why the OEWS should be the preferred source for the AEWR. The IFR claims that using OEWS is more accurate than using

---

[44] *See, supra*, notes 16, 17.

[45] Computing the AEWR through the OEWS is currently an option under 20 C.F.R. § 655.120(b)(1)(i)(B) when the annual average hourly gross wage is not reported by the FLS.

[46] U.S. Bureau of Labor Statistics, *Occupational Employment and Wage Statistics Frequently Asked Questions*, https://www.bls.gov/oes/oes_ques.htm (last visited Oct. 17, 2025).

[47] *Id.*

[48] *United Farm Workers v. United States Dep't of Lab.*, 509 F. Supp. 3d at 1231.

[49] 88 Fed. Reg. 12760, 12773 (Feb. 28, 2023) (citing 84 Fed. Reg. 36183-84, 36243 (Jul. 26, 2019)).

[50] *United Farm Workers v. Perdue*, No. 120CV01452DADJLT, 2020 WL 6318432, at *8 (internal quotations omitted).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 9

the Farm Labor Survey because the data is based on a larger sample of employer establishments employing workers for temporary and permanent employment across different sectors in the United States.[51] The AEWR would then incorporate a larger sample size of establishments (1.1 million total nonfarm establishments) to arrive at average wage rates.[52] In that regard, the AEWR would be based upon competing wages in other industries that are available to corresponding workers within a specified region. The IFR further adds that the DOL can no longer compute the AEWR because the USDA eliminated the Farm Labor Survey on August 28, 2025, so no data collection could occur for the mandatory January 1, 2026 publication of the AEWR.[53] Yet, the claimed inability to do so is self-created by the current administration as discussed *supra*.

The reliance on broader data points and the self-manufactured inability to rely on the Farm Labor Survey provide no clear support to alter an AEWR computation specifically reflective of the farm labor market. The Farm Labor Survey produces more accurate wage estimates since it considers overtime, on-call pay, and shift differentials in the farming industry, as the IFR itself recognizes.[54] So a larger sample size of establishments—from wholly unrelated industries—does not imply a more accurate measure. Indeed, the belated change to the OEWS reflects the arbitrary nature of choosing it. The 2020 Final Rule instead proposed using the generic Employment Cost Index as the data source for the AEWR. These repeated shifts suggest that there is no real confidence that either broad data set helps to compute accurate agricultural wages better than the canceled Farm Labor Survey, but the IFR does acknowledge that its proposed changes will transfer $2.46 billion from farmworker wages to farm employers.[55]

### C.  The DOL arbitrarily creates a lower job category to excuse further cuts in pay.

The DOL arbitrarily bifurcates the AEWR to establish an even lower wage rate for "entry-level" H-2A workers. The IFR adds a new subsection, Section 655.120(b)(2), that further lowers wages by bifurcating the AEWR into (1) skill level I ("entry-level") and (2) skill level II ("experienced").[56] Skill level I AEWR is computed as the average hourly gross wage paid to the lower one-third of all workers employed in jobs of the five Standard Occupational Classification codes of the "field and livestock workers (combined)" category.[57] Skill level II AEWR is computed as the average hourly gross wage paid to all workers in the five codes of the same category. In other words, "entry-level" workers will be paid even lower wages since their compensation will be based on the lowest wages offered to one-third of workers in all five codes.

---

[51] 90 Fed. Reg. at 47929, 47930, 47934.

[52] U.S. Bureau of Labor Statistics, *Occupational Employment and Wage Statistics Overview*, https://www.bls.gov/oes/oes_emp.htm (last visited Oct. 17, 2025); *see also* 75 Fed. Reg. 66268, 6895 (Oct. 27, 2010).

[53] 90 Fed. Reg. at 47926.

[54] *Id.* at 47931.

[55] *Id.* at 47952.

[56] 90 Fed. Reg. at 47932-47933.

[57] The five Standard Occupational Classification codes under the new rule are (1) 45-2092 – Crop, Nursery, Greenhouse workers; (2) 45-2093 – Livestock, Farm, Aquacultural animal workers; (3) 45-2091 – Ag equipment operators; (4) 45-2041 – Graders & sorters; agricultural products, and (5) – 53-7064 – Packers & Packagers, Hand). *Id.* at 47918 n. 41.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 10

For example, if there were fifteen workers categorized in all five codes with wages ranging from $15 to $21, but five workers (one-third of the labor pool) were specifically paid the lowest wages of the workforce at $15, $15.25, $15.50, $16.00, and $16.50, "entry-level" workers will receive an AEWR of $15.65 (average of $15, $15.25, $15.50, $16.00, and $16.50). As a result, this two-tier system provides a means to further cut worker wages. In addition, as defined in the IFR, although the lower-tier wage will be computed based on the lowest third of wages, the higher-tier wage will continue to be computed based on *all* wages, not just the highest two-thirds. In the above example, if the ten highest-paid workers in the labor pool earned between $17.00 and $21.00 per hour with an average wage of $19.50, their AEWR would nevertheless not be $19.50 but a significantly lower rate based on an average including the entry-level workers as well. This makes no sense if, as the IFR assumes, the "entry-level" and "experienced" workers are effectively performing different jobs with different skill levels.

The DOL provides no evidence that the tiered pay structure is practicable for the H-2A program. In the IFR, the DOL purports that the tiered system as seen in the H-1B program is a model supporting the use of pay differentials.[58] In the H-1B program, those with specialty occupations, such as those in technology, engineering, medicine, finance, and academia, are classified into the following four levels to determine their prevailing wage:

- Level 1: Entry – wage rates assigned to jobs for beginning level employees who have only a basic understanding of the occupation.
- Level 2: Qualified – wage rates assigned to jobs for qualified employees who have attained, either through education or experience, a good understanding of the occupation.
- Level 3: Experienced – wage rates assigned to jobs for experienced employees who have a sound understanding of the occupation and have attained, either through education or experience, special skills or knowledge.
- Level 4: Fully competent – wage rates assigned to jobs for competent employees who have sufficient experience in the occupation to plan and conduct work requiring judgment and the independent evaluation, selection, modification, and application of standard procedures and techniques.[59]

Collectively, the median annual compensation for all H-1B employees in FY 2022 was $118,000, and 70 percent of H-1B employees had a bachelor's degree or higher. By comparison, nearly half of farmworkers lack a high school diploma.[60] The H-1B labor pool is a stark contrast

---

[58] 90 Fed. Reg. at 47932-37.

[59] Employment and Training Admin., U.S. Dep't of Lab., *Prevailing Wage Determination Policy Guidance* (Nov. 2009), https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/NPWHC_Guidance_Revised_11_2009.pdf (last visited Nov. 13, 2025); Congressional Research Service, *Prevailing Wage Requirements for H-1B, H-1B1, and E-3 Workers in Specialty Occupations* (Jan. 30, 2025), https://www.congress.gov/crs_external_products/IF/PDF/IF12892/IF12892.3.pdf (last visited Nov. 13, 2025).

[60] U.S. Dep't of Agric., Econ. Research Serv., *Farm Labor* (Sept. 12, 2025), https://www.ers.usda.gov/topics/farm-economy/farm-labor/ (last visited Nov. 13, 2025).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 11

to the H-2A labor pool, rendering the H-1B tiered payment concept incompatible with the realities of the H-2A program.

Even the DOL during the first Trump administration recognized the irrationality of a tiered pay structure in the H-2A program. In the 2020 Final Rule, the DOL responded to a comment which suggested the provision of a tiered, skill-based wage structure like the H-1B program. The DOL stated the following:

> [T]he Department determined that the notion of meaningful skill differences among agricultural workers is unfounded and that the most common H-2A agricultural occupations involve skills that are readily learned in a very short time on the job, skills peak quickly, rather than increasing with long-term experience, and skills related to one crop or activity are readily transferred to other crops or activities.
> . . .
> Importantly, the Department's practical experience has demonstrated that use of a []tiered wage structure in the H-2A program leads to the overwhelming majority of H-2A job opportunities being classified at a level I wage, well below the median wage for the occupation. The Department's experience using a tiered wage structure in the H-2B program led to a similar result and the Department ultimately determined that use of the tiered wage structure produced artificially lower [wages] to a point that [they] no longer represent[ed] a market-based wage. The commenter . . . provided no evidence demonstrating the existence of a meaningful skill differentials among workers within a particular occupation, much less a nexus between those differentials and wages paid to workers in the occupation that would necessitate the same . . . skill-based wage structure in the H-2A program . . . .[61]

Similarly, the DOL during the second Trump administration in this IFR provides no evidence necessitating a skill-based wage structure in an industry untethered to the prolonged educational and experiential attainment needed for the specialty jobs overseen by the H-1B program. The ever-changing positions of the DOL evince the arbitrary nature to lower the AEWR in such a rushed manner through an IFR.[62]

Furthermore, the new tiered system will be a burden to our States. According to the IFR, the State Workforce Agencies ("SWA"), for example, the Employment Development Department in California, the Department of Employment Security in Illinois, and the Employment Security Department in Washington, will make the AEWR determination for the

---

[61] 85 Fed. Reg. at 79462 (internal quotations omitted) (citing to the data recognized by the 2010 Final Rule after the brief establishment of the four-tier pay structure in the H-2A program established by the 2008 Final Rule, whereby "73 percent of applicants for H-2A workers specified the lowest available skill level—corresponding to the wage earned by the lowest paid 16 percent of observations in the OES data" while "[o]nly 8 percent of applicants specified a skill level that translated in a wage above the OES median." 75 Fed. Reg. at 6898).

[62] *See Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (concluding that "[a]gency regulations are arbitrary and capricious where they rely on reasoning that is internally inconsistent and inadequately explained" (internal quotations omitted)).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 12

state or territory using one of the two skill levels identified in the employer's job order and the SWA will determine the appropriate occupational classification for the employer's requested occupation.[63] In response to the 2010 rule, a SWA noted that the data used and the assessment of a worker's skill-level under the 2008 tiered system was a "complex, confusing system resulting in multiple H-2A wage rates for various geographical areas within a State."[64] This complication will likewise occur under the IFR, and the DOL has not provided any substantive reason to impose this added responsibility on our States when a tiered wage system has no merit in the H-2A program.

Indeed, even though the IFR anticipates that hundreds of thousands of additional H-2A guest workers will need to be certified by SWAs as a result of the IFR's wage cuts, the IFR says nothing about the increased administrative burden on the States or how that cost is to be defrayed. The IFR does not even mention SWAs' costs under the "Quantifiable Costs" section of the IFR's cost-benefit analysis.[65] The DOL administers a grant program to help states afford the role that they play in the H-2A program, the Foreign Labor Certification Grant, but the IFR does not mention that program or how it might be adjusted to reflect the rapid growth that the DOL seeks to promote of H-2A job-seekers.

**D. To further cut wages, the DOL defies the purpose of the AEWR and undercuts the federal statute that mandates that employers must provide temporary agricultural workers with housing.**

The IFR whittles wages even further by subtracting an amount from foreign worker wages to help cover the cost of housing that employers are obligated to provide under the INA.[66] The IFR eliminates an employer's full obligation to provide housing at no cost to the employee under 8 U.S.C. § 1188(c)(4) and 20 C.F.R. § 655.122(d)(1), stating that corresponding workers who are reasonably able to return to their residence within the same workday are adversely affected because they "are competing in an uneven playing field as they must accept employment under at least the same terms of the work contract—often at the same wage—while continuing to pay and maintain their own housing out of their earned wages [while H-2A workers do not]."[67] Hence, the IFR will subtract from wages, at an amount not to exceed thirty percent of the AEWR, the weighted statewide average of fair market rents for four-bedroom housing units established by the U.S. Department of Housing and Urban Development.[68] The IFR provides the example that if the fair market rent for a four-bedroom unit is $1,390, and if there are eight worker occupants in the unit who each work 172 hours in one month, the hourly housing adjustment to their AEWR is $1.07, which is $1,390 divided by (172 multiplied by 8).[69] Thereafter, if a worker identified as "entry-level" had a computed AEWR of $15.07, the housing adjustment of $1.07 will result in an actual AEWR of $14.00 for the worker.

---

[63] 90 Fed. Reg. at 47933; *see also* 20 C.F.R. § 655.121(e) (SWA review).

[64] 75 Fed. Reg. at 6900.

[65] *See* 90 Fed. Reg. at 47953.

[66] 8 U.S.C. § 1188(c)(4).

[67] 90 Fed. Reg. at 47947.

[68] *Id.* at 47948, 47963.

[69] *Id.* at 47954.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 13

Leveling down in this manner drives toward exactly the opposite of the purpose of the AEWR as mandated by Congress. The status quo, under which the AEWR *is not subtracted by* guest workers' housing, is what prevents an adverse effect on domestic workers. The status quo forces employers to simply treat no-cost housing for H-2A guest workers as an added cost of hiring them.

The DOL during the first Trump administration recognized this reality, in response to public comment to the 2020 Final Rule:

> The Department declines to adopt [a wage credit for housing] because of its longstanding determination that such approaches would lead to an adverse effect on the wages of workers in the United States similarly employed in violation of the Department's statutory mandate. Requiring employers to guarantee an hourly AEWR based on a wage survey without adjustments for housing and other benefits costs has been the Department's interpretation of H-2A statutory requirements since the 1980s. In addition, the statute contemplates a wage rate that accounts for the lower wages that the introduction of foreign workers causes, as well as no-cost housing and transportation for workers outside the local commuting area, which is intended to make agricultural jobs more attractive to U.S. workers.[70]

So the downward housing adjustment will achieve the opposite of the claimed effect. The new IFR asserts, for instance, that "[t]he employment of H-2A workers is generally more costly than hiring local domestic farm workers due to the other program costs and non-wage compensation benefits employers provide."[71] But that state of affairs *fulfills* the statutory purpose that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States." 8 U.S.C. § 1188(a)(1)(B). By cutting the AEWR to eliminate added housing cost, the IFR promises only to erode the wage position of *domestic* laborers, who are the particular object of the statute's concern.

Moreover, the IFR does not recognize that Congress set out to avoid the ills of the Bracero program by amending the INA with the IRCA in 1986 to add the requirement that "[e]mployers shall furnish housing in accordance with regulations."[72] The statute and its implementing regulation, 20 C.F.R. 655.122(d), were instituted in response to the substandard housing historically provided to agricultural laborers and as a means to ensure safe conditions that would attract domestic workers. Almost two decades after the enactment of the housing requirement, the DOL still continues to find that employers continuously violate the requirement

---

[70] 85 Fed. Reg. at 70463.

[71] 90 Fed. Reg. at 47947.

[72] 8 U.S.C. § 1188(c)(4); *see* H.R. REP. 99-682(I), 83-84, 1986 U.S.C.C.A.N. 5649, 5687-88 (The House Judiciary Committee in 1986 was "ever mindful of the reports of abuses that occurred during the old Bracero program," recognizing the most effective way to respond to "[employer] concerns regarding the availability of labor and at the same time to protect workers to the fullest extent of all applicable federal, state and local laws is to provide workers with the option of switching jobs and to provide them with a status that ensures that their employment is fully governed by all relevant law without exception.").

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 14

to provide safe housing to workers.[73] Despite this, in enacting the housing adjustment here, the IFR provides no detailed analysis on whether growers are already fiscally sound enough to cover the full cost of housing for the workers that they have requested through the H-2A program. The IFR provides no evidence or data showing how the added gains to employers from the new housing adjustment will relieve purported losses experienced by growers when covering full housing costs. The IFR does not provide a concrete analysis as to why the AEWR must be subtracted specifically by the statewide average of fair market rents for four-bedroom housing units. The IFR does not address corrections to H-2A housing already mired by safety and health violations.

The housing adjustment is an arbitrary and capricious measure that eliminates core protections mandated by the INA, both for domestic workers on the one hand and guest workers on the other. It is a drastic shift ignoring the very purpose of the statute and its implementing regulations.

**E. The DOL further lowers wages by creating an arbitrary "majority duties rule" for specialized labor.**

The IFR arbitrarily creates a "majority duties rule" that lowers wages for specialized labor. The 2023 Final Rule, in part, required that H-2A workers doing jobs outside the field and livestock Standard Occupational Classification codes, like heavy truck driving or construction labor, were entitled to a higher hourly wage than the fieldwork AEWR.[74] The IFR replaces this rule with a "majority duties standard" which allows jobs to be categorized within the field and livestock workers category even if the job order includes duties from other occupations, as long as those other duties are performed for less than the majority of the workdays during the contract period.[75] As a result, an H-2A worker could spend 49 percent of their days under the contract doing skilled work such as driving heavy trucks or construction without being paid the OEWS AEWR applicable to this occupation for the hours spent doing this specialized labor.

The DOL imposition of this "majority of workdays" rule is arbitrary and contrary to the mandate to prevent adverse effects on local worker wages. This reduction in wages for workers performing duties that do not fall with the field and livestock worker Standard Occupational Classification codes will further lower wages for some H-2A and corresponding workers and risks depressing wages for other workers in these occupations. The DOL provides no justification for its "majority of workdays" approach, nor an explanation for how paying workers a lower than AEWR rate for specialized work that falls outside of the field and livestock worker category will avoid adversely effecting wages for this occupation.

---

[73] U.S. Gov't Accountability Office, *H-2A Visa Program: Agencies Should Take Additional Steps to Improve Oversight and Enforcement*, GAO-25-106389, at 33 (2024), https://www.gao.gov/assets/gao-25-106389.pdf (last visited Oct. 17, 2025).
[74] *Id.*
[75] *Id.* at 47939.

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 15

Furthermore, oversight of whether the job duties in fact do not exceed the majority of workdays will burden state enforcement agencies. The DOL's assertion that its "existing regulatory mechanisms to enforce prohibitions on misclassification of workers are adequate and appropriate"[76] is belied by state enforcement efforts. For example, Washington's Office of the Attorney General has brought enforcement actions against employers in cases where they misrepresent the availability of work for U.S.-based workers[77] and Washington State's SWA issues several notices of discontinuance to employers each year. The DOL's reliance on the employers' determinations of the time allocated to the job duty, when employers are incentivized to underestimate the time spent doing specialized occupation work, creates a risk of errors and misclassification. The IFR creates an unjustifiably complex rule for when workers must be paid the AEWR for specialized labor, which will increase burdens on state enforcement agencies.

**F. By effectuating the rule in haste, the DOL ignores historic violations in the H-2A program to quickly backfill a workforce diminished by the administration's immigration policies.**

The IFR boasts about the current administration's aggressive deportation of undocumented immigrants and assumes that a quick and significant agricultural labor deficit will hence result. The IFR claims that by decreasing the AEWR, growers will become motivated to restore the labor shortage expediently by hiring more H-2A workers.[78] Despite the expectation of introducing more H-2A workers into the labor pool, the IFR makes no effort to examine how growers will comply with the safe housing and transportation obligations that have historically challenged employers. The expanded violations will burden our States.

Providing safe and affordable housing, especially in rural farming areas, remains difficult under the H-2A program as the IFR recognizes. Under 20 C.F.R. 655.122(d)(1)(ii), rental or public accommodations offered by employers must meet state standards to address health or safety concerns. As mentioned *supra,* this regulation was instituted in response to the substandard housing or lack of housing historically secured for agricultural laborers. Despite the enactment of the regulation two decades ago, the DOL continues to find significant housing violations by employers.[79] State agencies, like California's Department of Housing and

---

[76] *Id.* at 47938

[77] *See* Press Release, Washington State Office of the Attorney General, *Sunnyside mushroom farm*, *supra*; Press Release, Washington State Office of the Attorney General, *AG's civil rights, consumer protection investigation results in $180,000 payment from agricultural grower King Fuji Ranch* (April 22, 2025), https://www.atg.wa.gov/news/news-releases/ag-s-civil-rights-consumer-protection-investigation-results-180000-payment; Press Release, Washington State Office of the Attorney General, *AG Brown sues Toppenish grower for discriminating against Washington farmworkers and women* (June 20, 2025), https://www.atg.wa.gov/news/news-releases/ag-brown-sues-toppenish-grower-discriminating-against-washington-farmworkers-and.

[78] *Id.* at 47957 ("[T]he Department assumes that lowering the AEWR increases H-2A employment—growers employ H-2A workers when the cost of doing so falls . . . .").

[79] U.S. Gov't Accountability Office, *H-2A Visa Program: Agencies Should Take Additional Steps to Improve Oversight and Enforcement*, GAO-25-106389, at 33 (2024), https://www.gao.gov/assets/gao-25-106389.pdf (last visited Oct. 17, 2025).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 16

Community Development, are tasked to assist in ensuring employers are following state safety and health standards.[80] Yet, states are under-resourced to ensure compliance.[81] The IFR is silent in proposing support or a solution to employers' disregard of housing mandates. Instead, the IFR assumes that the monetary transfer of funds from workers to employers will provide sufficient housing for employees. This is shortsighted and ignores the need for a robust analysis to ensure safe housing for the workers that U.S. employers petition to hire under the H-2A program.

States are already burdened by the unsafe use of employer-provided transportation to and from the fields. The IFR provides an incomplete analysis because it expects that its reform of the AEWR will prompt employers to hire an influx of H-2A workers, yet it ignores the increased obligation for employers, who already struggle to provide lawful transportation, to safely transport employees to and from work. The DOL's Wage and Hour Division uncovered that during FY2018 – FY2023, 30 percent of violations in the H-2A program were violations in providing safe employer-provided transportation.[82] The DOL has brought notable lawsuits against growers and farm labor contractors who provided unsafe transportation that caused or were close to causing the death of workers.[83] When accidents happen, those using state roads are put at risk, workers are injured, local and state law enforcement are called to the scene, and medical professionals within our States are called to respond to the injuries.

The IFR is also likely to exacerbate abuses of the H-2A program, including employers' use of the program to displace local domestic workers. While the H-2A program is intended to supplement, not displace, the local workforce, corresponding U.S.-based workers in some locations and industries have been displaced due to the growth of the program and employers'

---

[80] Cal. Dep't of Housing and Comm. Dev., *Employee Housing Program Overview*, https://www.hcd.ca.gov/building-standards/employee-housing/overview (last visited Nov. 16, 2025).

[81] CalMatters, *State inspectors are supposed to visit all farmworker housing to ensure its safety. Sometimes they used FaceTime instead*, Jul. 1, 2024, https://calmatters.org/california-divide/2024/07/california-farmworker-housing/ (last visited Oct. 17, 2025) (stating "Washington, for example, has one inspector for every 7,000 workers . . . North Carolina has about one inspector for every 4,000 workers. Michigan has about one for every 2,000, and inspectors regularly visit farmworker housing both before and after it's occupied . . . .")

[82] U.S. Gov't Accountability Office, *H-2A Visa Program: Agencies Should Take Additional Steps to Improve Oversight and Enforcement*, GAO-25-106389, at 34 (2024), https://www.gao.gov/assets/gao-25-106389.pdf (last visited Oct. 17, 2025); *see* CalMatters, *California cracked down after a crash killed 13 farmworkers. Why are workers still dying on the road?*, May 14, 2024, https://calmatters.org/politics/capitol/2024/05/california-farmworkers-transportation-deaths/ (last visited Oct. 17, 2025).

[83] *See Perez v. Valley Garlic Inc. et al.*, No. 1:16-cv-01156 (E.D. Cal. 2016); *Julie A. Su v. Rancho Nuevo Harvesting, Inc.*, No. 2:23-cv-07078 (C.D. Cal. 2023); *see also* U.S. Dep't of Lab., *Federal Court Orders Labor Contractor to Pay More Than $1M in Back Wages, Penalties After Investigations Find Repeated Violations of Farmworkers' Rights,* Sept. 19, 2023, https://www.dol.gov/newsroom/releases/whd/whd20230919-0 (last visited Oct. 17, 2025); U.S. Dep't of Lab., *U.S. Department of Labor Secures Judgment to Enhance Farmworker Transportation Safety in California's Central Valley*, Apr. 10, 2018,  https://www.dol.gov/newsroom/releases/whd/whd20180410 (last visited Oct. 17, 2025).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 17

preference for an H-2A workforce that may be easier to exploit.[84] Furthermore, U.S.-based workers' wages and terms of employment are increasingly tied to H-2A employers, making the IFR's change to the AEWR critical to the entire agricultural labor force.

The DOL does not consider the holistic implications of its reform of the AEWR alongside the expected, subsequent need to safely house and transport an increase in H-2A workers laboring within our States.

### G. The IFR results in farmworkers being paid less than or close to the federal poverty line, inflicting direct financial injuries to the States.

The IFR causes farmworkers to be paid meaningfully less than the wages computed through the traditional AEWR methodology. For instance, in California, an H-2A employee who worked for the same employer at the same job during an eight-month farming season prior to the IFR will most likely be paid a rate of $3.47 lower for the upcoming season for the same employer doing the same work.[85] This equates to approximately $609.46 per month or $5,163.36 in total less than last season's earnings. In Washington, an H-2A employee who worked for the same employer at the same job during an eight-month farming season prior to the IFR will likely be paid a rate of $3.16 lower for the upcoming season for the same employer doing the same work.[86] This equates to approximately $556.16 per month or $4,702.08 in total less than last season's earnings. In Connecticut, an H-2A employee who worked for the same employer at the same job during an eight-month farming season prior to the IFR will likely be paid a rate of $2.48 lower for the upcoming season for the same employer doing the same work.[87] This equates to approximately $436.48 per month or $3,690.24 in total less than last season's earnings. These

---

[84] *See supra* note 69.

[85] In California, the AEWR for entry level and experienced H-2A workers in addition to the housing adjustment, which respectively are $13.45 and $15.71, will be less than the state minimum wage of $16.50; hence, the wage rate will become the state minimum wage for temporary agricultural workers in the state. The most current AEWR for California prior to the IFR was $19.97. *See* U.S. Dep't of Lab., Foreign Labor Application Gateway, *H-2A Adverse Effect Wage Rates* (Dec. 16, 2024), https://flag.dol.gov/sites/default/files/2024-12/Range%20and%20Non-Range%20Occupations%20for%20Field%20Workers%20and%20Livestock%20Workers%20combined%20Effective%20December%2016%20to%20December%202029%2C%202024.pdf (last visited Nov. 17, 2025); *see also* 90 Fed. Reg. at 47926-27, Table-Statewide Hourly AEWRS Determined Under § 655.120(B)(1)(l) and Compensation Adjustment for H-2A Workers Only.

[86] In Washington, the AEWR for entry level and experienced H-2A workers in addition to the housing adjustment, which respectively are $14.04 and $16.51, will be less than the state minimum wage of $16.66; hence, the wage rate will become the state minimum wage for temporary agricultural workers in the state. The most current AEWR for Washington prior to the IFR was $19.82. *See id.*

[87] In Connecticut, the AEWR for entry level and experienced H-2A workers in addition to the housing adjustment, which respectively are $13.87 and $16.14, will be less than the state minimum wage of $16.35; hence, the wage rate will become the state minimum wage for temporary agricultural workers in the state. The most current AEWR for Connecticut prior to the IFR was $18.83. *See id.*

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 18

changes are significant as most farmworkers tend to earn an annual average of $35,980,[88] falling close to the current federal poverty line of $32,150 for a household of four.[89] By contrast, the median household income for the high school educated population in the United States is $58,410.[90] In the previous examples provided, the IFR's changes in the AEWR result in earnings as little as $24,552 for the eight-month season in California, $24,790.08 in Washington, and $24,328.80 in Connecticut.

The diminished earnings have significant effects on affording essential needs. As the court emphasized in *United Farm Workers v. United States Dep't of Lab.*:

> [Lowering the AEWR is] intertwined with farmworker poverty, notably that . . . [a lower AEWR] will intensify the challenges farmworkers already face in obtaining affordable housing and increase demand on state housing programs; farmworkers' children will be more educationally disadvantaged, experience food insecurity, and suffer poorer health, placing additional demands on state programs; and farmworkers, who already suffer from inadequate health care, will suffer poorer health.[91]

The IFR provides no analysis in examining the potential harms on the exact population the H-2A statute and regulations intend to protect. The effects will be widespread throughout the nation. The IFR lowers the AEWR below the state minimum wage in 21 states, including those with the largest H-2A workforces such as California, Florida, and Washington.[92] This results in deferring to paying the state minimum wage as the wage rate for temporary agricultural workers. The state minimum wages for these 21 states are lower than the most recent AEWRs calculated prior to the IFR.[93] This reduces wage rates up to $6 less than the AEWRs computed with data from the Farm Labor Survey.[94] In addition, the new AEWR for entry level workers with housing adjustments will be less than the AEWRs prior to the IFR *in all fifty states including the District of Columbia*

---

[88] Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook*, Agricultural Workers (Sept. 25, 2025), https://www.bls.gov/ooh/farming-fishing-and-forestry/agricultural-workers.htm (last visited Nov. 13, 2025).

[89] Dep't of Health and Human Services, *Federal Poverty Level 2025,* https://www.healthcare.gov/glossary/federal-poverty-level-fpl/ (last visited Nov. 13, 2025).

[90] United States Census Bureau, *Income in the United States: 2024* (Sept. 2025), https://www.census.gov/data/tables/2025/demo/income-poverty/p60-286.html (last visited Nov. 13, 2025).

[91] 509 F. Supp. 3d at 1249–50.

[92] U.S. Dep't of Agric., Economic Research Service using data from U.S. Dep't of Labor, Office of Foreign Labor Certification (May 30, 2023), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=106604 (last visited Nov. 13, 2025).

[93] *See* U.S. Dep't of Lab., Foreign Labor Application Gateway, *H-2A Adverse Effect Wage Rates* (Dec. 16, 2024), https://flag.dol.gov/sites/default/files/2024-12/Range%20and%20Non-Range%20Occupations%20for%20Field%20Workers%20and%20Livestock%20Workers%20combined%20Effective%20December%2016%20to%20December%2029%2C%202024.pdf (last visited Nov. 17, 2025); *see also* 90 Fed. Reg. at 47926-27, Table-Statewide Hourly AEWRS Determined Under § 655.120(B)(1)(l) and Compensation Adjustment for H-2A Workers Only.

[94] *Id.*

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 19

*and U.S. territories*.[95] As the DOL during the first Trump administration recognized, the positions with the lowest rates will most likely be the overwhelming majority of H-2A jobs applied for by employers; hence, the IFR will depreciate wages across the board.[96]

These dramatic wage cuts will, in the final analysis, make it impossible for the States to fulfill their role in the H-2A program: promoting the hiring of domestic workers for these roles through publicizing every H-2A job order, in accordance with the DOL's own regulations and policies. States know from their experience that domestic workers will not take these difficult jobs for so little money. In some locations and industries, domestic workers have already been displaced due to the growth of the program and employers' preference for an H-2A workforce that may be easier to exploit.[97] Because the IFR exacerbates rather than alleviates the roots of farmworker poverty, the direct strain on our States to provide essential needs to farmworkers, both domestic and foreign, will be considerable. Farmworkers will increasingly rely on state and local services, including food banks that receive state grant funding, benefits for workers that are funded by states, and state-funded programs for low-income students. In addition, reduced wages to farmworkers will lower state income tax and state tax revenues for essential programs, including workers' compensation programs, state family and medical leave programs, and state long-term care programs.

## III.    CONCLUSION

The Interim Final Rule fails to provide critical analysis on its impact on the workers who are the core demographic that the Immigration and Nationality Act's H-2A provisions mandate the DOL to protect. For the aforementioned reasons, the undersigned State AGs strongly oppose the U.S. Department of Labor's Interim Final Rule, *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*.

---

[95] *Id.*

[96] *See* 85 Fed. Reg. at 79462 (internal quotations omitted) (citing to the data recognized by the 2010 Final Rule after the brief establishment of the four-tier pay structure in the H-2A program established by the 2008 Final Rule, whereby "73 percent of applicants for H-2A workers specified the lowest available skill level—corresponding to the wage earned by the lowest paid 16 percent of observations in the OES data" while "[o]nly 8 percent of applicants specified a skill level that translated in a wage above the OES median." 75 Fed. Reg. at 6898).

[97] *See, e.g.* Press Release, Washington State Office of the Attorney General, *Sunnyside mushroom farm will pay $3.4 million for violating the civil rights of its workers* (May 17, 2023), https://www.atg.wa.gov/news/news-releases/sunnyside-mushroom-farm-will-pay-34-million-violating-civil-rights-its-workers (more than 170 Washington-based farmworkers discriminated against by employer who replaced them with H-2A workers in violation of the Washington Law Against Discrimination).

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 20

Sincerely,

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

ANNE E. LOPEZ
Hawaii Attorney General

KWAME RAOUL
Illinois Attorney General

AARON M. FREY
Maine Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

AARON D. FORD
Nevada Attorney General

MATTHEW J. PLATKIN
New Jersey Attorney General

RAÚL TORREZ
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

DAN RAYFIELD
Oregon Attorney General

PETER NERONHA
Rhose Island Attorney General

The Honorable Lori Chavez-DeRemer
December 1, 2025
Page 21


NICHOLAS W. BROWN
Washington Attorney General