# Exhibit 4



December 1, 2025

Susan Frazier
Acting Assistant Secretary
Employment and Training Administration
U.S. Department of Labor

Brian Pasternak
Administrator, Office of Foreign Labor Certification
Employment and Training Administration
Department of Labor
200 Constitution Avenue, Room N-5311
Washington, D.C. 20210

*Submitted through:* https://www.regulations.gov/document/ETA-2025-0008-0001

**Comment in response to DOL Docket No. ETA-2025-0008, Request for Public Comment Relating to Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States**

Dear Acting Assistant Secretary Frazier and Administrator Pasternak,

Migration that Works strongly opposes the U.S. Department of Labor (hereinafter, "the Department" or "DOL")'s Interim Final Rule to revise the methodology for determining the Adverse Effect Wage Rate ("AEWR") for H-2A farmworkers.

Migration that Works is a coalition of labor, migration, civil rights, and anti-trafficking organizations and academics advancing a labor migration model that respects the human rights of workers, families, and communities, and reflects their voices and experiences. Founded in 2011 as the International Labor Recruitment Working Group (ILRWG), Migration that Works aims to strategically address worker rights abuses across industries and visa categories.[1]

---

[1] For more information on Migration that Works, visit https://migrationthatworks.org/. To view Migration that Works' reports, visit https://migrationthatworks.org/reports/.

Migration that Works joins workers in supporting and advancing an ethical labor migration model in the legal and regulatory frameworks in the United States.[2] Our model for labor migration shifts control over the labor migration process from employers to workers, elevates labor standards for all workers, responds to established labor market needs, respects family unity, ensures equity and access to justice, and affords migrant workers an accessible pathway to citizenship. An ethical labor migration model would robustly protect all workers, while also ensuring that law-abiding employers are not undercut by unscrupulous employers determined to save costs by underpaying migrant and temporary workers.

The 2025 Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States Interim Final Rule (hereinafter, "2025 AEWR IFR" or "Interim Final Rule") has fundamentally changed the way the AEWR is determined to the detriment of both H-2A farmworkers and U.S. workers in corresponding employment. This revised methodology will depress farmworkers' pay in the United States generally, and have an even greater downward impact on H-2A workers' pay in particular. Agricultural employers will have an economic incentive to employ H-2A workers, and wages and working conditions will worsen across the industry. Furthermore, the housing deduction directly contravenes H-2A regulations, which require employers to provide housing free of charge, and will do nothing to address substandard housing conditions that H-2A workers already face. For these reasons, Migration that Works opposes this Interim Final Rule.

## I.    Background

U.S. agriculture is dependent on immigrant and migrant labor. Over two-thirds of crop workers surveyed in the 2021 National Agricultural Workers Survey were born outside the United States,[3] and migrant workers who work on U.S. farms through the H-2A visa program made up about 17% of crop workers in 2022.[4] If the recent trend of increasing H-2A visa issuances continues,[5] H-2A workers will represent an ever-growing part of the farm workforce in the coming years. The Federal Register notice for this Interim Final Rule acknowledges the U.S. agricultural sector's dependence on migrant and immigrant labor and argues that the current administration's heightened focus on aggressive immigration enforcement, including a

---

[2] Exhibit A, Migration that Works, *Proposal for an Alternative Model for Labor Migration* (2025), https://migrationthatworks.org/wp-content/uploads/2025/10/alternative-model-for-labor-migration-updated-2025.pdf .

[3] Exhibit B, Wenson Fung et al., JBS International, *Findings from the National Agricultural Workers Survey (NAWS) 2021–2022: A Demographic and Employment Profile of United States Crop Workers* (2023), https://www.dol.gov/sites/dolgov/files/ETA/naws/pdfs/NAWS%20Research%20Report%2017.pdf.

[4] Exhibit C, Daniel Costa, *How many farmworkers are employed in the United States?*, Working Economics Blog (Oct. 3, 2023, at 14:53 ET), https://www.epi.org/blog/how-many-farmworkers-are-employed-in-the-united-states/.

[5] Exhibit D, U.S. Dept. of State, Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards) Fiscal Years 2020-2024 (2025), https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/FY2024AnnualReport/Table%20XVB.pdf.

widespread use of worksite enforcement, is causing an "acute labor shortage" in agriculture.[6] The DOL concludes that the only way to prevent economic harm in agriculture is to "provide agricultural employers a viable workforce alternative."[7] The "viable workforce alternative" that the DOL is seeking to make easier to employ is H-2A workers.

To participate in the H-2A program and employ H-2A workers, employers must certify that: 1) too few U.S. workers are able, willing, and qualified to fill the positions, and available to perform the work at the place and time needed, and 2) working conditions and wages of U.S. workers similarly employed will not be adversely affected by the hiring of H-2A workers.[8] Regulation of wages in the H-2A program is one way to ensure that the hiring of H-2A workers does not adversely affect the working conditions and wages of U.S. workers. Among other program rules and regulations, employers are required to pay H-2A and corresponding workers[9] the highest of the following: 1) the Adverse Effect Wage Rate (AEWR), 2) the prevailing wage, 3) the federal, state or local minimum wage, or 4) or the agreed upon collective bargaining wage.[10] The AEWR was designed to be a wage floor for H-2A farmworkers and other U.S.-based workers in corresponding employment to prevent the depression of wages for farmworkers across the industry.[11] Until recently, the AEWR was based on data obtained from the U.S. Department of Agriculture (USDA)'s Farm Labor Survey (FLS). FLS surveyed about 16,000 U.S. farms about their employees' earnings and had a 44-45% response rate in 2024 and 2025.[12] The FLS then published the average hourly earnings of crop and livestock farmworkers, and this data was used to determine the AEWR for each U.S. state.[13] The AEWR is one of the key protections that help prevent agricultural employers from exploiting the H-2A program through depressed farmworker wages, and prevents a "race to the bottom" by providing a minimum

---

[6] Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, 90 Fed. Reg. 47914 (Oct. 2, 2025) (to be codified at 20 C.F.R. pt. 655) [hereinafter AEWR IFR], https://www.govinfo.gov/content/pkg/FR-2025-10-02/pdf/2025-19365.pdf.

[7] *Id.*

[8] 8 U.S.C. §1188(a)(1); 20 C.F.R. § 655.100(a)(1)(ii) (2025) (noting that the Secretary may issue a temporary agricultural labor certification only if "[t]he employment of the H–2A worker(s) will not adversely affect the wages and working conditions of workers in the United States similarly employed").

[9] Corresponding employment is the employment of non-H–2A workers, including local U.S.-based workers, by an employer with an approved Application for Temporary Employment Certification in any work in the job order, or "in any agricultural work performed by H-2A workers." 20 C.F.R. § 655.103(b) (2025). Workers in corresponding employment are entitled to at least all the rights and protections of the H-2A contract. 20 C.F.R. § 655.122(a) ("The employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H-2A workers.").

[10] *See* Exhibit E, U.S. Dept. of Labor, Wage & Hour Div., *Fact Sheet #26: Section H-2A of the Immigration and Nationality Act* (2010), https://www.dol.gov/agencies/whd/fact-sheets/26-H2A.

[11] Exhibit F, Rural Migration News, *AEWRs, FLS, and OEWS* (Dec. 30, 2021), https://migration.ucdavis.edu/rmn/blog/post/?id=2675.

[12] Exhibit G, Nat'l Ag. Stat. Serv., Ag. Stat. Bd., U.S. Dept. of Ag., *Farm Labor Methodology and Quality Measures* (May 2025), https://www.nass.usda.gov/Publications/Methodology_and_Data_Quality/Farm_Labor/06_2025/fmla0525.pdf.

[13] *Id.*

hourly wage floor that must be paid to all H-2A workers and any other worker engaged in corresponding employment.

## II. The changes to the AEWR methodology will depress all farmworkers' wages and leave H-2A workers more susceptible to economic coercion and labor trafficking.

On August 28, 2025, USDA announced that it would discontinue the FLS. The DOL subsequently published the 2025 AEWR IFR, switching the basis for the AEWR from the FLS to the Bureau of Labor Statistics' Occupational Employment and Wage Statistics ("OEWS"). Before this change, the OEWS applied to few H-2A jobs, including agricultural-support jobs that are largely not performed on farms, such as construction workers and truck drivers.[14] OEWS collected data for those jobs from farm labor contractors, who generally tend to pay lower wages than farmers do for the same work.[15] The 2025 AEWR IFR will also allow employers to deduct an "Adverse Compensation Adjustment" amount from H-2A workers' hourly AEWR to account for the cost of housing that employers are required to provide for H-2A workers. This deduction does not apply to corresponding U.S. workers. Taken together, the use of the OEWS and the application of the housing deduction will result in, in DOL's own words, a massive "wage transfer" from H-2A workers to their employers.  DOL has projected an annual benefit of $2.46 billion for H-2A employers, or a transfer of about $5,513 from each H-2A worker to their employer.[16]

During the recent COVID-19 pandemic, farmworkers were widely recognized as "essential workers," workers who were unable to take time off or perform work remotely and were relied upon by the U.S. public to continue working, due to their work being intrinsic to the U.S. food supply.[17] A recent study by the Economic Policy Institute (EPI) noted that, although farmworkers are deemed essential workers, they are paid about 60% less than comparable workers outside of agriculture.[18] H-2A workers are paid even less than U.S.-based farmworkers.[19] Since the EPI analysis was conducted in 2021, farmworker wages have remained

---

[14] Exhibit H, Rural Migration News, *DOL: H-2A Changes* (Oct. 24, 2025), https://migration.ucdavis.edu/rmn/blog/post/?id=3086.
[15] Rural Migration News, *supra* note 11.
[16] AEWR IFR, *supra* note 6.
[17] Exhibit I, U.S. Dept. of Homeland Sec, Advisory Memorandum Ensuring Essential Critical Infrastructure Workers' Ability to Work During the COVID-19 Response (Aug. 10, 2021), https://www.cisa.gov/sites/default/files/publications/essential_critical_infrastructure_workforce-guidance_v4.1_508.pdf.
[18] Exhibit J, Daniel Costa, *The Farmworker Wage Gap Continued in 2020*, Working Economics Blog (July 20, 2021, at 12:35 ET), https://www.epi.org/blog/the-farmworker-wage-gap-continued-in-2020-farmworkers-and-h-2a-workers-earned-very-low-wages-during-the-pandemic-even-compared-with-other-low-wage-workers/.
[19] *Id.*

low. In May 2024, the median annual income for crop workers on U.S. farms was $35,690.[20] In a National Agricultural Workers Survey, 21% of crop workers reported having family incomes below the federal poverty level.[21]

H-2A workers face additional forms of economic precarity due to coercive recruitment practices that many face before arriving in the United States. Prospective migrant workers are often charged illegal fees and face other forms of economic coercion when attempting to apply for H-2A jobs in the U.S. In Centro de los Derechos del Migrante's (CDM) report on the H-2A program, *Ripe for Reform*, more than a quarter of workers surveyed reported paying illegal recruitment fees, and 73% reported not receiving full inbound and outbound travel reimbursements from their employers, as required by H-2A rules.[22] Many prospective migrant workers take out loans with high interest rates to pay these illegal fees and expenses. Workers then face pressure to use their H-2A earnings to repay this employer-driven debt.[23] Because of this pattern of economic coercion in recruitment, H-2A workers are less likely to complain about substandard wages or working conditions, because the combination of economic precarity and employer-driven debt makes it difficult for them to take any actions that might place their livelihood at risk.

H-2A workers are also reluctant to blow the whistle on labor abuses because of their lack of power relative to their employer, an imbalance that is inherent in the structure of the H-2A program. The biggest hurdle H-2A workers face when deciding whether to take action to improve workplace conditions is the fact that workers' H-2A visas, and therefore their ability to stay in the U.S., are tied to their continued employment with the visa-sponsoring employer.[24] H-2A workers face a myriad of abuses—illegal recruitment fees, rampant wage theft, discrimination, and health and safety hazards. Many workers do not complain about wages or working conditions because they understand that their employer has the power to fire them (typically causing them to lose their authorization to stay in the United States), or choose not to hire them the following season.[25] If H-2A workers are fired, they must leave the United States within 60 days or risk accruing unlawful presence, which can result in lasting immigration-related consequences that could prevent them from returning to the U.S. in the future.[26]

---

[20] U.S. Bureau of Lab. Stat., U.S. Dept. of Lab., Agricultural Workers, Occupational Outlook Handbook, https://www.bls.gov/ooh/farming-fishing-and-forestry/agricultural-workers.htm (Aug. 2025).

[21] Migration that Works, *supra* note 2.

[22] Exhibit K, Centro de los Derechos del Migrante*, Ripe for Reform: Abuse of Agricultural Workers in the H-2A Visa Program* (2020), https://cdmigrante.org/wp-content/uploads/2020/04/Ripe-for-Reform.pdf.

[23] *Id.* at 5.

[24] *Id.* at 4.

[25] *Id.* at 7, 27.

[26] U.S. Citizenship & Immigr. Serv., *Options for Nonimmigrant Workers Following Termination of Employment* (Jan. 2025), https://www.uscis.gov/archive/options-for-nonimmigrant-workers-following-termination-of-employment-0.

Another barrier to speaking out about workplace abuse is the fact that H-2A farmworkers often live and work in rural and isolated areas in the U.S. and have limited access to reliable transportation outside of employer-provided or -controlled transportation. Many workers cannot access legal, health, or other critical services when they have a need. Thirty-four percent of worker respondents in *Ripe for Reform* said that their employers have compounded their isolation by restricting their mobility.

Barriers to speaking out about labor abuses are especially acute in cases of labor trafficking. According to a recent report by the Polaris Project, an organization that operated the National Human Trafficking Hotline, 59% of H-2A workers who experienced labor trafficking reported that their employers made immigration-related threats when they spoke up about substandard workplace conditions or demanded their promised wages.[27] Although confiscating passports[28] and other identity documents is expressly prohibited under the regulations governing the H-2A program, advocates have documented instances of low-road employers doing so to control H-2A workers.[29] When employers confiscate H-2A workers' passports or other identity documents, workers are coerced to continue working and otherwise do as the employer demands. Without their documents, H-2A workers are reluctant to leave their workplace because they may be unable to prove their identity or visa status to anyone, including local or federal law enforcement. Withholding identity documents is an indicator of labor trafficking.

The downward pressure on farmworkers' wages created by the 2025 AEWR IFR will exacerbate H-2A program flaws, enabling unscrupulous agricultural employers and farm labor contractors to engage in human trafficking and extract as much labor for as little economic cost as possible, all at the expense of farmworkers. The Department acknowledges that the 2025 AEWR IFR will impact AEWRs and cut farmworkers' wages across all 50 states. New job certifications approved after October 2, 2025 will now be subject to the updated AEWR methodology, and H-2A and corresponding workers will be paid lower wages under this new regulation.[30] Against the backdrop of the H-2A program's many flaws, H-2A workers will likely feel more pressure to continue working under already difficult conditions. H-2A workers will be forced to work longer hours to make the same pay they made during prior seasons. Additionally, with the wage changes under this IFR, H-2A and corresponding workers will face more difficulty in determining whether they are being paid properly and repaying employer-driven debt.

### III.    The 2025 AEWR IFR's housing deduction will de facto charge H-2A workers for housing and create an adverse impact on U.S.-based farmworkers.

---

[27] Exhibit L, Polaris Project, *Labor Trafficking on Specific Temporary Work Visas* (2022), https://polarisproject.org/wp-content/uploads/2022/07/Labor-Trafficking-on-Specific-Temporary-Work-Visas-by-Polaris.pdf.

[28]  20 C.F.R. § 655.135(o) (2025).

[29] Polaris Project, *supra* note 27, at 27.

[30] AEWR IFR, *supra* note 6, at 47927.

The AEWR was designed to ensure that the H-2A visa program does not have an *adverse impact* on wages for U.S.-based farmworkers. In a prior AEWR rulemaking, the DOL recognized that U.S.-based farmworkers are particularly "vulnerable to wage deflation."[31] The 2025 AEWR IFR creates an incentive for agricultural employers to employ more H-2A workers, because employers will now be able to pay H-2A workers less by charging the "Adverse Compensation Adjustment" to account for the cost of housing. This IFR also directly contravenes regulations that require employers to provide housing free of cost for H-2A workers.[32]

Many H-2A workers report substandard conditions in their employer-provided housing; 45% of H-2A workers surveyed in *Ripe for Reform* reported overcrowded and even dangerous conditions in employer-provided housing.[33] H-2A workers calling CDM's intake line regularly share concerns about overcrowded housing and report insufficient bathrooms or spaces to store and prepare food safely. An H-2A worker in California recently reported being housed in a warehouse-style barracks with more than 70 other workers, few bathrooms and showers, and a single kitchen space to share with everyone living in the same barracks.[34] H-2A workers regularly encounter overcrowded housing, and this often causes or exacerbates other housing-related concerns, including inadequate ventilation and insulation, pest infestations, and general squalor.[35] A recent report from the Oakland Institute shares similar descriptions of dilapidated worker housing in California. It also highlights housing supply tensions local communities face when growers take over local motels and other housing in rural areas, which can displace local farmworker families.[36] Despite pervasive housing violations in the H-2A program, the IFR will enable employers to charge H-2A workers for substandard housing without strengthening housing protections.

### IV.    Conclusion

The 2025 AEWR IFR will result in a significant loss of earnings for H-2A and U.S.-based farmworkers, and this rule will inevitably result in the displacement of corresponding U.S.-based workers. Farmworker advocates are already mounting legal challenges to reverse this

---

[31] Temporary Agricultural Employment of H-2A Aliens in the United States, 74 Fed. Reg. 45906 (Sept. 4, 2009) (20 C.F.R. pt. 655), https://www.dol.gov/sites/dolgov/files/oalj/PUBLIC/INA/REFERENCES/FEDERAL_REGISTER/74_FED_REG_45905_(SEPT_4_2009).PDF.

[32] 20 CFR § 655.122(d)(1) (2025).

[33] Polaris Project, *supra* note 27, at 29.

[34] Anonymous interview with H-2A worker (July 3, 2024) (on file with Centro de los Derechos del Migrante).

[35] Polaris Project, *supra* note 27, at 29.

[36] Exhibit M, David Bacon, The Oakland Institute, *Dignity or Exploitation: What Future for Farmworker Families in the United States?* (2021), https://www.oaklandinstitute.org/sites/default/files/files-archive/dignity-exploitation.pdf.

interim final rule and preserve farmworker wages.[37] For the reasons explained above, Migration that Works strongly opposes the 2025 AEWR methodology IFR.

Sincerely,

Rachel Micah-Jones
Chair
Migration that Works

---

[37] Exhibit N, Press Release, UFW Foundation, U.S. Farmworkers Sue Trump Administration to Save American Farm Jobs and Wages (Nov. 21, 2025), https://ufwfoundation.org/u-s-farm-workers-sue-trump-administration-to-save-american-farm-jobs-and-wages/.