**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED FARM WORKERS, et al., | Case No. 1:25-cv-1614 KES EGC |
| Plaintiffs, | ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND SECTION 705 STAY |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR, et al., | Doc. 21 |
| Defendants. | |

Agricultural employers hiring foreign workers through the H-2A visa program must pay the highest wage among the following: (1) the Adverse Effect Wage Rate ("AEWR"), (2) the prevailing wage, (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage. The Department of Labor ("DOL") is required to set the AEWRs to help ensure that the use of H-2A workers will not "adversely affect" wages and working conditions for U.S. workers. After a prior rule setting AEWRs was held invalid, the DOL issued a new Interim Final Rule on October 2, 2025, adopting a new methodology for calculating the AEWRs. Plaintiffs brought this action challenging the new rule.

Plaintiffs subsequently moved for a preliminary injunction to enjoin the continued implementation of the new rule and to require a different methodology to be used to calculate the AEWRs. Based on the present record, and for the reasons set forth below, the motion for a

1

preliminary injunction is denied as Plaintiffs have failed to show they are likely to suffer irreparable harm in the absence of the injunction, pending the resolution of the merits of their complaint.  As addressed below, the parties are directed to submit a proposed briefing schedule on the merits of Plaintiffs' claims.

## I.   BACKGROUND

### A.   The H-2A Visa Program

The Immigration and Nationality Act, as amended by the Immigration Reform and Control Act, established the "H-2A classification for 'a worker having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services … of a temporary or seasonal nature.'"  90 Fed. Reg. 47914(I)(A) (quoting 8 U.S.C. § 1101(a)(15)(H)(ii)(a)).  When it created the H-2A visa program, Congress charged the DOL with the "unique responsibility to regulate the employment of nonimmigrant foreign nationals in agriculture to guard against adverse impact on the wages of agricultural workers in the United States similarly employed."  90 Fed. Reg. at 47960.  Congress did not define "adverse impact" and left it to the DOL "to ensure that the employment of farmworkers met the statutory requirements while serving the interests of both farmworkers and growers—which are often in tension."  *Id.* at 47915 (internal quotation marks, citation omitted).

### B.   Adverse Effect Wage Rates

To help ensure the use of H-2A workers will not "adversely affect" wages and working conditions for U.S. workers, the DOL set "a state or region-specific minimum wage" that employers must pay the temporary foreign farmworkers, known as the "Adverse Effect Wage Rate" ("AEWR").  90 Fed. Reg. at 47916.  The AEWR has become "one of the primary ways" the DOL satisfies "its statutory obligation to certify that the employment of H-2A workers will not have an adverse effect on the wages of agricultural workers in the United States similarly employed, while ensuring that employers can access legal agricultural labor."  *Id.*  The DOL is not required "to determine the AEWR at the highest conceivable point, nor at the lowest, so long as it serves its purpose to guard against adverse impact on the wages of agricultural workers in the United States similarly employed."  *Id.* (quotation marks, citations omitted).

The DOL's regulations require that employers utilizing the H-2A visa program must pay the "wage that is the highest among": (1) the AEWR, (2) the prevailing wage, (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage. *Id.* at 47954; *see also* Doc. 1 at 17, ¶ 46.

### C. The Interim Final Rule

On October 2, 2025, the DOL modified how the AEWRs will be calculated with its Interim Final Rule entitled "Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States" (the "IFR"). 90 Fed. Reg. 47914; *id.* at 47954; *see also* Doc. 1 at 4, ¶ 5. The IFR "went into effect immediately, without notice and comment." Doc. 1 at 4, ¶ 5.

#### 1. Good cause findings

The DOL invoked the "good cause" exception in the IFR to the notice and comment requirements of the Administrative Procedure Act ("APA"). 90 Fed. Reg. at 47914, 47920-26. The DOL asserted it was both within the "public interest" to forgo the notice and comment period, and impracticable to provide such a period before the IFR took effect, including because the 2023 final rule applying to AEWRs had been vacated by an August 25, 2025 final judgment by the District Court for the Western District of Louisiana. *Id.* at 47919-21. The calculation of the AEWRs had therefore reverted to the 2010 final rule methodology, but that rule relied on a data set that was no longer being collected and was thus not able to be used. *Id.*

First, the DOL indicated the "public interest" established good cause, because of "the lack of a reasonable and viable AEWR methodology" and "immediate dangers to the American food supply." 90 Fed. Reg. at 47920; *see also id.* at 47920-25. To calculate AEWRs under the 2010 final rule, the DOL had relied in part upon the USDA's Farm Labor Survey ("FLS"), which "collected employment and wage information based on a survey of farm and ranch establishments, which included any establishment with $1,000 or more in annual agricultural sales (or potential sales), semiannually in April and October." 90 Fed. Reg. at 47929. In 2021, the FLS began using a "smaller national sample … to align with reductions in funding for the statistical program and adjustments for declining survey participation rates." *Id.* But the USDA

3

discontinued the FLS as of August 31, 2025. *Id.* at 47923; *see also* 90 Fed. Reg. 42560 (Sept. 3, 2025). Plaintiffs do not challenge the discontinuance of the FLS.

The DOL also asserted that the prior methods for calculating the AEWRs—including under the 2010 final rule—failed to account for "the qualifications [required] … or how much time a worker spends performing specific duties during a work contract period," which resulted in "unreasonably high price floors on labor." *Id.* at 47920. The DOL stated that the "IFR addresses and solves this imminent threat by implementing an AEWR methodology that results in more precise market-based price floors." *Id.* The DOL indicated the new methods under the IFR satisfy the "statutory function of protecting American workers, but also, ensures that American supermarkets and U.S. consumers will have access to safe, affordable and American-grown produce." *Id.* The DOL also observed that similar risks to the American food supply "supported [a finding of] good cause in the past." *Id.* (citing *Friendship Dairies, Inc. v. Butz*, 432 F. Supp. 508, 513 (E.D.N.Y.), *aff'd*, 573 F.2d 1290 (2d Cir. 1977); *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981).

Second, the DOL indicated it had "good cause under the 'impracticability' prong to forgo the APA's notice-and-comment procedures … due to the USDA's decision to discontinue certain statistical surveys including the [FLS]…". 90 Fed. Reg. at 47920. The DOL noted that the discontinuation of the FLS "created a regulatory gap for establishing AEWRs under the H-2A program that [the] IFR will immediately fill." *Id.* Accordingly, the DOL sought to establish AEWRs that were "untethered" from the discontinued FLS data. *Id.* The DOL also observed that any delay in implementing the IFR would prevent the department "from complying with the regulatory requirement to establish new annual AEWRs" prior to the end of the calendar year in 2025. *Id.*; *see also id.* at 47925 ("Given the requirement to publish updated AEWRs on or before December 31, 2025, immediate action is necessary."). There also was not any other "data collection that could incur in time for the mandatory January 1, 2026 publication of the AEWRs." *Id.* at 47926.

///

///

4

**2.    Reliance interests**

The DOL identified four groups of "parties with potential reliance interests that are likely to be impacted by [the] IFR," including: (1) agricultural employers; (2) U.S. workers currently, or potentially, employed in the agricultural sector; (3) non-U.S. workers currently, or potentially, legally employed in the agricultural sector via the H-2A rules; and (4) U.S. consumers of U.S.-grown agricultural commodities.  90 Fed. Reg. at 47927-28.  The DOL stated:

> The Department has carefully considered the impact of this IFR on each of these groups, especially in this IFR's economic analysis of transfers and rule familiarization costs.  The Department acknowledges that the overall impact of this new methodology will be a reduction in the AEWRs, or minimum hourly wage rate floors for H-2A workers and workers in corresponding employment that are likely to result in wage transfers to employers as a result of adopting more precise skill-based AEWRs based on the actual qualifications of the job opportunity as well as the adverse housing adjustment factor.  The Department acknowledges these reliance interests and has accounted for them in this IFR, but … concludes that they are far outweighed by other reliance interests and other significant reasons that support the promulgation of this IFR.

*Id.* at 47928.

The DOL found the reliance interest of U.S. workers was "tethered to a labor market that is dramatically changing and increasingly unstable."  90 Fed. Reg. at 47928.  The DOL asserted that a "current and imminent labor shortage" could not be avoided, due to a reduction in the number of unauthorized noncitizens in the country.  *Id.*  The DOL also indicated that it had "no evidence of the existence of a substantial population of U.S. workers who are willing and able to accept wage rates that are reasonable and proportionate to agricultural work but are deterred from entering agricultural work by AEWR-priced H-2A workers."  *Id.*  The DOL opined that the reliance interests of U.S. workers were "slight-to-nil" and were "far outweighed by the duty the Department has to address the now correcting labor market, and implement the AEWR methodology laid out here, for those lawful H-2A workers."  *Id.*  In addition, the DOL determined that the U.S. workers' "reliance interest is vitiated by the USDA's discontinuation of the FLS" because "even if the Department did nothing, the FLS will cease, thus making any reliance interest on it misplaced...".  *Id.*

For H-2A workers, the DOL found that "to the extent such reliance exists, it is based on

voluntary participation in *temporary* and *seasonal* work contracts authorized under the H-2A program."  90 Fed. Reg. at 47928 (emphasis in original).  The DOL "conclude[d] that if such a reliance interest could even be said to exist, it is too highly attenuated and speculative to be given much if any weight."  *Id.*  The DOL also "considered other potential reliance interests, such as [] H-2A workers['] potential financial planning based on an expected level of compensation rooted in the FLS."  *Id.*  The DOL determined these reliance interests were "of low weight for two reasons with respect to this IFR: first, because the USDA's discontinuation of the FLS already undermines this expectation regardless of this IFR; and second, because it is highly attenuated, relying on numerous logical steps for any particular individual."  *Id.*  Thus, the DOL found the identified reliance interests did not "rise to the level of serious."  *Id.*

### 3.    AEWR methodology changes

The DOL indicated it sought "to fill [the] imminent regulatory gap and promote long-term stability by adopting revisions to the AEWR methodology that rely on the [Department's Bureau of Labor Statistics (BLS) Occupational Employment and Wage Statistics ("OEWS") survey] as the sole source of employment and wage information for establishing more precise skill-based AEWRs for all job opportunities specific to each state."  90 Fed. Reg at 47925.  The OEWS survey is "the largest ongoing statistical survey program of the federal government, producing employment and gross wage estimates . . . , and is used as the primary wage source for establishing skill-based prevailing wage determinations at local and state geographic areas in other nonimmigrant and immigrant visa programs."  *Id.* at 47929.  The DOL "determined that the OEWS is a superior data source to the FLS for establishing more precise skill-based AEWRs covering all job opportunities specific to each state and will possess an even higher degree of superiority once the anticipated expansion of the OEWS to collect information from farm establishments begins during calendar year 2026."  *Id.* at 47926.

Pursuant to the IFR, positions will now be classified into two levels: "Skill Level I (Entry-Level) and Skill Level II (Experience Level)."  90 Fed. Reg. at 47926; *see also* Doc. 1 at 5, ¶ 8.  DOL asserts that the skill levels classifications are "based on the actual qualifications of the job opportunity."  *Id.* at 47928.  The OEWS will be "the sole wage source" to determine the AEWRs

for the two skill levels for jobs. *Id.* at 47930. Under the IFR, it appears that approximately 92% of H-2A positions will be categorized as Skill Level I. Doc. 1 at 23, ¶ 69 (citing 90 Fed. Reg. at 47955).

The DOL also identified a purported "disparity in compensation between U.S. workers and H-2A workers, the latter of whom receive non-wage compensation in the form of employer-provided lodging." 90 Fed. Reg. at 47954. The IFR indicates, "To address this disparity, the Department established a standardized AEWR adjustment factor reflecting the value of employer-provided housing." *Id.* The housing adjustment calculation "is derived from annual fair market rents data published by the U.S. Department of Housing and Urban Development (HUD)." *Id.*

The DOL states that the change to AEWR calculation methods "are more reflective of the market-based wages being paid to U.S. workers similarly employed." 90 Fed. Reg. at 47928. The DOL asserts that the IFR "will allow it to better carry out its statutory mandate in a manner that balances the needs and interests of workers and agricultural employers." *Id.*

**D.    Plaintiffs and AEWR Changes**

Plaintiffs contend the IFR will "drastically cut[]the minimum wage that U.S. employers must pay foreign farmworkers, all while costs and wages in other sectors have sharply increased." Doc. 1 at 2, ¶ 1. According to Plaintiffs, the IFR "creates an adverse effect" on the wages for U.S. workers "by significantly lowering the AEWRs, which will in turn put downward pressure on the wages of U.S. workers who work, and will continue to work, similar jobs, often on the same contract as the H-2A workers." *Id.* at 4-5, ¶ 7. Plaintiffs contend that "by allowing employers to hire H-2A workers at even lower wages, the IFR all but ensures that many U.S. farmworkers will receive lower wages." *Id.* at 5, ¶ 7. Plaintiffs submitted several declarations in support of their motion.

**1.    Jose Cruz**

Cruz is a lawful permanent resident currently residing in Washington state. Doc. 21-4 at 1-2, ¶¶ 1, 4. Cruz has worked with wine grapes "for the last 26 years," performing tasks such as cleaning vines and pruning grapes using air-powered tools. *Id.* at 1-2, ¶ 3. Cruz indicates that he will "continu[e] to seek positions" where he will operate machinery and drive tractors. Doc. 21-4

7

at 2, ¶ 8. He contends a cut to his wages would "negatively impact [his] ability to pay for food, housing, and transportation." *Id.* Cruz explains that he currently spends about $400 on groceries every two weeks for his family of three, but he "would have to reduce that amount by $200 and limit … food to only the most necessary such as eggs, beans, milk, and vegetables." *Id.* Cruz believes that helping his father—with whom his family lives— to pay rent would be difficult, and he "would be forced to live with only the bare minimum, prioritizing only what is necessary to survive and eliminate nonessential expenses like outings or trips." *Id.* at 3, ¶ 8.

Cruz's work in Washington was last classified as "Chemical Sprayer/Tractor Driver," for which he was paid $20.93 per hour, which was above the AEWR of $19.82 for such work. *Id.* at 2, ¶ 5. Under the IFR, the AEWR for such work would be $16.53, which represents a cut of 16.6% to the AEWR. *Id.*, ¶¶ 6, 7. While the new AEWR is 21.02% below Cruz's last hourly pay, Cruz does not identify any actual reduction in his hourly wage rate since the IFR went into effect on October 2, 2025. *See* Doc. 21-4.

### 2.    Claudia Garcia

Garcia is a U.S. citizen and has been a farmworker for the last 25 years, "picking and packing lettuce." Doc. 21-7 at 1, ¶¶ 1-2. Garcia currently lives in California, where her "last hourly wage was $19.97" for working as a packager. *Id.*, ¶¶ 4-5. Garcia reports that her employer hires H-2A workers, and she previously worked in "positions that often are filled by H-2A workers working in the same fields." *Id.* at 2, ¶ 8.

The applicable AEWR for Garcia's packager position was $19.97. Doc. 21-7 at 1, ¶ 5. Under the IFR, the new AEWR for that position would be $16.47, which is a reduction of 17.6%. *Id.*, ¶ 6. Garcia anticipates that she will continue to work as a packager and picker, but if her wages are cut due to the IFR it will make her unable to afford her rent and "force [her] to cut expenses for food, bills, and other expenses." *Id.* at 2, ¶ 10. For example, Garcia currently pays for her daughter's college education, and a wage cut would make her unable to continue doing so. *Id.* Garcia does not identify any actual reduction in her hourly wage rate since the IFR went into effect. *See* Doc. 21-7.

///

8

### 3.    Aaron Grimaldo

Grimaldo is a U.S. citizen, currently living and working in Texas.  Doc. 21-3 at 1, ¶¶ 1, 4. He has been "picking potatoes and tractor driving, transporting produce from the field to warehouses for the last four years."  *Id.*, ¶ 4.  Grimaldo has been a farmworker for 12 years, and previously worked in Wisconsin, Minnesota and Michigan.  *Id.*, ¶¶ 1, 4.  He reports that the employers in Wisconsin and Minnesota provided housing, but his employer in Michigan "didn't keep his word about providing housing and reduced [the] hourly wage by charging … for transportation."  *Id.* at 2, ¶ 5.  After the deduction for transportation, Grimaldo received an hourly rate of $17.50.

Grimaldo anticipates that he will continue to seek employment as a farmworker, including positions where he "would be a tractor driver and picker."  Doc. 21-3 at 2, ¶¶ 7, 9.  He notes such positions could be filled by H-2A workers, as he worked with foreign farmworkers at prior jobs and "held positions that often are filled H-2A workers."  *Id.*, ¶ 8.  The prior AEWR applicable to these positions was $18.15.  *Id.*, ¶ 9.  Under the IFR, the AEWR for these positions would be cut by about 24%, to $13.78.  *Id.*, ¶¶ 6, 9.  Grimaldo indicates that a cut to his wages due to the IFR "will substantially and irreparably" harm him and his family.  Doc. 21-3 at 2, ¶ 10.  Such a wage cut would impact his ability to pay for food, housing, transportation, health care, and his children's education.  *Id.*  According to Grimaldo, his family would be forced to move and would have to cut down on their weekly groceries.  *Id.*  Thus, Grimaldo contends a wage cut due to the IFR would result in harm to his family's health and safety.  *Id.* at 2-3, ¶ 10.  Grimaldo does not identify any actual reduction in his hourly wage rate since the IFR went into effect.

### 4.    Fortino Lopez

Lopez reports that he is a citizen of the U.S., currently residing in Washington state, and has worked as a farmworker for 40 years.  Doc. 21-5 at 1-2, ¶¶ 1, 4.  Lopez has worked in the wine grape industry "for the last 20 years," but he also has experience "picking apples, asparagus, cherries, hops, pears, and grapes."  *Id.* at 1, ¶ 2.  Lopez indicates that he will "continu[e] to seek positions where [he] would be a tractor driver in agriculture or driving a forklift at fruit/vegetable factories."  Doc. 21-5 at 2, ¶ 7.  Lopez asserts a wage cut "will substantially and irreparably"

9

cause harm to him and his family, with a negative impact on his ability to pay for health care, living expenses (such as food, housing, transportation) and his children's education. *Id.*, ¶ 8. Lopez explains that the reduction in wages "would not be sufficient to feed his family," and he needs to maintain insurance because his wife has Type 2 diabetes. *Id.* Lopez also assists his daughter by paying $1,500 for tuition and books for her college, and the "wage cut would make it impossible to continue." *Id.* at 2-3, ¶ 8. Lopez thus asserts the IFR will cause harm to his family's health and safety. *Id.* at 3, ¶ 8.

Lopez was last paid $20.90 per hour for work as a tractor driver, which was above the AEWR of $19.62 for that position. *Id.* at 2, ¶ 5. Under the IFR, the AEWR for this position would be cut by approximately 16%, to $16.53, which is 20.9% below Lopez's last pay rate of $20.90 per hour. *Id.* Lopez does not identify any actual reduction in his hourly wage rate since the IFR went into effect.

### 5.   Irene Mendoza

Mendoza is a U.S. citizen and has worked as a farmworker for the past four years, "packing, sorting, and picking green beans and potatoes." Doc. 21-8 at 1, ¶¶ 1-2. She currently lives and works in Texas, but previously traveled to Wisconsin, Minnesota, and Michigan for work. *Id.* at 2, ¶ 5. Mendoza "worked alongside H-2A workers" and has been in positions often filled by foreign farmworkers. *Id.*, ¶ 9. Mendoza indicates that if her wages are cut under the IFR, it "will negatively impact [her] ability to pay for food; housing; transportation; and healthcare, home, vehicle, and life insurance." *Id.*, ¶ 11; *see also id.* at 3-4, ¶¶ 11-13.

Mendoza reports that her last promised hourly wage was $20 for a position in Michigan, which was above the then-applicable AEWR of $18.15, but she received $17 per hour after her employer reduced the wages for providing transportation. *Id.* at 2, ¶¶ 6, 10. Under the IFR, the AEWR applicable to the Michigan position would be $13.78, which is 18.9% below the wage Mendoza last received. *Id.*, ¶¶ 7, 10. Mendoza does not identify any actual reduction in her wage rate since the IFR went into effect.

///

///

10

### 6. Crisanto Serrano

Serrano is a U.S. citizen currently living in Washington state and has "worked as a farmworker for 45 years." Doc. 21-6 at 1-2, ¶¶ 1, 4. For the last four years, Serrano "worked picking potatoes and transporting produce from the field to warehouses." *Id.* at 1, ¶ 2. He has also previously "worked in fruit-packing factories, operated forklifts in cherry and mushroom facilities, performed construction, and driven a combine in the hop fields." *Id.* Serrano worked with H-2A workers and "held positions that often are filled by H-2A workers." *Id.* at 2, ¶ 8. He anticipates that in the future he will seek similar positions, which "could likewise potentially be filled by H-2A workers, such as driving combines, operating machinery, driving small semi-trucks, and driving tractors." *Id.*

Serrano asserts that wage differences "due to the IFR will substantially and irreparably harm" him and his family, negatively impacting his "ability to pay for food, housing, and transportation." *Id.*, ¶ 10. He explains he does "not have health insurance and cannot afford routine medical care," and he has $18,000 in medical debt following asthma attacks that required emergency treatment at a hospital. *Id.* at 2-3, ¶ 10. Serrano also believes wage cuts will force him "to choose between paying for [asthma] medication and buying groceries." *Id.* at 3, ¶ 11.

Serrano's last hourly wage was $20 for work as a machine operator, which was above the AEWR of $19.82 for the position. Doc. 21-6 at 2, ¶ 5. Under the IFR, the new AEWR would be $16.53, which is a cut of approximately 16.5% to the AEWR and is 17.35% below Serrano's last hourly wage. *Id.*, ¶¶ 6, 9. While Serrano anticipates his wage rate will be cut, he does not identify an actual reduction in his wage rate since the IFR went into effect.

### 7. Isabel Panfilo

With their reply, plaintiffs submitted two additional declarations, from Isabel Panfilo and from Teresa Romera, the President of the United Farm Workers.

Panfilo is a U.S. citizen and has "worked as a farmworker in California for two years." Doc. 34-2 at 1, ¶ 1. Panfilo reports she has worked for Socal Berry Growers LLC, which also employed H-2A workers. *Id.* at 2, ¶ 2. Last year, Socal Berry paid Panfilo "$2.60 through piece wage rate, which amounted to rates as high as $19.35 per hour for the job task of picking

11

strawberries." *Id.* She reports that the AEWR for this position was $19.75 in 2024 and $19.97 in 2025. *Id.* Panfilo reports that on January 5, 2026, she resumed work for Socal Berry, "doing the same tasks picking strawberries," and she is "now getting paid $16.90 per hour, the state minimum wage in California," after the IFR set the AEWR as $16.45 in California. *Id.*, ¶ 3.

### 8.    The UFW

In her supplemental declaration, Teresa Romero, President of the United Farm Workers, states: "The UFW represents thousands of farmworkers across the country and is dedicated to improving wages, working conditions, and economic stability for agricultural workers."[1] Doc. 21-2 at 1, ¶¶ 1-2. "UFW has thousands of farmworker members in California, Oregon, Washington, and New York who are employed under collective bargaining agreements, and many of whom spend part of each year working for employers that do not have a collective bargaining agreement." *Id.*, ¶ 3. The organization also has "members who pay membership dues but do not work under a collective bargaining agreement in California, Arizona, Oregon, Washington, and New York." *Id.*, ¶ 4. There are "non-dues paying" UFW members in most states. *Id.*, ¶ 5.

Romero asserts that, "[b]ecause the UFW has members and engages with farm workers in the majority of the states, a stay or a preliminary injunction that is not universal would result in the Interim Final Rule and its wage cuts harming UFW members in states where the stay or injunction does not apply." Doc. 21-2 at 2, ¶ 6. Romero asserts the IFR would require the UFW to "divert significant staff time and resources … in order to respond to its members' urgent needs and interfere with [the organization's] core mission." *Id.*

Romero reports that "[i]n worksites where the UFW represents farmworkers, the IFR "already had the effect of lowering the wages of farmworkers there and will continue to do so in the coming weeks and months." Doc. 34-1 at 2, ¶ 4. "This will impact UFW members who are U.S. farmworkers as well as H-2A workers." *Id.* Romero states:

> The UFW represents workers at Cahoon Farms in New York. In
> 2025, Cahoon Farms offered UFW members $19.40 per hour,

[1] Plaintiffs also submitted a short declaration from Romero with their initial motion filings, but Romero's initial declaration does not meaningfully address the standing or irreparable harm issues. *See* Doc. 21-2.

slightly above the 2025 AEWR in New York of $18.83, for the work of picking apples for fresh market. Cahoon Farms recently informed UFW that effective January 12, 2026, they will begin offering UFW members $17.91 per hour for that same work. $17.91 represents the prevailing wage rate, which is highest of all wages now that the IFR reduced the AEWR to $15.68 for U.S. farmworkers and $13.38 for H-2A workers.

UFW has multiple members who have worked, and again intend to work for Cahoon Farms.  For example, John Doe I,[] a U.S. farmworker with 18 years of experience, has worked for Cahoon Farms for 8 years, and was previously compensated at an hourly rate of $19.40. John Doe II, an H-2A farmworker with 38 years of experience, has worked at Cahoon Farms for 7 years, and was previously compensated at an hourly rate of $19.40 per hour.  John Doe III, an H-2A farmworker with 7 years of experience, has worked at Cahoon Farms for 4 years, and was previously compensated at an hourly rate of $19.40. …

The UFW also has a collective bargaining agreement with D'Arrigo Brothers in California that set the 2025 wages at the 2025 AEWR in California, $19.97. D'Arrigo Brothers uses the farm labor contractor, Elkhorn Packing Co. LLC ("Elkhorn"), to hire workers, including H-2A workers.  While Elkhorn has not submitted job orders for D'Arrigo Brothers positions, it has submitted job orders for other employers that it contracts for. These job orders offer hourly wages of $16.90, the California state minimum wage, which is the lowest that employers and contractors can legally offer H-2A workers and U.S. farmworkers in corresponding employment due to the IFR lowering the AEWR in California to $13.45 and $16.45, respectively.  The AEWR in California prior to the IFR was $19.97, which is what Elkhorn offered, via H-2A job orders, in 2025.  We anticipate that Elkhorn will offer similar rates of $16.90 in their jobs orders for D'Arrigo Brothers, as they have begun to offer for jobs that begin on February 16. But even if they do not, offering wages for D'Arrigo Brothers' competitors that are lower than what was offered in 2025, because of the IFR, will put downward pressure on a company that employs higher wage workers under a collective bargaining agreement.

UFW has multiple members that have worked, currently work, and again intend to work, for D'Arrigo Brothers.  For example, Jane Doe I, a U.S. farmworker with 25 years of experience, has worked for D'Arrigo Brothers for 25 years, and was previously compensated at an hourly rate of $19.97.  She is currently being compensated at $18.63 for her work at D'Arrigo Brothers.  She seeks anonymity because she is worried about problems or retaliation at work. Jane Doe II, a U.S. farmworker with 20 years of experience, has worked for D'Arrigo Brothers for 20 years, and was previously compensated at an hourly rate of $19.97.  She seeks anonymity because she fears retaliation from her employer. Jane Doe III, a U.S. farmworker with 13 years of experience, has worked for D'Arrigo Brothers for 20 years, and was previously compensated at an hourly rate of $19.97.  She also seeks

13

> anonymity because she fears retaliation at work from the foreman and supervisors at her work.

Doc. 34-1 at 2-3, ¶¶ 5-8.

Romero reports that, due to the seasonal nature of agricultural work, many UFW members—including H-2A workers and U.S. workers in corresponding positions— "do not commence seasonal farm work until the spring." Doc. 34-1 at 3, ¶ 9. Romero estimates about 40% of UFW members in California, New York, and Oregon begin their agricultural jobs between March and May, and 50% of UFW members in Washington begin their agricultural work during the same months. *Id.* at 3-4, ¶ 9. According to Romero, "[t]his includes individual plaintiffs who face imminent wage cuts that will not directly impact them until they begin work later in the year." *Id.* Romero reports that "[a]s part of [the UFW's] work to bargain for higher wages for farmworkers," the UFW "recently encountered in negotiations employers who have shared that they will hire H-2A workers at the new, lowered AEWR rates," and these employers have pushed back against UFW's requests for higher wages. *Id.* at 4, ¶ 10. "This will impact UFW members who are both H-2A workers and U.S. workers in corresponding employment when those jobs actually begin." *Id.*

### 9.    The UFW Foundation

Plaintiffs indicate that "[t]he UFW Foundation is a nonprofit organization and DOJ-accredited immigration legal services provider that serves over 100,000 farmworkers and immigrant community members annually." Doc. 1 at 8, ¶ 19. The UFW Foundation provides its members with "immigration services, emergency assistance, worker-rights education, and support for families experiencing financial instability, housing insecurity, food insecurity, or workplace abuses." *Id.*

Plaintiffs note that "many farmworkers live at or below the poverty line." Doc. 1 at 8, ¶ 19. They assert that the UFW Foundation's "members will face lower wages if the IFR remains in effect," and they contend that "reductions in wages immediately translate into inability to pay rent, buy food, afford transportation to work, purchase school supplies for children, or cover out-of-pocket medical costs." *Id.* at 8-9, ¶ 19. Plaintiffs assert there will therefore be a "significant

14

increase in demand for UFW Foundation's services." *Id.* at 8, ¶ 19.

According to Plaintiffs, the "UFW Foundation will be forced to divert limited resources from ongoing programs to handle emergency food assistance requests, crisis rent support, and increased casework arising from workers losing income." Doc. 1 at 9, ¶ 19. Plaintiffs assert that "[t]hese harms impair UFW Foundation's ability to carry out its mission and impose real, immediate, and irreparable burdens on the organization and the communities it serves." *Id.*

### E.   Procedural History

Plaintiffs' complaint for declaratory and injunctive relief, filed on November 21, 2025, asserts three claims for relief: (1) violation of the Administrative Procedure Act, 5 U.S.C. § 706, asserting the IFR is not in accordance with the law; (2) violation of the APA, 5 U.S.C. § 706, asserting the IFR is "arbitrary and capricious" because it failed to consider important aspects and reliance interests of farmworkers; and (3) violation of the APA, 5 U.S.C. § 533, asserting the DOL failed to comply with the requirements of notice-and-comment rulemaking. Doc. 1 at 37-43.

On December 22, 2025, Plaintiffs filed the pending motion for a preliminary injunction and Section 705 stay. Doc. 21. On January 22, 2026, Defendants filed their opposition to the motion. Doc. 28. The North Carolina Chamber, and the California Farm Bureau Federation and the National Council of Agricultural Employers, filed amici curiae briefs in support of Defendants' opposition. Docs. 29, 33. Plaintiffs subsequently filed a reply, Doc. 34, and the court held a hearing, Doc. 43.

## II.   GOVERNING LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). Preliminary injunctions are intended "merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (citations omitted). Similarly, a stay under 5 U.S.C. § 705 permits the court to stay an agency action—and preserve the status quo—pending review of a plaintiff's APA challenge. *Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 989-90 (9th Cir. 2025).

15

Plaintiffs seeking a preliminary injunction must establish: (1) they are "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 339-40 (2024) (reiterating courts must consider the *Winter* test). The moving party has the burden to "make a showing on all four prongs" of the *Winter* test to support a request for injunctive relief. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In some circumstances, courts may apply a sliding-scale, under which "the required degree of irreparable harm increases as the probability of success decreases." *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1057-58 (9th Cir. 2007); *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (indicating the sliding scale test remains viable after *Winter*, and the district court did not err in its application). A stronger showing on the balance of hardships may support the issuance of a preliminary injunction where there are "serious questions on the merits … so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135.

But when the requested relief is a mandatory injunction, "weakness in a plaintiff's showing of harm cannot be offset by a stronger showing on the merits of the underlying legal claim." *Doe v. Snyder*, 28 F.4th 103, 111, n.4 (9th Cir. 2022). On a motion seeking a mandatory injunction, courts decline to apply the "sliding scale" standard in evaluating the *Winter* factors. *See, e.g., Doe v. Becerra*, 787 F. Supp. 3d 1083, 1089 n.2 (E.D. Cal. 2025) (declining to use the "sliding scale" test on a request for a mandatory injunction); *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) (same).

Stays under Section 705 of the APA require the Court to address "the same factors as preliminary injunctions." *Immigrant Def. L. Ctr.*, 145 F.4th at 984 (citing *Colorado v. EPA*, 898 F.3d 874, 883 (10th Cir. 2021); *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020)). Thus, the Court also applies the *Winter* factors to a request for a Section 705 stay.

///

16

**III.    EVIDENCE BEFORE THE COURT**

A preliminary injunction may be awarded only "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter*, 555 U.S. at 22. A moving party satisfies this burden by presenting "factual support beyond the allegations of the complaint." *CI Games S.A. v. Destination Films*, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (citing *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)). Given the nature of preliminary injunctive proceedings, which occur "at a point when there has been limited factual development, the rules of evidence do not apply strictly." *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1189-90 (noting the "Federal Rules of Evidence do not strictly apply in the preliminary injunction context").

The Court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt v. Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). For example, the Court may consider declarations that include hearsay. *See*, *e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) ("a court may exercise its discretion to accept hearsay" at preliminary injunction proceedings). Defendants do not make evidentiary objections to the declarations that Plaintiffs submitted with their motion or reply, and such evidence is properly considered in evaluating the request for injunctive relief.[2]

**IV.    DISCUSSION AND ANALYSIS**

Plaintiffs contend that "[t]he Court should stay the IFR under 5 U.S.C. § 705 and issue a universal preliminary injunction against the IFR." Doc. 21-1 at 28. Plaintiffs seek to: (1) enjoin the defendants "from implementing or otherwise taking any action to enforce" the Interim Final

---

[2] In their opposition, among other points, Defendants argued that Plaintiffs' initial declarations failed to establish standing or irreparable harm. *See* Doc. 28. Plaintiffs then submitted supplemental declarations, by Romero and Panfilo, with their reply brief. *See* Docs. 34-1, 34-2. At the hearing, Defendants objected to the Romero and Panfilo declarations as untimely. The Court will not exclude these declarations as Defendants were able to address the new evidence on the record at the hearing. Additionally, as addressed below, even with these additional declarations, Plaintiffs have failed to show a likelihood of irreparable harm.

17

Rule published on October 2, 2025, and (2) require the DOL create a new methodology to generate AEWRs, which will "approximate the wages that U.S. farmworkers in the relevant markets would have received absent the H-2A program." Doc. 21 at 2; Doc. 21-1 at 30.

### A.      Standing

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To satisfy the "case or controversy" requirement, a plaintiff must establish standing under Article III to bring suit. *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *see also Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 938 (2007) ("standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). In evaluating standing, courts "must consider the facts as they exist at the time the complaint was filed." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir. 2002).

To establish Article III standing, a "plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). The injury in fact element requires "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks, citations omitted). A future injury alleged by a plaintiff "need not be 'literally certain,' but there must be a 'substantial risk' that it will occur." *Northwest Requirements Utils. v. FERC*, 798 F.3d 796, (9th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024) ("the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek").

Plaintiffs seeking a preliminary injunction "must make a clear showing of each element of standing relying on the allegations in their complaint and whatever evidence they submitted in support of their motion to meet that burden." *L.A. All. for Hum. Rights v. County of Los Angeles*,

18

14 F.4th 947, 956-57 (9th Cir. 2021) (modifications adopted). The parties dispute whether Plaintiffs have carried their burden to establish standing to proceed with their claims. Doc. 28 at 11, 17-20; Doc. 34 at 8-12.

### 1.     The UFW

Organizations may establish standing under two theories: (1) organizational standing, to the extent the organization claims its own injury, and (2) associational or representative standing, to the extent the organization sues on behalf of its members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *see also E. Bay Sanctuary Covenant v. Biden,* 993 F.3d 640, 662 (9th Cir. 2021) ("Organizations can assert standing on behalf of their own members, or in their own right"). Plaintiffs invoke both theories of standing in the complaint.[3] Doc. 1 at 7-8, ¶ 18. Defendants contend the UFW fails to show standing under either theory. Doc. 28 at 18-20.

### a.     *Organizational standing*

To sue on its own behalf, an organization must demonstrate that it suffered an injury in fact. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). "An organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources and a frustration of its mission.'" *Id.* (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). An organization's purportedly injurious diversion of resources must "differ from its routine activities." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 482, 500 (5th Cir. 2020) (citation omitted, modification adopted).

Plaintiffs allege the IFR will "directly and immediately harm" the UFW. Doc. 1 at 8, ¶ 18. Plaintiffs assert the UFW "is dedicated to improving wages, working conditions, and economic stability for agricultural workers." *Id.* at 7, ¶ 18. The organization "assists workers with enforcing their rights, engages in collective bargaining, and supports workers during workplace disputes, health and safety issues, wage theft, and labor violations." *Id.* at 8, ¶ 18.

---

[3] The Romero declaration addresses the UFW's standing to sue. *See* Doc. 34-1. Plaintiffs do not present similar such evidence regarding the UFW Foundation, which is a separate legal entity. Given the limited evidence regarding the UFW Foundation and its membership, this analysis focuses on the UFW.

Plaintiffs contend that "[a] core function of the UFW is to advocate for better wages for its members as part of its negotiations with employers for collective bargaining agreements, including renegotiating new terms." *Id.* Plaintiffs assert the IFR will "interfere with [the] core mission and require the organization to redirect resources to address the economic disruption caused…". *Id.*; *see also* Doc. 21-2 at 2, Romero Decl. ¶ 6. For example, Plaintiffs assert the UFW will have to "divert significant staff time and resources to respond to urgent worker needs," including housing, food security, transportation, and medical care. *Id.* Plaintiffs contend that the lower AEWRs will also undermine the UFW's ability to negotiate wages, because the IFR "provide[s] more leverage to employers in those negotiations." *Id.*

Defendants argue the UFW fails to "establish a sufficiently concrete injury in fact for organizational standing" based upon the allegations in the complaint. Doc. 28 at 18. According to Defendants, the injuries identified relate to the UFW "executing [its]… missions as opposed to the obstruction of their ability to carry out the same." *Id.* at 19. Defendants observe that "[h]arm that consists of advocacy, education, or outreach undertaken in response to a challenged policy, as opposed to impairment of existing programs or activities, does not confer standing." *Id.* at 19. Defendants also assert that the UFW does not show standing based upon its "diversion-of-resources" theory, because there is no evidence of such a diversion. *Id.* at 19-20.

Defendants' arguments are well-taken. As Plaintiffs assert, a core mission of the UFW is improving wages and economic stability for their agricultural worker members. To the extent the UFW would have to use funds to address members' needs related to housing, food security, or transportation, such activities are arguably consistent with its overall mission. And there is no evidence presented that the UFW had to divert any resources otherwise dedicated to other functions of the organization. *Cf. Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) (finding organizational standing where the association "had to divert resources to educational programs to address its members' … concerns about the [challenged] law's effect"). In their reply brief, Plaintiffs do not address or refute the arguments regarding organizational standing. *See* Doc. 34 at 11-12. Given the lack of evidence of any diversion of resources, the UFW fails to establish an injury in fact as required for organizational standing.

20

> b.   *Associational standing*

"The doctrine of associational standing permits an organization to sue to redress its members' injuries, even without a showing of injury to the association itself." *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003).  An organization has standing sue on behalf of its members when it demonstrates: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1157 (9th Cir. 2025) (citation omitted); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000).  The second and third prongs are not disputed by the parties. *See* Doc. 28 at 20; Doc. 34 at 12.

> i.   Members' standing

Defendants argue the first element for associational standing is not satisfied because Plaintiffs' declarations "fail to show a concrete, particularized, imminent injury for standing because all speculate about future wage reductions, without any concrete evidence."  Doc. 28 at 20 (citing Doc. 21-3 Grimaldo Decl. ¶¶ 7, 9, 10; Doc. 21-4, Cruz Decl. ¶¶ 6-8; Doc. 21-5, Lopez Decl. ¶¶ 6–8; Doc. 21-6, Serrano Decl., ¶ 6-11; Doc. 21-7, Garcia Decl., ¶¶ 7–10; Doc. 21-8, Mendoza Decl. ¶¶ 8–13).  Defendants observe:

> Each plaintiff claims a plan to seek work as a farmworker in the future. *Id.*  Each also alleges that he or she anticipates a decrease in wages based upon a decrease in the AEWR. *Id.*  No Plaintiff submitted facts to show that he or she had already suffered a decrease in wages. *Id.*  Much of their complaints rest on the assumption that job opportunities they will apply and be selected for will be assigned a Skill Level I wage, but that is speculative given that they have not yet applied for any job opportunities since the IFR took effect and the job duties are unknown.

*Id.*  Defendants conclude that the evidence does not show the UFW members have standing.  *Id.*

Plaintiffs argue that the UFW has "associational standing through their farmworker members whose wages will likely … fall (or have already fallen) because of the significant drop in AEWRs."  Doc. 34 at 6.  With their reply brief, Plaintiffs submit the supplemental Romero declaration in support of their argument that "UFW members have previously worked, and will

21

likely again seek to work, for certain employers that have already signaled that they will lower farmworker pay in light of the IFR." *Id.* at 12 (citing Romero Decl. ¶¶ 4-8.)  Plaintiffs contend that "given the IFR's broad economic consequences, it is 'relatively clear' that many of the … [UFW] members will be impacted by the IFR." *Id.*

Typically, to invoke associational standing, an organization must make "specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Associated Gen. Contrs. of Am. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (emphasis in original); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Significantly, there are no allegations in the complaint related to the membership of the individual plaintiffs.  *See generally* Doc. 1.  Similarly, none of the individual declarants identify themselves as UFW members.  *See* Docs. 21-3 (Grimaldo), 21-4 (Cruz), 21-5 (Lopez), 21-6 (Serrano), 21-7 (Garcia), 21-8 (Mendoza), 34-2 (Panfilo).

Nevertheless, the Ninth Circuit has permitted some flexibility in the requirement to identify an injured member by name "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).  Here, the evidence shows that UFW has thousands of members, including both U.S. citizens and H-2A farmworkers.  Doc. 34-1 at 2.  As it is undisputed that the IFR will reduce the AEWRs for H-2A farmworkers, it is "relatively clear" that at least one such UFW member will be adversely affected by the challenged IFR.

ii.    Association's interests

To determine whether the interests an organization seeks to protect are germane its purpose, the Court considers the identified missions and goals.  *Perdomo v. Noem*, 148 F.4th 656, 677 (9th Cir. 2025).  As discussed above, the UFW "is dedicated to improving wages, working conditions, and economic stability for agricultural workers."  Doc. 21-2 at 1, ¶ 2.  The interests the UFW seeks to protect for its members—related to the AEWR calculation methodology—are germane to the identified goals and sufficient to establish associational standing.  Defendants do

22

not dispute this element of associational standing.

iii.    Members' participation

Member participation is not required in an action where the plaintiffs seek only declaratory or injunctive relief, which does not require individualized proof. *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (citation omitted). As Plaintiffs' requests for relief in the complaint are limited to declaratory and injunctive relief, the participation of individual UFW members is not required in this action. *See id.*; *see also Iowa League of Cities,* 711 F.3d at 854, 869 (8th Cir. 2013) (no individual participation required for APA claim).

*c.*    *Conclusion*

Although the UFW lacks organizational standing, the three elements for associational standing are satisfied, and the UFW has standing to sue on behalf of its members.

**2.    Individual Plaintiffs**

Only one plaintiff needs to establish standing for the Court to address the claims asserted in the action. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also Mecinas v. Hobbs,* 30 F.4th 890, 896-97 (9th Cir. 2022) ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the suit to proceed."). The Ninth Circuit has found that "in an injunctive case [the] court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians Lenscrafters, Inc. v. Brown,* 567 F.3d 521, 523 (9th Cir. 2009). Given that the UFW has standing, the Court need not further address Defendants' arguments as to the standing of the individual plaintiffs.

**B.    <u>Nature of Requested Relief</u>**

Preliminary injunctions may be prohibitory or mandatory. *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590 (9th Cir. 2025). A prohibitory injunction is one that "restrains" a party from further action and "aims at simply maintaining the status quo." *N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A preliminary injunction that forbids enforcement of new government policy is prohibitory. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). A mandatory injunction is one that "compels the nonmoving party to take

23

affirmative action." *San Louis Obispo*, 161 F.4th at 597. A mandatory injunction is "disfavored," *id.,* and "courts should be extremely cautious" when the requested relief "goes well beyond maintaining the status quo." *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (citation omitted). Parties seeking a mandatory injunction must establish "the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 739 (9th Cir. 2015) (emphasis in original). Due to this "heightened standard" upon a party seeking a mandatory injunction, a court must first determine the nature of the requested injunctive relief. *Master Tax LLC v. Ultimate Software Grp.*, 770 Fed. Appx. 386, 387 (9th Cir. 2019); *see also Stanley*, 13 F.3d at 1320.

Plaintiffs seek injunctive relief: (1) "preventing Defendants from implementing or otherwise taking any action to enforce the challenged regulation in the IFR" and (2) "compelling Defendants to adopt a methodology for calculating AEWRs that complies with applicable law." Doc. 1 at 44, ¶¶ 147, 150. In their briefing on the motion, Plaintiffs contend the Court should require the DOL to promptly produce a substitute methodology for calculating AEWRs, that "adopts a new wage data source" and excludes both the two-tiered skill level system and housing deductions. Doc. 34 at 28. Plaintiffs' requested relief would require the government to take additional actions, including creating a new methodology for calculating AEWRs and using a new wage data source. Thus, the requested relief is mandatory in nature. *See San Louis Obispo*, 161 F.4th at 597.

### C.    *Winter* **Factors**

When faced with a request for a mandatory injunction, as here, courts typically decline to apply the Ninth Circuit's "sliding scale" standard in evaluating the *Winter* factors. *See, e.g., Doe v. Snyder*, 28 F.4th 103, 111, n.4 (9th Cir. 2022); *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1089 n.2 (E.D. Cal. 2025) (declining to use the "sliding scale" test on a request for a mandatory injunction); *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1135 (C.D. Cal. 2015) (same). The Ninth Circuit has noted that, with a mandatory injunction, "weakness in a plaintiff's showing of harm cannot be offset by a stronger showing on the merits of the underlying legal claim." *Snyder*, 28 F.4th at 111, n.4. Instead, the moving party faces a "doubly demanding"

24

standard. *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).

### 1.    Irreparable harm

Plaintiffs contend the IFR "will cause significant and irreparable harms" to the plaintiffs. Doc. 21-1 at 27 (citing Mendoza Decl. ¶¶ 11-12; Garcia Decl. ¶ 10; Lopez Decl. ¶ 8; Serrano Decl. ¶ 11; Cruz Decl. 8; Grimaldo Decl. ¶ 10). Plaintiffs contend they may suffer difficulties with paying for education, "housing, food, and health care costs." Doc. 34 at 24. Plaintiffs note this court previously observed that farmworkers were in a "fragile socioeconomic position," which heightens the identified injuries. Doc. 21-1 at 27 (quoting *United Farm Workers v. United States Dep't of Lab.*, 509 F. Supp. 3d 1225, 1231 (E.D. Cal. 2020)). In addition, Plaintiffs contend "the wage cuts occasioned by lower AEWRs may force the individual Plaintiffs to look for employment in other sectors," and the "loss of a job opportunity constitutes irreparable harm that cannot be remedied by damages." *Id.* (citing *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Defendants argue the evidence "fail[s] to show a sufficiently concrete injury for irreparable harm," for three reasons. Doc. 28 at 20; *id.* at 20-21. First, Defendants argue, "Plaintiffs describe only *potential future* economic effects, not immediate or unavoidable injury." *Id.* at 20-21. Defendants contend: "Plaintiffs claim they 'anticipate' seeking employment, and the 'anticipated cuts' to wages will harm them, and UFW claims without an injunction it 'would' suffer certain alleged harms, but no one alleges such harms have occurred." *Id.* (citing Docs. 21-2 through 21-8). According to Defendants, "Forward looking concerns of this kind do not establish irreparable harm warranting emergency relief." *Id.* at 21 (citing *Winter*, 555 U.S. at 22). Second, Defendants argue that "Plaintiffs' delay in seeking preliminary relief undercuts any irreparable harm." *Id.* (citing *Oakland Tribune, Inc. v. Chronicle Publ'g Co*., 762 F.2d 1374, 1377 (9th Cir. 1985); *Lydo Enters*., *Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213-14 (9th Cir. 1984)). Finally, Defendants contend that "Plaintiffs' request for an order enjoining the 'implementation' of the IFR is moot because the IFR has been in effect for over three months." *Id.*

///

25

a.      *Harms identified*

Plaintiffs must establish that the risk of irreparable harm is "likely, not just possible." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,1131 (9th Cir. 2011).  Irreparable harm traditionally includes harm for which there is no adequate remedy; economic damages do not typically constitute irreparable harm.  *See Arizona Dream Act Coal.*, 757 F.3d at 1068.  But courts have found that decreased wages or loss of income can satisfy the "irreparable harm" requirement "when an employee is so poor that …. the consequences would be severe."  *See Lee v. Christian Coal. of Am. Inc.*, 160 F. Supp. 2d 14, 31 (D.D.C. 2001).

The Court has carefully reviewed the declaratory evidence submitted by Plaintiffs in support of the request for injunctive relief.  The declarants each identify their last hourly wage rate, but without identifying when they received that wage and completed the work.  *See* Doc. 21-4 at 2, Cruz Decl. ¶¶ 4-6; Doc. 21-7 at 5, Garcia Decl. ¶ 5; Doc. 21-3 at 2, Grimaldo Decl. ¶ 5; Doc. 21-5 at 2; Lopez Decl. ¶ 5; Doc. 21-8 at 2, Mendoza Decl. ¶¶ 5-6; Doc. 21-6 at 2, Serrano Decl. ¶ 5.  As to most of the declarants—including Grimaldo, Cruz, Lopez, Serrano, Garcia, and Mendoza—it is unclear whether they were employed as farmworkers at the time of executing their declarations, as they reference only past wages and do not identify any *current* hourly wage rate they were earning.  *See id.*  These plaintiffs indicate that they "anticipate continuing to seek" employment as a farmworker, but they do not identify when they expect to return to such employment or whether they intend to return to the same employer that paid their past identified hourly wages.  *See* Doc. 21-4 at 2, Cruz Decl. ¶ 7; Doc. 21-7 at 5, Garcia Decl. ¶¶ 7-9; Doc. 21-3 at 2, Grimaldo Decl. ¶¶ 7-9; Doc. 21-5 at 5; Lopez Decl. ¶ 7; Doc. 21-8 at 2, Mendoza Decl. ¶¶ 8-10; Doc. 21-6 at 2, Serrano Decl. ¶¶ 7-9.  These Plaintiffs have not shown that they are likely to be employed in the same positions in the future or that they will likely receive a wage reduction for such work.

Five of the declarants—Cruz, Grimaldo, Lopez, Mendoza, and Serrano—previously received hourly wages or pay offers that were higher than the identified AEWR for their position.  *See* Doc. 21-4 at 2, Cruz Decl. ¶ 5; Doc. 21-3 at 2, Grimaldo Decl. ¶¶ 5-6; Doc. 21-5 at 2; Lopez Decl. ¶¶ 5-6; Doc. 21-8 at 2, Mendoza Decl. ¶¶ 6-7; Doc. 21-6 at 2, Serrano Decl. ¶ 5.  As their

prior hourly pay exceeded the floor set by the then-applicable AEWR, it cannot simply be assumed, as Plaintiffs argue, that a reduction in the AEWR will necessarily mean a reduction in their wages.  While Plaintiff Garcia reports that her prior wage rate equaled the AEWR for her position, neither she nor the five other declarants noted above indicate that there has been any reduction in their wage rates since the IFR went into effect.  *See id.*; Doc. 21-7 at 5, Garcia Decl. ¶ 5.  While these declarants establish that a wage cut would affect their ability to pay for basic costs of living— as well as expenses related to education and other needs—they fail to present sufficient evidence showing they are likely to receive reduced hourly wages due to the IFR.

In reply, Plaintiffs submit the declaration of Isabel Panfilo, who is the only declarant who indicates she is now employed at a lower hourly wage since the issuance of the IFR.  Doc. 34-2.  The Romero declaration, which Plaintiffs also submitted in reply, similarly asserts that certain Doe UFW members have received lower wages for their work since the IFR took effect.  Doc. 34-1.  But neither declaration asserts that Panfilo or the Doe individuals have had any difficulties in paying for costs of living, or suffered any other irreparable harm, due to the wage reductions or the IFR.  *See id.*

Based on the evidence currently before the Court, Plaintiffs have failed to show that they are likely to suffer irreparable harm due to the IFR.

                                  *b.*       *Delay*

A delay in seeking a preliminary injunction "implies a lack of urgency and irreparable harm."  *Oakland Trib., Inc. v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985).  Although there is not a bright-line rule, courts have determined that a delay of two months weighs against finding irreparable harm.  *See Cutting Edge Solutions, LLC v. Sustainable Low Maint. Grass, LLC*, 2014 WL 5361548, at *6 (N.D. Cal. Oct. 20, 2014) ("courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months") (citation omitted); *see also Killa Bees Distrib. LLC v. Left Coast Fin. Sols., Inc.*, 2024 WL 4664490, at *2 (D. Or. Nov. 4, 2024) (where the plaintiffs waited approximately eight weeks to seek injunctive relief, the court found the delay "counsels against a finding of likely irreparable harm"); *Giving Back Fund Inc. v. Miami Mktg. Grp.,* 2011 WL 13217774, at *4 (C.D. Cal. Jan.

20, 2011) (stating that the plaintiffs' two-month delay in filing their motion "certainly implies a lack of urgency and accordingly counsels against finding a likelihood of irreparable harm").

The challenged IFR was issued on October 2, 2025, and Plaintiffs moved for a preliminary injunction on December 22, 2025.  Thus, there was nearly a three-month period between the DOL's issuance of the IFR and Plaintiffs' filing of the pending motion.  The delay in seeking injunctive relief also weighs against finding irreparable harm.

### c.    Mootness

Defendants summarily argue that Plaintiffs' request to enjoin the IFR's implementation is moot, as the IFR took effect nearly three months before Plaintiffs filed their motion for a preliminary injunction.  But while the request to enjoin the IFR's initial implementation may be moot, Plaintiffs correctly note that the Court "can still stay the continued implementation of the IFR."  Doc. 34 at 27, n. 12 (citing *Coal. for Humane Immigr. Rts. v. Noem*, 2025 WL 2192986, at *15 (D.D.C. Aug. 1, 2025) (emphasis omitted).  As Plaintiffs seek prospective relief regarding the continued implementation of the IFR, their claims are not moot.

### 2.    Remaining *Winter* factors

Given the finding that plaintiffs have not sufficiently shown a likelihood of irreparable harm, the remaining *Winter* factors need not be addressed.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for a preliminary injunction and Section 705 stay is denied.

The parties shall submit a joint statement within fourteen (14) days setting forth their positions on the appropriate case and briefing schedule on the merits of Plaintiffs' claims.

IT IS SO ORDERED.

Dated:   May 13, 2026

_____
UNITED STATES DISTRICT JUDGE