Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Sela Carrington**
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
kcholera@cov.com
*Admitted pro hac vice
**Pro hac vice application forthcoming

*Attorneys for Plaintiffs*

*(additional counsel listed on signature page)*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| UNITED FARM WORKERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR;<br><br>KEITH E. SONDERLING, in his official capacity as Acting Secretary of Labor;<br><br>LORI FRAZIER BEARDEN, in her official capacity as Acting Assistant Secretary for Employment and Training<br><br>Defendants. | Civil Case No.: 1:25-cv-1614<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |

# TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Congress instituted the H-2A program to allow U.S. employers to hire seasonal foreign laborers, but only if the wages of similarly-employed U.S. workers would not be adversely affected by the use of H-2A labor. ..... 3

B. In 2020, DOL issued a regulation that would have lowered AEWRs, but it was found unlawful, and enjoined, by this Court. ..... 5

C. In October, DOL suddenly and drastically changed its methodology for calculating AEWRs. ..... 5

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

A. Plaintiffs have standing to challenge the IFR. ..... 9

B. The IFR is substantively and procedurally unlawful under the APA. ..... 13

1. The IFR is arbitrary and capricious, and contrary to law. ..... 13

2. The IFR is procedurally defective. ..... 21

C. The Court must vacate the IFR and compel DOL to promptly release a substitute AEWR methodology and require U.S. employers to provide appropriate backpay. ..... 23

1. The Court should vacate the IFR and remand the matter to DOL so it can generate a lawful methodology for calculating AEWRs. ..... 23

2. The Court must compel DOL to require employers to provide appropriate backpay. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Fed'n of Gov't Emps. v. Block*,
655 F.2d 1153 (D.C. Cir. 1981) ....................22

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Brock*,
835 F.2d 912 (D.C. Cir. 1987) ....................13, 15

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....................24

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ....................21

*Cnty. of Fresno v. Azar*,
384 F. Supp. 3d 1164 (E.D. Cal. 2019) ....................8

*Diamond Alt. Energy, LLC v. Env't Prot. Agency*,
606 U.S. 100 (2025) ....................10

*F.C.C. v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................13

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) ....................9

*Friends of Wild Swan v. U.S. Env't Prot. Agency*,
74 F. App'x 718 (9th Cir. 2003) ....................24

*Garcia v. Stewart*,
531 F. Supp. 3d 194 (D.D.C. 2021) ....................4

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,
861 F.3d 944 (9th Cir. 2017) ....................10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................13, 20

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....................10

*Nat. Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) ....................23

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ....................23

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................ 23

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) ........................................ 21

*Nw. Requirements Utilities v. FERC*,
798 F.3d 796 (9th Cir. 2015) ........................................ 9

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ........................................ 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
280 F. Supp. 3d 187 (D.D.C. 2017) ........................................ 23, 24

*Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*,
749 F. Supp. 3d 697 (W.D. La. 2024) ........................................ 5

*Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*,
No. 6:23-cv-00831-RRS-CBW (W.D. La. Aug. 26, 2025), Dkt. No. 87 ........................................ 5

*UFW v. DOL*,
598 F. Supp. 3d 878 (E.D. Cal. 2022) ........................................ 5

*UFW v. Perdue*,
No. 20-cv-01452, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020) ........................................ 5

*UFW v. United States Dep't of Lab. ("UFW I")*,
509 F. Supp. 3d 1225 (E.D. Cal. 2020) ........................................ 4, 5, 14

*United Farm Workers ("UFW") v. United States Dep't of Lab.*,
2021 WL 1946696 (E.D. Cal. May 14, 2021), *amended in part*, 2021 WL 2402244 (E.D. Cal. June 11, 2021) ........................................ 3, 24

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ........................................ 11

**Statutes**

5 U.S.C. § 553 ........................................ 21

8 U.S.C. § 1188 ........................................ 3, 8, 18

**Other Authorities**

20 C.F.R. § 655.120 ........................................ 4, 6, 7, 18

20 C.F.R. § 655.122 ........................................ 8, 18

75 Fed. Reg. 6884 (Feb. 12, 2010) ........................................ 4, 14, 16, 19

76 Fed. Reg. 3452 (Jan. 19, 2011) .......... 10, 16, 17

80 Fed. Reg. 62958 (Oct. 16, 2015) .......... 22

85 Fed. Reg. 63872 (Oct. 8, 2020) .......... 17

85 Fed. Reg. 70445 (Nov. 5, 2020) .......... 5, 17

86 Fed. Reg. 70729 (Dec. 13, 2021) .......... 17

88 Fed. Reg. 12760 (Feb. 28, 2023) .......... 5, 9, 15, 19

90 Fed. Reg. 45986 (Sept. 24, 2025) .......... 16

90 Fed. Reg. 47914 (Oct. 2, 2025) .......... *passim*

91 Fed. Reg. 15454 (Mar. 27, 2026) .......... 17

Agricultural Workers Advocacy Coalition, Comment Letter on IFR, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States (Nov. 25, 2025), https://perma.cc/A5RX-97KQ .......... 19

*April Hired Workers Up 3 Percent; Gross Wage Rate Increased 3 Percent from Previous Year*, U.S. Dep't of Agric. (May 21, 2025), https://perma.cc/JA5F-9BBN .......... 5

National Agricultural Statistics Service, Farm Labor Methodology and Quality Measures (May 21, 2025), https://perma.cc/J422-2EBT .......... 4

Zachariah Rutledge et al., *H-2A Adverse Effect Wage Rates and U.S. Farm Wages*, Am. J. Agric. Econ. (June 9, 2025), https://perma.cc/6EFE-UJ2T .......... 4

Zachariah Rutledge & Junjian Zhu, *Michigan's H-2A wage offers in first half of Fiscal Year 2026*, Michigan State University Extension (June 16, 2026), https://perma.cc/TM5Z-PUC3 .......... 15

## INTRODUCTION

Congress has long recognized that the employment of temporary foreign farmworkers through the H-2A program can threaten the wages of U.S. workers performing similar work. To address this issue, Congress tasked the Department of Labor ("DOL") with ensuring that the employment of H-2A workers will not "adversely affect" the wages of similarly-employed U.S. farmworkers. DOL has historically sought to fulfill that mandate by setting minimum wages for H-2A workers—Adverse Effect Wage Rates, or "AEWRs"—that approximate the wages U.S. farmworkers would have otherwise received if there were no H-2A program (*i.e.*, the "market" wages). The AEWRs, when properly calculated, help ensure that H-2A workers cannot be hired for sub-market wages that would in turn depress U.S. farmworker wages. And over the years, as wages across the economy have ticked up, DOL has steadily increased AEWRs to ensure they continue to serve their purpose.

Until now. In October of 2025, DOL instituted an interim final rule ("IFR") that imposed draconian cuts to AEWRs, tanking H-2A wages and consequently bringing down the wages of scores of U.S. farmworkers. That IFR violates federal law. The Court should grant summary judgment to the Plaintiffs and award appropriate relief.

First, as a threshold matter, the Plaintiffs—eighteen individual farmworkers and two farmworker organizations—have standing to challenge the IFR. To establish standing for prospective relief, a plaintiff must show that it will likely suffer an imminent injury due to the challenged action. Here, the individual Plaintiffs—seventeen U.S. farmworkers and an H-2A worker—have standing because, in light of the IFR's predictable economic effects, they will likely suffer wage reductions due to the IFR. The U.S. farmworker Plaintiffs will likely experience wage cuts because they must compete with H-2A labor that is now substantially cheaper due to the IFR. In fact, since the IFR was issued, several companies that employ certain U.S. farmworker Plaintiffs have *already* cut those Plaintiffs' wages. The H-2A Plaintiff will also be impacted because the AEWR—his functional minimum wage—is now lower. Additionally,

the organization Plaintiffs can claim associational standing through their farmworker members, many of whom, like the individual Plaintiffs, have *already* experienced wage cuts due to the IFR. Thus, all Plaintiffs have standing to sue.

Second, Plaintiffs are likely to prevail on the merits of their claims. For one, the IFR is arbitrary and capricious, and contrary to law, under the Administrative Procedure Act ("APA") because DOL did not reasonably consider whether, under the IFR, it can satisfy its statutory duty to protect U.S. farmworker wages from the adverse effects of H-2A labor. As explained above, AEWRs can serve their purpose only when they track the market rates for the relevant farmworker positions. But as explained in prior briefing, multiple provisions of the IFR ensure that AEWRs for most H-2A workers will plummet far below the market rates. Most notably, the IFR creates a two-tier system under which over 90% of H-2A jobs are expected to be classified in the bottom tier, and *all* of those jobs will receive AEWRs equal to only the *17th wage percentile* for the relevant sectors. DOL offers no coherent explanation for how the 17th wage percentile would approximate the market rates for the vast majority of farmworker positions. To the contrary, DOL itself has previously acknowledged, in prior rulemakings, that AEWRs cannot serve their purpose if they are pegged at a rate below the relevant average wages. And in addition to the two-tier system, the IFR institutes at least two other measures that tank AEWRs even further. The IFR is thus arbitrary and capricious.

Additionally, the IFR is also procedurally unlawful because DOL was required to, but did not, use a notice-and-comment process before issuing it. Regulations that alter parties' rights and obligations must generally undergo notice-and-comment unless there is good cause for failing to do so, and there was no good cause here. The IFR principally notes that it needed to rush out a new AEWR methodology because the prior data source that DOL relied on became unavailable. But as explained before, the IFR does far more than swap in a new data source. It completely overhauls how AEWRs are calculated. Thus, there was no good cause for bypassing notice-and-comment for *all* of the IFR's provisions.

The Court should thus grant Plaintiffs summary judgment on their APA claims. It should then institute three remedies. First, the Court should "set aside," or vacate, the IFR, which is the presumed remedy under the APA. Second, the Court should compel DOL to promptly issue a new AEWR methodology free of the IFR's flaws, and to then promptly publish new AEWRs thereunder. Third, the Court should institute a backpay remedy similar to what it issued in *United Farm Workers ("UFW") v. United States Dep't of Lab.*, 2021 WL 1946696, at *5 (E.D. Cal. May 14, 2021), *amended in part*, 2021 WL 2402244 (E.D. Cal. June 11, 2021).

## BACKGROUND

### A. Congress instituted the H-2A program to allow U.S. employers to hire seasonal foreign laborers, but only if the wages of similarly-employed U.S. workers would not be adversely affected by the use of H-2A labor.[1]

Under the Immigration Reform and Control Act of 1986 ("IRCA"), agricultural employers may hire foreign temporary workers through H-2A petitions, but only if the Secretary of Labor certifies that: "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services" at issue and "(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1).[2] Unlike other guestworker programs, the H-2A program has no cap on the number of foreign laborers permitted under the program.

To implement IRCA's "no adverse effect" requirement, DOL requires agricultural employers to pay H-2A workers the highest of (i) the AEWR, (ii) any applicable Federal or State minimum wage, (iii)

---

[1] Consistent with L.R. 261, Plaintiffs do not submit a separate statement of facts.

[2] Internal citations and quotation marks are omitted throughout this brief unless otherwise stated.

any available prevailing wage rate,[3] or (iv) any agreed-upon collective-bargaining wage. *See* 20 C.F.R. § 655.120(a). The highest available rates are generally the AEWRs, which are state or region-specific minimum wages set at least annually by DOL to ensure that the employment of H-2A workers will not artificially lower the wages of similarly-employed domestic farmworkers. *See* 90 Fed. Reg. 47914, 47916–17 (Oct. 2, 2025); *UFW v. United States Dep't of Lab. ("UFW I")*, 509 F. Supp. 3d 1225, 1231 (E.D. Cal. 2020) ("The AEWR . . . is the primary wage rate under the H-2A program because it is higher than the other wages in most circumstances" and so "the AEWR determines the wages of approximately 92 percent of the farmworkers working for H-2A program employers."). DOL has explained that, to comply with the "no adverse effect" requirement, the AEWRs have "approximate[d] the equilibrium wage that would result absent an influx of temporary foreign workers" and thus "put incumbent farm workers in the position they would have been in but for the H-2A program." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010). With a few discrete exceptions, AEWRs have generally been based upon farmworker wage data collected by the U.S. Department of Agriculture ("USDA") through the Farm Labor Survey ("FLS"), which "provide[d] the basis for employment and wage estimates for all workers directly hired by the United States farms and ranches (excluding Alaska)." National Agricultural Statistics Service, Farm Labor Methodology and Quality Measures at 1 (May 21, 2025), https://perma.cc/J422-2EBT.

For decades, AEWRs, like wages in general, have steadily increased over time. In particular, since the 1990s, AEWRs have increased on average by about 4% per year. *See* Zachariah Rutledge et al., *H-2A Adverse Effect Wage Rates and U.S. Farm Wages*, Am. J. Agric. Econ. at 6 (June 9, 2025), https://perma.cc/6EFE-UJ2T. And more recently—from 2019 to 2025—AEWRs have increased annually

---

[3] A prevailing wage rate is a local (often crop- or task-specific) wage rate calculated by State workforce agencies ("SWAs") using State-based surveys. *See Garcia v. Stewart*, 531 F. Supp. 3d 194, 215 (D.D.C. 2021). Note that though there will always be a DOL-generated AEWR for each H-2A position, there will not always be a State-provided "prevailing wage rate" because "[m]any SWAs . . . declin[e] to conduct prevailing wage surveys at all." *Id.* at 201.

by around 5.5%. *See* 90 Fed. Reg. at 47923. If the new AEWRs were based off of the FLS survey data collected in April 2025, those AEWRs would increase by 3%. *See April Hired Workers Up 3 Percent; Gross Wage Rate Increased 3 Percent from Previous Year*, U.S. Dep't of Agric. at 1 (May 21, 2025), https://perma.cc/JA5F-9BBN.

**B. In 2020, DOL issued a regulation that would have lowered AEWRs, but it was found unlawful, and enjoined, by this Court.**

Toward the end of the first Trump Administration, USDA suspended the FLS,[4] and DOL subsequently issued a final rule (the "2020 Rule") that would have produced lower AEWRs. In particular, the 2020 Rule, among other things, froze most AEWRs for two years. *See* 85 Fed. Reg. 70445, 70467 (Nov. 5, 2020). UFW challenged the 2020 Rule, and this court held that it was likely to succeed on the merits of its claim that the rule was arbitrary and capricious. *See UFW I*, 509 F. Supp. 3d at 1225. The Court agreed with UFW that, by generally freezing AEWRs for two years, the Rule "sever[ed] the relationship between the AEWR and current farm labor market conditions" and "intentionally depresse[d] and stagnate[d] the wages of" U.S. farmworkers. *Id.* at 1237–39. Later, the Court issued a final judgment vacating the 2020 Rule on the same grounds.[5] *UFW v. DOL*, 598 F. Supp. 3d 878 (E.D. Cal. 2022).

**C. In October, DOL suddenly and drastically changed its methodology for calculating AEWRs.**

On October 2, 2025, DOL published the IFR, which instituted a new AEWR methodology that went into effect immediately without notice-and-comment. *See* 90 Fed. Reg. at 47914. The new

---

[4] This suspension of the FLS was enjoined. *See UFW v. Perdue*, No. 20-cv-01452, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020).

[5] Note that DOL issued a new AEWR rule in 2023, 88 Fed. Reg. 12760 (Feb. 28, 2023), which was likewise enjoined, *Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*, 749 F. Supp. 3d 697 (W.D. La. 2024). That rule has now been vacated. *See* Judgment, *Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su,* No. 6:23-cv-00831-RRS-CBW (W.D. La. Aug. 26, 2025), Dkt. No. 87. According to the IFR, the 2023 rule and the 2010 rule overlapped substantially. *See* 90 Fed. Reg. at 47952 n.189 (the 2010 rule and the 2023 rule "used the same methodology to set the AEWR for the vast majority of job[s]").

methodology made several significant changes which, by DOL's admission, will collectively decrease AEWRs. *See* 90 Fed. Reg. at 47928 ("The Department acknowledges that the overall impact of this new methodology will be a reduction in the AEWRs, or minimum hourly wage rate floors for H-2A workers.").

First, the IFR changes the wage data source used to calculate AEWRs. On August 31, 2025, USDA again discontinued the FLS, and the IFR thus declares that DOL will now rely on state-level wage data collected by the Bureau of Labor Statistics' Occupational Employment and Wage Statistics ("OEWS") survey. *See* 90 Fed. Reg. at 47920–25; 20 C.F.R. § 655.120(b)(1). That data consists of wage estimates derived from a semi-annual survey of *non-farm* employers, though the IFR indicates that OEWS will begin collecting data from farm establishments in 2026. *See* 90 Fed. Reg. at 47925. The OEWS organizes its wage data into Standard Occupational Classification ("SOC") codes established by the Office of Management and Budget. Each SOC code represents a separate occupational category. For example, there are five SOC codes that encompass most H-2A positions (the "Big Five"): (1) farmworkers and laborers, crop, nursery, and greenhouse workers; (2) farmworkers, farm, ranch, and aquaculture animals; (3) agricultural equipment operators; (4) packers and packagers, hand; and (5) graders and sorters, agricultural products.[6] *See id.* at 47918 n.41. Each requested H-2A position is classified into an SOC code based on the duties associated with that job. *See id.* at 47937.

In deciding which OEWS data is relevant to any given H-2A position, DOL must first determine the applicable SOC code. To do so, DOL generally relies on the written job description produced by the employer. *See id.* at 47938. In the event an H-2A position involves multiple responsibilities that can be classified under multiple SOC codes, the IFR states that the position, as a whole, will be subject to the

[6] Until this IFR, there was a sixth SOC code, "Agricultural Workers, All Others" included in the SOC group. The IFR eliminates this SOC code altogether.

SOC code applicable to the duties that, according to the employer, the relevant H-2A worker will perform for the majority (over 50%) of the workdays. *See id.* at 47939; 20 C.F.R. § 655.120(b)(7).

Second, in addition to changing the wage data source used to generate AEWRs, the IFR also changes *how* wage data is used to generate AEWRs. Prior to the IFR, the AEWR for any given position was equal to the average wage in the relevant sector (calculated using the available wage data). *See* 90 Fed. Reg. at 47917 (AEWRs were previously set to the "the average wage of farmworkers" in the relevant sectors). The IFR changes that through its new "two-tier" system. Specifically, the IFR adopts two tiers within each SOC code: Skill Level I and Skill Level II. *See id.* at 47926. Skill Level I jobs are those which DOL considers more "entry-level" and which require workers with limited to no formal training or credentials. *See id.* Skill Level II positions, however, generally do require formal training or credentials and often involve supervisory duties. *See id.* The IFR itself provides no criteria for determining whether a particular job opportunity falls under Skill Level I or II, though the IFR's preamble suggests that an amorphous "totality of the circumstances of an employer's job offer" standard will be used to classify jobs into one of those two tiers. *Id.* at 47932–34. Further, it appears that classification will be based on the written job descriptions, rather than the qualifications of the workers that eventually fill those positions. *Id*. The IFR estimates that 92% of H-2A positions will be considered Skill Level I. *See id.* at 47955.

Importantly, the AEWR for Skill Level I positions will not equal the average wage for the relevant SOC code, but rather the 17th wage percentile for that code. *Id.* Put differently, although 92% of H-2A workers are expected to receive the Skill Level I AEWR, this will be lower than the wages earned by 83% of farmworkers covered by the relevant SOC codes. Meanwhile, the AEWRs for the H-2A workers occupying Skill Level II positions will equal the average wage for the relevant SOC code, even though, in theory, those are senior-level positions. *See id.* at 47933.

Third, even after identifying the appropriate SOC code and Skill Level tier for a particular position, the IFR decreases the AEWR even further through a "housing adjustment." By statute and regulation, U.S.

employers must provide H-2A employees with free housing.[7] Although that free housing requirement remains in effect, the IFR nonetheless further reduces AEWRs for H-2A positions to account for the purported value of that housing. *See* 90 Fed. Reg. at 47948. DOL estimates the value of that housing by looking to the so-called Fair Market Rents ("FMR") for a four-bedroom housing unit available from the Department of Housing and Urban Development ("HUD"), even though DOL does nothing to verify that H-2A housing is in any way comparable to a HUD four-bedroom unit. *Id.* DOL deducts, from the AEWR per-hour rate, an amount sufficient to cover the estimated weekly housing cost assuming the H-2A laborer works a 40-hour workweek; *e.g.*, if the weekly housing cost is estimated at $100, the per-hour housing deduction will equal $2.50. *See id.* at 47949. That AEWR deduction, however, applies to every hour worked even if the laborer works more than 40 hours per week. The only limit on the housing deduction is that it cannot exceed 30% of the AEWR—*i.e.*, almost a third of their wages. *See id.* at 47948.

Accordingly, by instituting a number of changes—including changing the data source, instituting the two-tier system, and applying a housing deduction—the IFR drastically changes how AEWRs are calculated, with the "overall impact" being a reduction in AEWRs and thus a reduction in wages for similarly-employed U.S. workers. *Id.* at 47928.

## LEGAL STANDARD

"[I]n the context of reviewing an administrative decision under the APA, there are normally no disputed facts that the district court must resolve," and the "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Cnty. of Fresno v. Azar*, 384 F. Supp. 3d 1164, 1172–73 (E.D. Cal. 2019).

---

[7] 8 U.S.C. § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations."); 20 C.F.R. § 655.122(d) (2025) ("The employer must provide housing at no cost to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day.").

## ARGUMENT

### A. Plaintiffs have standing to challenge the IFR.

To establish standing for prospective relief, a plaintiff "must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 680 (9th Cir. 2023). There need only "be a substantial risk that" some future injury "will occur." *Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 805 (9th Cir. 2015). Further, "in cases seeking injunctive . . . relief, only one plaintiff need demonstrate standing." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022). Here, all Plaintiffs have standing.

*Individual Plaintiffs.* First, there is a substantial risk that the individual Plaintiffs—seventeen U.S. farmworkers and an H-2A farmworker—will experience wage cuts due to the IFR. The U.S. farmworker Plaintiffs will likely experience wage cuts because the IFR slashes AEWRs, lowering the wages farms must now pay for the H-2A workers that those Plaintiffs must compete with for jobs.[8] *See* 90 Fed. Reg. 47914, 47928 (Oct. 2, 2025) ("[DOL] acknowledges that the overall impact of this new methodology will be a reduction in the AEWRs, or minimum hourly wage rate floors for H-2A workers and workers in corresponding employment [*i.e.*, U.S. workers] that are likely to result in wage transfers to employers."). Consequently, whenever the U.S. farmworker Plaintiffs seek seasonal work, there is a substantial risk that their wages will be lower than they would have been but-for the IFR's new methodology. *See* 88 Fed. Reg. 12760, 12796 (Feb. 28, 2023) ("The AEWR" seeks to prevent "adverse [wage] effect[s]" by providing "a floor below which wages cannot be negotiated, thereby strengthening the ability of this

[8] Several individual Plaintiffs have held, and will continue to seek, seasonal jobs requiring tasks that have been (and can still be) performed by H-2A workers, such as picking and transporting fruits and vegetables. *See, e.g.*, Grimaldo Decl. ¶¶ 2, 8, Dkt. No. 21-1; Lopez Decl. ¶ 2, Dkt. No. 21-5; Serrano Decl. ¶¶ 2, 8, Dkt No. 21-6; Garcia Decl. ¶¶ 2, 8, Dkt No. 21-7; Second Panfilo Decl. ¶ 3; Doe Decl. ¶ 3; Solorio Decl. ¶ 3; Rivera Decl. ¶ 3; Mendoza Decl. ¶ 2, Dkt. No. 21-8.

particularly vulnerable labor force to negotiate over wages with growers who are in a stronger economic and financial position."); 76 Fed. Reg. 3452, 3463 (Jan. 19, 2011) ("An employer paying U.S. workers as well as" foreign laborers "has no incentive to pay the U.S. workers any higher compensation. The local competitors, by extension, have no incentive to pay a higher compensation."). The anticipated economic consequences of lower AEWRs are sufficient to establish the individual Plaintiffs' standing to sue. *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 951 (9th Cir. 2017) ("introduc[ing] new competition into the market, making it more difficult for [plaintiffs]" to earn more money is "sufficient to establish Article III injury"); *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 116 (2025) (a standing analysis should "recognize[] commonsense economic realities," and thus "[w]hen third party behavior is predictable, commonsense inferences may be drawn").

And these wage cuts are not hypothetical. Several of the individual Plaintiffs have already suffered wage cuts due to the IFR. For example, before the IFR was issued, Plaintiff Isabel Panfilo earned roughly $19.35 an hour at Socal Berry Growers LLC in California. *See* Second Panfilo Decl. ¶ 2. The IFR, however, dropped the applicable AEWR to $16.45, and Ms. Panfilo thus now earns only $16.90 an hour from that same employer, which is the California minimum wage. *See id.* ¶ 4. Plaintiff Irene Mendoza had a similar experience. In 2025, she held a seasonal job with Peterson Bros Potatoes in Minnesota where she was earning $20 an hour. Second Mendoza Decl. ¶ 2. At the time, the applicable AEWR was $18.15. *See id*. After the IFR was issued, the same employer offered her only $16.50 for the same work—less than the prior AEWR. *See id.* ¶ 3. Plaintiff Claudia Garcia Hernandez experienced a similar wage cut from her employer. *See* Hernandez Decl. ¶¶ 2, 4.

The IFR is thus harming those Plaintiffs now. And when they again seek comparable farmworker jobs in the future, they will likely continue to receive wages that are lower than what they would have been but for the IFR; after all, they will still have to compete with H-2A labor that is now substantially cheaper. *See Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("If a plaintiff demonstrates that a particular

Government defendant" caused a prior injury, "it will be easier for her to prove that she faces a continued risk of future [injury] that is likely to be traceable to that same defendant."). Accordingly, the U.S. farmworker Plaintiffs have standing. Additionally, the H-2A farmworker Plaintiff has standing because his wages are directly governed by the AEWRs, and those will now be lower. Thus, all individual Plaintiffs have standing to sue.

Organization Plaintiffs. The United Farm Workers ("UFW") and UFW Foundation have standing as well. An organization has associational standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025). For the first prong, an organization need only show that it is "relatively clear . . . that" at least "*one* . . . member[] . . . will be adversely affected by a defendant's action." *Id.* (emphasis added).

Here, the organization Plaintiffs satisfy all three prongs. To start, the organization Plaintiffs have thousands of farmworker members across the country, many of whom would have standing to sue in their own right because they will likely experience wage cuts due to the IFR. *See* Third Romero Decl. ¶¶ 3–4; Corcoran Decl. ¶¶ 2–3. As explained above, those wage cuts are the predictable consequence of a sharp reduction in AEWRs. And again, those wage cuts are not speculative; they are already happening. For example, in 2025, over 300 UFW members worked at D'Arrigo Brothers in California and received $19.97 per hour, which was the then-applicable AEWR. *See* Third Romero Decl. ¶ 5. After the IFR dropped that AEWR to $16.45, however, the wages for most UFW members working for D'Arrigo dropped to $18.63, which is the minimum they can be paid under the applicable union contract. *See id.*; Solorio Decl. ¶¶ 2–4. Similarly, the wages for UFW members working at Cahoon Farms in New York have also dropped. In 2025, when the applicable AEWR was $18.83, those farmworkers were paid $19.40 per hour. *See* Third Romero Decl. ¶ 15. Now, UFW members working at Cahoon make only $17.91 per hour. *See id.* Cahoon

acknowledged that, in light of the IFR, that is the minimum amount it must pay those farmworkers.[9] *See id.* ¶ 16.

UFW Foundation members have also seen pay cuts due to the IFR. For example, in 2025, several H-2A workers who are UFW Foundation members held seasonal jobs in Michigan where they earned the then-applicable AEWR of $18.15. *See* Corcoran Decl. ¶¶ 4–11. After the IFR was issued, they continued working in Michigan, but are now earning the new AEWR of $13.78, or, in some cases, $13.73. *See id.* Multiple other UFW Foundation members across the country—both H-2A workers and U.S. farmworkers—have seen similar wage cuts. *See id.* ¶¶ 12, 15–18. And as with the individual Plaintiffs, it is likely that when the UFW and UFW Foundation members seek seasonal work in the future, they will continue to receive wages that are lower than what they would have earned but for the IFR. Thus, although each organization need only identify *one* member who would have standing to sue in her own right, both organizations have shown that many of their members would have standing to challenge the IFR. The organization Plaintiffs thus satisfy prong one of the associational standing analysis.

They also clearly satisfy prongs two and three: the interests they seek to protect are germane to their purpose and their members need not participate directly in this suit. The protection of farmworker employment conditions is germane to the purpose of both UFW and UFW Foundation, a farmworker labor union and a farmworker nonprofit. Further, the claims at issue here (relating to the lawfulness of the IFR) and the relief requested (an injunction against the IFR) do not require any information from, or the participation of, the organizational Plaintiffs' members. The organization Plaintiffs, like the individual Plaintiffs, therefore have standing to challenge the IFR.

---

[9] The IFR dropped the applicable AEWR to $15.68, but the "prevailing wage" in New York is $17.91 and thus Cahoon must pay that amount. *See supra* at 3–4 (under DOL regulations, the minimum wage for H-2A workers and U.S. workers in corresponding employment is the higher of the AEWR, the prevailing wage, the minimum wage, or the union-negotiated rate).

### B. The IFR is substantively and procedurally unlawful under the APA.

The IFR violates the APA in multiple ways. First, it is arbitrary and capricious, and contrary to law, because DOL was obligated to, but did not, properly consider whether the IFR's new methodology would protect U.S. farmworker wages from the adverse effects of H-2A labor. Second, the IFR is procedurally defective because it was improperly issued without a notice-and-comment process.

1. <u>The IFR is arbitrary and capricious, and contrary to law.</u>

An agency action is arbitrary and capricious under the APA, and thus unlawful, if the agency failed to "act[] within a zone of reasonableness and, in particular, has" failed to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, to survive arbitrary-and-capricious review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action" and "[i]n reviewing that explanation," the Court must determine "whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, DOL committed a "clear error of judgment" because it did not adequately consider whether the IFR will fulfill DOL's statutory obligation to protect U.S. farmworker wages from the adverse effects of H-2A labor. Indeed, to the contrary, the IFR deliberately slashes AEWRs to well below market levels, thus creating those very adverse effects. As explained above, to comply with the statutory "mandate that foreign workers not adversely affect the wages of United States workers," DOL sets "minimum wage requirements" for H-2A workers; *i.e.*, AEWRs. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987); *see supra* at 3–4. Those "wage levels" are "designed to approximate the rates that would have existed had there been no increase in labor supply from foreign labor." *Brock*, 835 F.2d at 913. Here, DOL has offered no "satisfactory explanation" for how, under the IFR, AEWRs will serve their intended purpose: to protect U.S. farmworker wages from the adverse effects of the H-2A program. *State Farm*, 463 U.S. at 43. In fact, multiple features of the IFR, by design, significantly depress

AEWRs, placing downward pressure on (and thus adversely affecting) the wages of similarly-employed U.S. farmworkers. First, the IFR creates an arbitrary "tier" system under which the AEWRs for the majority of H-2A positions will be equal to only the 17th wage percentile in the relevant sectors. Second, the IFR applies a large "housing deduction" to AEWRs, which will drop them even further. And third, the IFR immediately shifts to a new wage data source which, in the near term, does not even include data from farm establishments.

*The Tier System.* The IFR creates a two-tier system engineered to slash AEWRs for most H-2A positions. As explained above, to determine the AEWR for any given position, that position must first be assigned an SOC code. Then, under the IFR, the position must be classified into one of two tiers: Skill Level I or Skill Level II. Although the IFR provides no set criteria for making that classification, the IFR suggests that Skill Level I positions are those that require no formalized training or certification, even though they may very well involve complex tasks. *See supra* at 7. Skill Level II positions, by contrast, are those more managerial positions that generally do require some formalized training or certification. *See id*. The IFR estimates that roughly 92% of H-2A positions will be classified as Skill Level I positions. *See* 90 Fed. Reg. at 47955. Indeed, the most common farmworker positions will presumably all be classified under Skill Level I, including line-level crop, nursery, and greenhouse workers and hand packers and packagers.[10] *See id.* at 47935; *UFW*, 509 F. Supp. 3d at 1239 ("[L]ower-skill work, which is field and livestock work, make up most H-2A job opportunities.").[11]

---

[10] DOL has previously opined that a tier-system for H-2A jobs would make little sense because there are generally no material skill-level differences between those jobs. *See* 75 Fed. Reg. at 6900 (rejecting skill-level tier system in part because "the notion of meaningful skill differences among agricultural workers is unfounded;" "[m]ost of the occupations and activities relevant to the H-2A program involve skills that are readily learned in a very short time on the job" and "skills peak quickly").

[11] This prediction—that most farmworker jobs will be classified as Tier 1—has proven correct. In Michigan, for example, during the first half of FY 2026, roughly 80% of H-2A jobs received wages below
(continued…)

Alarmingly, under the IFR, the AEWRs for all Skill Level I positions—the overwhelming majority of H-2A positions—will equal only the 17th wage percentile for positions within the relevant SOC codes. Thus, for example, *all* Skill Level I positions within the Big Five SOC codes will receive AEWRs greater than only 17% of Big Five positions. That is a radical departure from the prior methodology under which AEWRs equaled the average wage for the relevant occupational categories. *See supra* at 7. And AEWRs will consequently drop significantly. For instance, the AEWR for a Big Five position in California was previously $19.97, but will now drop to $16.45 (a nearly 18% reduction) if classified as Skill Level I. *See* Compl. ¶ 100. Likewise, the AEWR for a Big Five position in Georgia was previously $16.08, but will now drop to $12.27 if classified as Skill Level I—a nearly 24% decline. *See id.* The IFR provides no coherent explanation for how these AEWRs, set to only the 17th wage percentile, "approximate the rates that would have existed" for *all* Skill Level I positions absent the H-2A program. *Brock*, 835 F.2d at 913.

Nor could it. DOL itself previously explained that "use of the *mean wage*"—not the 17th percentile wage—"best meets the Department's obligation to protect workers in the United States similarly employed against the adverse effects on their wages that could be caused by the employment of foreign workers" because "[t]he mean provides equal weight to the wage rate received by each worker in the SOC code across the wage spectrum and represents the average wage paid to workers to perform jobs in the SOC codes." 88 Fed. Reg. 12760, 12774 (Feb. 28, 2023). DOL noted that it has therefore had "a long-standing practice of using the average or mean wage to determine the AEWR in the H-2A program." *Id.* Notably, DOL previously conceded that "*[s]etting the AEWR below the mean in the relatively less skilled agricultural SOC codes that predominate in the H-2A program may have a depressive effect on the wages*

---

the applicable Tier 2 AEWRs. *See* Zachariah Rutledge & Junjian Zhu, *Michigan's H-2A wage offers in first half of Fiscal Year 2026*, Michigan State University Extension (June 16, 2026), https://perma.cc/TM5Z-PUC3.

*of workers in the United States similarly employed.*"[12] *Id.* (emphasis added); *see also* 76 Fed. Reg. at 3463 ("[I]f the employer must only offer and pay Level I wages, wages below what the average similarly employed worker is paid, those wages will make the U.S. workers less likely to accept those job opportunities or will require them to accept the job at a wage rate less than the market has determined is prevailing for the job. The net result is an adverse effect on the worker's income."). At the preliminary injunction hearing, this Court therefore expressed skepticism over how the 17th wage percentile can approximate the relevant market rates. *See* Tr. at 75:5–98 (Mar. 18, 2026) ("[D]idn't DOL peg all of these H-2As at a level that is on average way lower than what most similarly situated workers, including American workers, are making by pegging it at the 17th percentile? Isn't that just a matter of math?").

The IFR tries to justify its policy change by noting that an AEWR "computed at the equivalent of the 17th [wage] percentile . . . is similar to the" prevailing wages for other "visa programs administered by the Department," referring at least to the H-1B program. 90 Fed. Reg. at 47932-33. The IFR, however, omits a key distinction: the H-1B program—which concerns skilled non-agricultural positions—utilizes a *four-tier* system where the "prevailing wage" for only the *fourth tier* is "approximately the 17th percentile of the OEWS wage distribution for the relevant occupation in the relevant location." 90 Fed. Reg. 45986, 45990 (Sept. 24, 2025). Here, by contrast, there are only two tiers, the bottom tier will likely encompass roughly 92% of all positions, and yet that entire tier will receive AEWRs equal to the 17th wage percentile for the relevant occupational categories.[13]

---

[12] Strangely, for positions classified under Skill Level II—in theory, the senior-level managerial positions—the AEWRs will equal only the average wage for positions within the relevant SOC codes. The IFR offers no coherent explanation for that decision either. If Skill Level II positions require formalized training and involve managerial functions, they would presumably merit salaries above the average wages in the relevant SOC codes.

[13] Note that, unlike with the H-2A program, there is a cap on the number of workers who may be hired through the H-2B program. *See* 75 Fed. Reg. at 6895.

Moreover, DOL previously acknowledged that it should not incorporate the H-1B program's four-tier system into the H-2A companion program—the H-2B program (which concerns temporary non-agricultural work)—because doing so would adversely affect U.S. worker wages. Specifically, DOL estimated that "almost 75 percent of [H-2B] jobs" would be "classified at a Level I wage," and noted that basing the prevailing wages for all of those jobs "on the mean of the bottom one third"—*i.e.*, roughly the 17th percentile—would "adverse[ly] impact . . . those U.S. workers performing the same tasks and engaged in the same jobs." 76 Fed. Reg. 3452, 3463 (Jan. 19, 2011). DOL thus concluded that the "four-tier structure artificially lowers that wage to a point that it no longer represents a market-based wage for that occupation." *Id.* And during the first Trump Administration, DOL stated that the same concerns applied to the use of a tier structure for the H-2A program. It explained that "[DOL's] practical experience has demonstrated that use of a []tiered wage structure in the H-2A program" would lead "to the overwhelming majority of H-2A job opportunities being classified at a level I wage," resulting in AEWRs that fall "well below the median wage for" those jobs. 85 Fed. Reg. 70445, 70462 (Nov. 5, 2020).

And even if the H-1B program's tier system were a valid reference point here, DOL has repeatedly sought to abandon its use of the 17th wage percentile to set the prevailing wage for H-1B tier 1 jobs. For example, in October of 2020, the First Trump Administration tried to increase the tier 1 prevailing wage to the *45th wage percentile*. *See* 85 Fed. Reg. 63872, 63894 (Oct. 8, 2020). DOL explained that a "substantial body of evidence examined . . . suggests that the existing prevailing wage rates . . . are causing adverse effects on the wages and job opportunities of U.S. workers, and are therefore at odds with the purpose of the INA's labor safeguards." *Id.* at 63876. Ultimately, that attempt was "set aside or enjoined . . . on procedural grounds" because DOL did not use a notice-and-comment process. 86 Fed. Reg. 70729, 70730 (Dec. 13, 2021). And recently, DOL initiated a notice-and-comment process for a new rule that would double the H-1B tier 1 prevailing wage to the 34th wage percentile. *See* 91 Fed. Reg. 15454, 15483 (Mar. 27, 2026). DOL explained that the old "methodology . . . did not adequately protect U.S. workers

from adverse wage effects" and that DOL "did not clearly articulate a rationale for choosing levels as low as the 17th percentile." *Id.* at 15459. The structure of the H-1B tier system therefore does not justify the IFR's arbitrary two-tier system for the H-2A program.

Accordingly, the IFR's two-tier system will drop AEWRs to the point where they fall far below the relevant market rates, preventing those AEWRs from serving their purpose. That tier system is arbitrary and capricious.

*Housing Adjustment.* The IFR further tanks AEWRs by broadly applying an arbitrary "housing deduction." Employers have long been required to provide housing "at no cost" to H-2A workers (and U.S. workers in corresponding employment) who are not reasonably able to return to their residences at the end of the workday. 20 C.F.R. § 655.122(d)(1); *see* 8 U.S.C. § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations."). As noted above, the IFR upends this longstanding requirement by calling for a reduction in AEWRs to purportedly account for the value of that housing. *See supra* at 7-8; 20 C.F.R. § 655.120(b)(3) (applying the downward housing adjustment to "H-2A workers sponsored under the Application for Temporary Employment Certification"). That housing deduction will push AEWRs further below market levels. For example, the IFR itself projects that, in California and Florida, the housing deduction can reduce an AEWR by roughly 18%. *See* 90 Fed. Reg. at 47927. And the IFR contemplates that the housing deduction could even reach 30%. *See supra* at 8.

Critically, the housing deduction will almost certainly overshoot the fair market value of the housing H-2A workers ultimately receive. The methodology used to calculate the per-hour AEWR deduction assumes a 40-hour workweek; *i.e.*, it determines the amount that must be deducted per-hour for 40 hours to cover a week's worth of housing. Farmworkers, however, often work more than 40 hours per

week,[14] and the deduction will apply to all of those hours, not just the first 40 hours. The IFR also calculates the housing deduction based on the "Fair Market Rent" for a four-bedroom unit from HUD, but makes no attempt to establish that H-2A housing is comparable in quality to that type of HUD unit.[15]

DOL tries to justify the housing deduction by essentially arguing that the "free housing" requirement for H-2A workers unfairly privileges those workers over U.S. workers. *See* 90 Fed. Reg. at 47948. That explanation makes little sense. By lowering the AEWRs, the housing deduction will in turn place downward pressure on the wages of similarly-employed U.S. farmworkers. That will harm U.S. farmworkers. Accordingly, the housing deduction further (and needlessly) depresses AEWRs.

*Data Source.* The IFR also cannot ensure that its AEWRs will approximate the market wages of U.S. farmworkers because it relies on a data source that currently does not even contain wage data from farm establishments. *See supra* at 6. DOL previously generated AEWRs using FLS wage data, which was based on surveys of actual farm establishments. *See supra* at 4. DOL therefore repeatedly championed FLS data, claiming that it provided accurate estimates of market wages. *See* 90 Fed. Reg. at 47929; 75 Fed. Reg. at 6898; 88 Fed. Reg. at 12794. The IFR, however, now shifts to OEWS data, which currently does *not* survey wages from farm establishments. *See* 90 Fed. Reg. at 47931–32. DOL previously admitted that "the [OEWS] survey is not an appropriate data source for ensuring that the importation of guest workers does not adversely affect U.S. workers" because it "does not gather data directly from farmers." 75 Fed. Reg. at 6901. DOL further explained that OEWS data on farmworker wages comes "from non-

[14] *See* First Mendoza Decl. (Dec. 22, 2025) ¶ 3, Dkt. No. 21-8; Grimaldo Decl. ¶ 3, Dkt. No. 21-3; H-2A Job Order H-300-25305-354421, posted November 12, 2025, https://perma.cc/2L2N-DKAW (anticipating 66 hours of work per week).

[15] H-2A housing is generally inferior to a typical HUD unit. *See* Agricultural Workers Advocacy Coalition, Comment Letter on IFR, Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States, at 2 (Nov. 25, 2025) ("[H-2A living] conditions are not remotely equivalent to the housing quality, privacy, amenities, square footage, or safety that the HUD Fair Market Rent metric assumes."), https://perma.cc/A5RX-97KQ.

farm establishments whose operations support farmer production"—such as farm labor contractors—and the "workers employed by support services establishments are less educated and less likely to be U.S. citizens than employees of farm establishments, and therefore typically have substantially lower wage rates." *Id.* Indeed, the IFR appears to acknowledge that OEWS data, in its current form, is insufficient. It notes that DOL intends to work to ensure that, in the future, OEWS data will incorporate data from farm establishments. *See* 90 Fed. Reg. at 47931–32. OEWS data is thus not a reliable basis to calculate the market rates for farmworkers in all relevant sectors.

Not only is the OEWS data generally insufficient, the IFR, in certain circumstances, will deliberately rely on the wrong OEWS data. As explained above, in certain circumstances, an H-2A job may involve multiple tasks that can be classified under different SOC codes. *See supra* at 6–7. Rather than pull data from all relevant SOC codes, the IFR requires that the entire job be subject to the SOC code applicable to the task that, according to the employer, consumes over 50% of the job. *See id.* That can further depress AEWRs. For example, suppose an H-2A position calls for the jobholder to spend 51% of his time doing ranch farmwork and 49% of his time working as a heavy truck driver. The FLS notes that the median wage for the ranch farmworker SOC code has been $17.38 per hour, whereas the median wage for the heavy truck driver SOC code has been far higher, at $27.62 per hour. *See* 90 Fed. Reg. at 47935. Under the IFR, the AEWR for that position as a whole—including the heavy truck driving tasks—will be based only on data for the ranch farmworker SOC code, thus obviously underestimating the true market rate for that job. The IFR therefore does not base AEWRs on appropriate data.

* * * * *

At bottom, the IFR deliberately (and significantly) decreases AEWRs, allowing U.S. agricultural employers to hire an unlimited supply of foreign labor at sub-market, exploitative wages. DOL thus cannot "articulate a satisfactory explanation" for how the AEWRs will serve their intended purpose: to protect U.S. farmworker wages from the adverse effects of the H-2A program. *State Farm*, 463 U.S. at 43. Indeed,

the IFR is even more problematic than the 2020 Rule that this Court previously found unlawful. That rule froze AEWRs for a limited period of time; the IFR, by contrast, reduces them. *See supra* at 5. The IFR is therefore arbitrary and capricious.

Furthermore, the arguments set forth in this subsection also show that Plaintiffs should prevail on their statutory claim that the IFR conflicts with the INA because it creates the very "adverse effects" on U.S. worker wages that Congress requires DOL to prevent. *See Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007) ("The APA empowers [courts] to set aside an agency decision that is contrary to governing law.").

2. The IFR is procedurally defective.

The IFR is unlawful because it was issued without the required notice-and-comment process. The APA requires that, prior to promulgating rules, an agency must "give interested persons an opportunity to participate in the rule making through submission of" comments. *See* 5 U.S.C. § 553(b), (c). The notice-and-comment procedure can be bypassed if an agency, "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). "[T]he good cause exception goes only as far as its name implies: It authorizes departures from the APA's requirements only when compliance would interfere with the agency's ability to carry out its mission." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (alteration in original). "Good cause is to be narrowly construed and only reluctantly countenanced." *Id.* "[T]he good cause exception is usually invoked in emergencies, and an agency must overcome a high bar to do so." *Id.*

Here, DOL fails to overcome the high bar of showing that it had good cause for bypassing the notice-and-comment process. DOL relies on two arguments to try and show good cause. Neither has merit. First, DOL argues that increased enforcement of immigration law has created a "current and imminent labor shortage" since farms were relying on undocumented laborers. 90 Fed. Reg. at 47920. But it is unclear how drastically reducing AEWRs is necessary to cure any labor shortage. DOL fails to explain

why farms could not simply hire more H-2A workers based on AEWRs that actually approximate relevant market rates. Alternatively, those farms could also address any labor shortage by doing what employers generally do in that circumstance: increase wages in order to draw more U.S. workers. *See* 80 Fed. Reg. 62958, 62992 (Oct. 16, 2015) ("[A] basic principle of economic supply-and-demand theory is that in market economies, shortages signal that adjustments should be made to maintain equilibrium" and thus "compensation should rise to attract more workers where employers are experiencing a shortage of available workers."). At the preliminary injunction hearing, the Court made a similar point. *See* Tr. at 34:4–35:4 (Mar. 18, 2026) (the Court noting that it would be "counterintuitive" to "lower the wages" as a result of a "change in the market that has resulted in a widespread shortage of farm laborers").

Second, DOL also tries to justify bypassing notice-and-comment by referring to USDA's cessation of the FLS. 90 Fed. Reg. at 47926. But the FLS's discontinuance could, at most, justify an immediate regulation that selects a new data source (*i.e.*, the IFR provision selecting OEWS data as the new source for calculating AEWRs). The FLS's discontinuance, however, does not justify bypassing notice-and-comment for the other IFR provisions that DOL admits are "untethered from the continued use of annual FLS wage data," *id.* at 47920, including those creating an arbitrary two-tier system and imposing the housing deduction. DOL had to, but did not, utilize notice-and-comment before instituting those provisions. *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) ("[D]etailed regulations which respond . . . to much more than the exigencies of the moment must be promulgated through public procedures before they are chiseled into bureaucratic stone."). Those provisions are thus unlawful. Plaintiffs are therefore entitled to relief on their APA notice-and-comment claim.

### C. The Court must vacate the IFR and compel DOL to promptly release a substitute AEWR methodology and require U.S. employers to provide appropriate backpay.

#### 1. *The Court should vacate the IFR and remand the matter to DOL so it can generate a lawful methodology for calculating AEWRs.*

"Where . . . a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA." *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025). By vacating the IFR, the court would be "declar[ing] that" the IFR "was unlawful and return[ing] the world to the status quo" preceding its release. *Nat'l TPS All. v. Noem*, 166 F.4th 739, 760 (9th Cir. 2026). Thus, here, the Court should vacate the IFR, which would "return the world to the status quo" preceding its release.

Additionally, under the APA, a court can compel an agency, on remand, to promptly issue required regulations. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (a court can issue a general "judicial decree under the APA requiring the prompt issuance of [required] regulations," even if the "judicial decree" does not "set[] forth the content of those regulations."). Here, DOL acknowledges that it must have a regulation in place governing the calculation of AEWRs. *See, e.g.*, 90 Fed. Reg. at 47925 n.89 ("failure to publish an AEWR is problematic, in its own right, as a failure of the Department to satisfy a regulatory mandate"). Thus, once the IFR is vacated, DOL is obligated to release a new methodology under which lawful AEWRs may be published. To be clear, Plaintiffs do not ask the Court to direct DOL to establish any particular AEWR methodology. DOL can exercise its discretion in the construction of an appropriate alternative methodology, provided that it complies with DOL's statutory duty to protect U.S. farmworker wages from the adverse effects of the H-2A program. At a minimum, that alternative methodology cannot include the unlawful IFR provisions discussed herein, including the arbitrary two-tier system. Plaintiffs also respectfully request that the Court require the parties submit a joint status report every two weeks following the issuance of the remand, updating the Court on DOL's progress in crafting a permanent replacement AEWR methodology. *See Standing Rock Sioux Tribe v. U.S. Army Corps of*

*Eng'rs*, 280 F. Supp. 3d 187, 189–90 (D.D.C. 2017) (imposing "conditions during remand" to "provid[e] the Court with relevant information during [the remand] period").

2. *The Court must compel DOL to require employers to provide appropriate backpay.*

Even after the Court compels DOL to release a new AEWR methodology, and publish new AEWRs thereunder, many farmworkers will continue to receive unlawfully depressed wages until DOL complies with the Court's Order. To address that inequity, the Court should—consistent with its approach in *UFW I*—compel DOL to require employers to provide farmworkers with appropriate backpay for the time during which DOL is crafting a lawful methodology. *See* UFW, 2021 WL 1946696, at *5 ("granting equitable restitution" in the form of "backpay").

Under the APA, courts "retain equitable powers to shape an appropriate remedy." *Friends of Wild Swan v. U.S. Env't Prot. Agency*, 74 F. App'x 718, 721 (9th Cir. 2003). "[A]n equitable action for specific relief" under the APA "may include an order providing for . . . backpay." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). In previously providing a backpay award in similar circumstances, this Court considered two principal factors. First, it asked whether the "administrative edict" was "invalid." *UFW*, 2021 WL 1946696, at *3–4. Here, as explained above, the IFR is invalid for several reasons.

The Court then asked whether "justice between the parties requires a backpay award." *Id.* To make this determination, the Court considered (a) whether the growers relied on the administrative action, (b) whether that reliance was reasonable, (c) the role of the agency in setting the relevant policy, (d) the timing of events, (e) the existence of a statutory refund power, (f) the existence of bad faith, and (g) the public interest in seeing that restitution is granted. *Id.* at *4–6. Here, these factors weigh in favor of granting backpay. First, employers cannot reasonably rely on the IFR's AEWRs even after this Court vacates the IFR, because "in light of the district court" decision, "the growers [would know] full well that the [IFR] was, if not flatly invalid, of at least dubious validity." *Id.* at *4–5. Second, the timing of this matter does not counsel against backpay. UFW promptly filed suit and moved for a preliminary injunction, and also

sought—and received—an expedited summary judgment briefing schedule. Third, DOL's regulations do not foreclose a backpay award; indeed, it appears they complied with this Court's backpay award in UFW's challenge to the 2020 AEWR rule. Finally, the public interest strongly favors a backpay order. Farmworkers are among the most economically vulnerable members of society, and the wage cuts have compromised their ability to cover basic life expenses. *See id.* at *6. Conversely, the IFR offers no evidence indicating that U.S. agricultural employers, as a general matter, cannot afford to pay farmworkers an appropriate, market-based rate.

Accordingly, if the Court enters summary judgment for the Plaintiffs, it should issue a backpay award analogous to the one issued previously. In particular, the Court should direct DOL to require any employer who hired H-2A employees whose compensation was governed by the IFR's AEWRs to provide appropriate backpay to those H-2A employees and correspondingly employed U.S. farmworkers. The backpay award for each qualifying employee should "equal [1] the total number of hours [the employee] worked" during the period between when this Court issued its summary judgment ruling and when DOL publishes new AEWRs (the "backpay period"), "multiplied by [2] the difference between the wage [the employee] received and the [new] geographically applicable" AEWR. *Id.* at *8. To facilitate this backpay award, DOL should promptly notify employers who hire H-2A workers that DOL is developing a new, lawful AEWR methodology pursuant to a Court order and that the employer is put on notice that it will be responsible for providing backpay for the backpay period.

**CONCLUSION**

The Court should grant Plaintiffs' Motion for Summary Judgment. A Proposed Order is attached.

DATED: July 1, 2026

Respectfully submitted,

/s/ *Kuntal Cholera*
Kuntal Cholera*
Tom Plotkin*
Mark Andrews-Lee*
Christina Coleburn*
Lindsay Williams*
Sela Carrington**
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-5367
kcholera@cov.com
tplotkin@cov.com
mandrewslee@cov.com
ccoleburn@cov.com
liwilliams@cov.com
scarrington@cov.com
*Admitted *pro hac vice*
** *Pro hac vice* application forthcoming

Mario Martinez, Esq.
Edgar Aguilasocho, Esq.
Martinez Aguilasocho Law, Inc.
P.O. Box 1998
Bakersfield, CA 93303
Phone: 661-859-1174 | Fax: 661-840-6154
mmartinez@farmworkerlaw.com
eaguilasocho@farmworkerlaw.com
info@farmworkerlaw.com

Lori Johnson*
Rebecca Rosefelt*
Farmworker Justice
1126 16th St. NW, Suite 507
Washington, DC 20036
ljohnson@farmworkerjustice.org
rrosefelt@farmworkerjustice.org
*Admitted *pro hac vice*

Verónica Meléndez (SBN 294106)
Cecilia Guevara Langberg (SBN 307159)
California Rural Legal Assistance Foundation
2210 K Street, Suite 201
Sacramento, CA 95816
Tel: (916) 446-7905
Fax: (916) 446-3057

vmelendez@crlaf.org
cguevarazamora@crlaf.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

UNITED FARM WORKERS, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF LABOR;

KEITH E. SONDERLING, in his official capacity as Acting Secretary of Labor;

LORI FRAZIER BEARDEN, in her official capacity as Acting Assistant Secretary for Employment and Training

Defendants.

Civil Case No.: 1:25-cv-1614

**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' Motion for Summary Judgment is **GRANTED**. The Court hereby:

1. **VACATES** the Interim Final Rule *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States*, 90 Fed. Reg. 47914 (Oct. 2, 2025) (the "IFR").
2. **ORDERS** Defendants, on remand to promptly produce a new methodology for calculating Adverse Effect Wage Rates ("AEWRs") for H-2A workers that is consistent with the Court's Order resolving the Motions for Summary Judgment, and to then promptly publish new AEWRs under that methodology. The Court hereby **RETAINS JURISDICTION** over this matter on remand, and directs the parties to submit, every two weeks following this Order, a status report detailing the progress Defendants have made in producing the required new methodology.
3. **ORDERS** Defendants to notify state workforce agencies, employers, and the public within seven (7) days of this order of the following:

a. Employers who hired or otherwise utilized H-2A labor that was governed by AEWRs published under the IFR between the date on which the notice required hereunder was sent and the date on which a new AEWR methodology is issued pursuant to this Order (the "backpay period") are required to make wage adjustment payments to qualifying H-2A workers and U.S. farmworkers in corresponding employment who worked during the backpay period and received an hourly wage below the new, applicable AEWRs generated under the new methodology;

b. Each wage adjustment payment must equal the total number of hours a farmworker worked during the backpay period multiplied by the difference between the wage received and the new applicable AEWR;

c. Those H-2A employers are required to make wage adjustment payments to the qualifying H-2A workers and U.S. farmworkers in corresponding employment within sixty (60) days of Defendants publishing new AEWRs pursuant to the new AEWR methodology required under this Order; and

d. Defendants shall require that any H-2A employer with H-2A workers or U.S. farmworkers in corresponding employment during the backpay period be required to certify compliance with the wage adjustment requirement either as part of its next H-2A application or by other valid and enforceable means.

SO ORDERED.

____________________________

The Hon. Kirk E. Sherriff