**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED FARM WORKERS, et al.,<br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF LABOR, et al.,<br>Defendants. | Case No. 1:25-cv-01614-KES-EGC<br>**ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>Docs. 72, 73 |

An agricultural employer may hire temporary foreign workers on H-2A visas only if the Department of Labor ("DOL") certifies that the employment of the H-2A workers will not "adversely affect the wages" of U.S. farmworkers. 8 U.S.C. § 1188(a)(1). To ensure that H-2A workers' wages do not adversely affect U.S. farmworkers' wages, DOL regulations provide that employers must pay H-2A workers the wage that is the highest among: (1) the "Adverse Effect Wage Rate" ("AEWR"), (2) the prevailing wage, (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage. 20 C.F.R. § 655.120(a). The AEWR is a state- or region-specific wage that is generally the highest of these four wages, and it therefore typically sets the minimum wage for an H-2A worker. DOL had a longstanding practice of setting the AEWR for a specific state or region at the mean of farmworkers' wages for that area, based on

DOL's prior findings that setting the AEWR below the mean would depress the wages of similarly situated U.S. farmworkers.

In August 2025, DOL issued an Interim Final Rule ("IFR") which ended the use of the mean wage to calculate AEWRs and, through this and other changes, deliberately lowered AEWRs. DOL issued the IFR on an emergency basis, bypassing the Administrative Procedure Act's ("APA's") usual procedural requirements for rulemaking.

Plaintiffs filed this action seeking judicial review of the IFR. The APA authorizes federal courts to review whether an agency rule is arbitrary and capricious, as well as to review whether an agency acted properly in bypassing the APA's procedural requirements. As explained below, the Court finds that the challenged components of the IFR are arbitrary and capricious, and that the IFR failed to establish that there was good cause to bypass the APA's procedural requirements for most of the challenged components. The Court therefore finds the IFR unlawful and remands to DOL to promptly generate a new methodology for calculating AEWRs.

## I. BACKGROUND

### A. <u>The H-2A Visa Program</u>

In 1986, Congress passed the Immigration Reform and Control Act and established the modern H-2A program. 90 Fed. Reg. 47914, 47915 (Oct. 2, 2025).[1] The Act created the H-2A visa for a "worker having a residence in a foreign country . . . who is coming temporarily to the

---

[1] The agricultural industry also relied on foreign workers prior to 1986, and the federal government long "sought to protect" U.S. farmworkers from the depressive effect that hiring foreign workers might "have on their wages." 54 Fed. Reg. 28037, 28039 (July 5, 1989). World War I produced the first large-scale demand for foreign agricultural workers. *See* U.S. Gov't Accountability Off., GAO/PEMD-89-3, *The H-2A Program: Protections for U.S. Farmworkers* (1988), at 10. DOL responded to this demand by permitting employers to hire foreign agricultural workers, but only if the employer first provided a "written promise and stipulation . . . [t]hat the employer will pay the current rates of wages for similar labor in the community in which the [foreign workers] are to be employed." Departmental Order of April 12, 1918, Concerning Admission of Agricultural Laborers, ¶ 5(f) (Dep't of Lab. Apr. 12, 1918). World War II generated a similar demand for foreign agricultural workers. During the war, the United States began the Bracero Program through a bilateral agreement with Mexico. 54 Fed. Reg. at 28039. Under that program, employers were authorized to hire foreign agricultural workers so long as they paid those workers "not less than a wage established by DOL." *Id.* Similar programs continued throughout the twentieth century, and all sought to protect U.S. farmworkers' wages from the adverse effects of hiring foreign workers. *See id.* at 28038–28040.

United States to perform agricultural labor or services . . . of a temporary or seasonal nature." *Id.* (quoting 8 U.S.C. § 1101(a)(15)(H)(ii)(a)). The Act provides that agricultural employers may hire temporary foreign workers through H-2A petitions, but only if the United States Department of Labor ("DOL") first certifies that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services, and
>
> (B) the employment of the alien in such labor or services will not *adversely affect* the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1) (emphasis added).

To ensure that the employment of H-2A workers will not "adversely affect" U.S. farmworkers' wages, DOL regulations provide that employers must pay H-2A workers the wage that is the highest among: (1) the "Adverse Effect Wage Rate" (AEWR), (2) the prevailing wage, (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage. 20 C.F.R. § 655.120(a). The AEWR is a "state or region-specific minimum wage" established by DOL, 90 Fed. Reg. at 47916, and it is "higher than the other wages in most circumstances," *United Farm Workers v. United States Dep't of Lab.*, 509 F. Supp. 3d 1225, 1231 (E.D. Cal. 2020). DOL uses AEWRs to "approximate the equilibrium wage that would result absent an influx of temporary foreign workers[,]" and this "put[s] incumbent [U.S.] farm workers in the position they would have been in but for the H-2A program." 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).

DOL has had "a long-standing practice of using the average or mean wage" of all farmworkers in a state or region "to determine the AEWR" for that state or region. 88 Fed. Reg. 12760, 12774 (Feb. 28, 2023). Throughout its history of setting AEWRs, with limited exceptions, DOL has used data from the U.S. Department of Agriculture's ("USDA's") Farm Labor Survey ("FLS"). *See* National Agricultural Statistics Service, Farm Labor Methodology and Quality Measures at 1 (May 21, 2025), https://perma.cc/J422-2EBT. The FLS was the only statistical survey that collected state- or region-level wage data from farm establishments in the United States. *See id.*; Elizabeth Weber Handwerker, *Measuring Wages in the Agricultural*

*Sector for the H-2A Visa Program*, Congressional Research Service (2024). However, in August 2025, USDA announced that it was discontinuing the FLS.[2] *See* 90 Fed. Reg. 42560 (Sept. 3, 2025).

**B. <u>The Interim Final Rule</u>**

On October 2, 2025, DOL issued an interim final rule titled "Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States" (the "IFR"). 90 Fed. Reg. 47914 (Oct. 2, 2025). The IFR implements a host of changes to the methodology used to calculate AEWRs. *Id.* at 47954.

The IFR went into effect immediately on October 2, 2025. *Id.* at 47920. Although the Administrative Procedure Act ("APA") generally requires that agencies issue a notice of proposed rulemaking and afford "interested persons an opportunity" to submit comments on a rule before it goes into effect, *see* 5 U.S.C. § 553(b), (c), DOL invoked the APA's "good cause" exception to bypass this requirement. *See* 90 Fed. Reg. at 47919; 5 U.S.C. § 553(b)(B) (excusing notice-and-comment process "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest").

**1. Good Cause Findings**

The IFR asserted two independent bases to invoke the "good cause" exception. First, given that USDA discontinued the FLS in August 2025, the IFR found that it was necessary to immediately select a new data source and update the AEWR methodology to conform with that data source. 90 Fed. Reg. at 47920. DOL observed that any delay in implementing the IFR would prevent DOL "from complying with the regulatory requirement to establish new annual AEWRs" prior to the end of calendar year 2025. *Id.*; *see also id.* at 47925 ("Given the requirement to publish updated AEWRs on or before December 31, 2025, immediate action is necessary.").

Second, the IFR concluded that the "the efficacy of current immigration enforcement" had created "acute labor shortages and instability" in the agricultural sector. 90 Fed. Reg. at 47920–

[2] Plaintiffs do not challenge the discontinuation of the FLS in this action. *See* Doc. 72.

47925. The IFR stated that approximately 42 percent of farmworkers do not have legal status in the United States and are paid sub-market wages. *Id.* at 47921–47922, 47924. The IFR asserted that this group's "sudden and large-scale departure is expected to significantly increase labor costs for employers," and that these increased labor costs could, in turn, threaten the productivity of the agricultural industry and the American food supply. *Id.* at 47922–47924.

Though noting that agricultural employers could turn to H-2A workers to staff farmworker jobs, the IFR expressed concern that the AEWRs had been set too high in the past and that "the current methodology for determining the AEWRs is an unworkable barrier to securing a legal agricultural workforce." *Id.* at 47924. It stated that "the reforms contained in this IFR [to] the H-2A program's wage policy are urgently needed to restore the usability of the H-2A program and to provide a practical, lawful workforce alternative to illegal aliens." *Id.* at 47925.

**2. Changes to the AEWR Methodology**

The IFR implements four key changes to the calculation of AEWRs. First, it selects DOL's Occupational Employment and Wage Statistics survey ("OEWS") as a new data source for calculating AEWRs. *Id.* at 47928–47932. The OEWS is the "largest ongoing statistical survey" of wages across the United States. *Id.* at 47932. But unlike the FLS, the OEWS does not capture data from farm establishments. *Id.* at 47929. The IFR indicates that DOL decided to use the OEWS primarily because the OEWS surveys farm labor contractors, which employ 42 percent of H-2A workers.[3] *Id.* at 47930–47931. The IFR acknowledged that DOL had previously concluded that it would be inappropriate to use the OEWS to set AEWRs because the OEWS does not survey farm establishments. *Id.* at 47932. It noted that that concern will be addressed in

[3] The IFR asserted several other benefits of using the OEWS as a data source: (1) farm work has "broadened to include on-farm and off-farm employment," some of which is captured by the OEWS; (2) the OEWS includes more precise statewide data; (3) the OEWS uses a larger sample size and has higher response rates than the FLS; (4) the OEWS can provide wage estimates at a state, national, and local level; (5) the OEWS can "produce estimates at broad geographic levels spanning a three-year aggregated timeseries collection," which results in data that is "more reliable, representative, and [that] generally experience[s] lower rates of volatility on a year-over-year basis"; and (6) the OEWS "produces wage estimates based on straight-time, gross pay, and excludes" other monetary compensation, such as overtime pay. *Id.* at 47930–47931.

future years through administrative action, as DOL intends to incorporate farm establishments into OEWS data sampling beginning in 2027. *Id.*

Second, given that the OEWS classifies different job categories into Standard Occupational Classification ("SOC") codes, the IFR identifies the five SOC codes that will apply to most H-2A jobs. Those SOC codes are: (1) farmworkers and laborers, crop, nursery, and greenhouse workers; (2) farmworkers, farm, ranch, and aquaculture animals; (3) agricultural equipment operators; (4) packers and packagers, hand; and (5) graders and sorters, agricultural products. *See id.* at 47918 n.41. The IFR explains that each H-2A position will be classified into an SOC code based on the duties associated with that job, and that DOL will generally rely on the employer's written job description to determine the duties associated with a given job. *See id.* at 47937–47938.

If an H-2A position involves duties that can be classified under multiple SOC codes, the IFR requires that the position be subject to the SOC code applicable to the duties that the H-2A worker will perform for the majority of his or her time. *See id.* at 47939; 20 C.F.R. § 655.120(b)(7). For example, under this "greater than 50%" rule, if a worker spends the "majority of [his] workdays" driving heavy tractor-trailer trucks, that job will "be assigned SOC code 53-3032 (Heavy and Tractor-Trailer Truck Drivers) even if such worker is also expected to perform some hand-harvesting work during a minor portion of the work contract period." 90 Fed. Reg. at 47943.

Third, the IFR creates a new tier system for AEWRs. As noted above, DOL has had "a long-standing practice of using the average or mean wage" of all farmworkers in a state or region to determine a single AEWR for all H-2A workers in that state or region. 88 FR at 12774. The IFR, however, states that setting a single AEWR for H-2A workers results "in a wage floor that is either artificially too high or too low in relation to the [employee's] qualifications." 90 Fed. Reg. at 47936. Agricultural workers are paid different wages, according to the IFR, based on differences in skill, education, and experience. *Id.* at 47933–47936. The IFR concludes that it is necessary to divide H-2A workers into two tiers to more accurately capture the market wage for similarly employed U.S. farmworkers. *Id.* at 47933–47936.

For reference, the IFR looks to the H-1B program, which has its own four-tier system. *Id.* at 47937. The IFR explains that DOL decided to select two tiers from the H-1B program: "the Level I 'entry level' . . ., and the Level III 'experienced[.]'"[4] *Id.* Under the H-2A program, these two tiers will be referred to as "Skill Level I (Entry-Level) and Skill Level II (Experience Level)." *Id.* at 47932.

The IFR estimates that 92% of H-2A positions will be classified as Skill Level I. *See id.* at 47955. An estimated 8% of H-2A positions would be classified as Skill Level II. *Id.* Under the IFR, "[a] Skill-Level I AEWR is computed at the equivalent of the 17th percentile of the occupational wage distribution," and a "Skill-Level II AEWR is computed at the equivalent of the 50th percentile of the occupational wage distribution." *Id.* at 47932–47933.[5]

Finally, the IFR requires a "housing adjustment." *Id.* at 47947–47950. Federal law mandates that employers "provide housing *at no cost* to the H–2A workers and those [U.S.] workers in corresponding employment who are not reasonably able to return to their residence within the same day." 20 C.F.R. § 655.122(d)(1) (emphasis added); *see also* 8 U.S.C. § 1188(c)(4) ("Employers shall furnish housing in accordance with regulations."). The IFR states that this "free housing" policy creates a "disparity in compensation between U.S. workers and H-2A workers, the latter of whom receive non-wage compensation in the form of employer-provided lodging." 90 Fed. Reg. at 47954. The IFR does not purport to modify § 655.122(d)(1)'s requirement that employers "provide housing at no cost to the H–2A workers[.]"[6] *See id.* The

---

[4] The H-1B program's "four 'skill levels' are Level I 'entry level,' Level II 'qualified,' Level III 'experienced,' and Level IV 'fully competent.'" 90 Fed. Reg. at 47937.

[5] The IFR states that "a Skill Level I AEWR will be computed as the *average* hourly gross wage paid to the lower one-third of all workers." 90 Fed. Reg. at 47932 (emphasis added). In the next sentence, it states that a "Skill-Level I AEWR is computed at the equivalent of the 17th percentile of the occupational wage distribution." 90 Fed. Reg. at 47932.

[6] Defendants acknowledged at the hearing that the IFR does not modify 20 C.F.R. § 655.122(d)(1). The IFR states that "that this downward AEWR adjustment factor . . . is not inconsistent with [20 C.F.R.] § 655.122(d)(1)." 90 Fed. Reg. at 47950. "The adjustment does not authorize an employer to charge workers rent or otherwise deduct housing costs from the wages of H-2A workers or of workers in corresponding employment who are not reasonably able to return to their residence within the same day." *Id.*

IFR nonetheless provides that it will deduct the value of such housing from AEWRs to account for the purported disparity, with what it calls a "housing adjustment."[7] *Id.* at 47928.

The "housing adjustment" is calculated using the fair market rent for a four-bedroom housing unit available from the Department of Housing and Urban Development ("HUD"). *See id.* at 47948–47949. "The adjustment value per week will be calculated by dividing the applicable weighted average statewide [fair market rent] (at the 50th percentile) by 4.345 (average number of weeks per month), and then the proceeding value will be divided by 8 (assumption of two workers per bedroom in a four-bedroom home)." *Id.* at 47949. The IFR deducts, from the AEWR per-hour rate, an amount sufficient to cover the estimated weekly housing cost. *See id.* In calculating the housing adjustment, the IFR assumes that H-2A workers work a 40-hour workweek, but under the IFR the housing adjustment is deducted from each hour worked, even if the workers work more than 40 hours per week. *See id.*

The IFR confirms that the "overall impact of this new methodology will be a reduction in the AEWRs," and that this reduction will "likely result in wage transfers to employers[.]" *Id.* at 47928.

### C. Procedural History

Plaintiffs United Farm Workers, UFW Foundation, Irene Mendoza, Claudia Garcia, Cristano Serrano, Yesenia Contreras Cervantes, Jose Cruz, Jane Doe I, Jane Doe II, John Doe I, Francisco Alvares Flores, Juan Manuel Flores Ayala, Aaron Grimaldo, Margaret DeAnda Magallon, Carina Martinez, Evelyn Medina, Isabel Rinton Panfilo, Celest Whittle, Fortino Lopez, and Jesus Lopez filed this action on November 21, 2025.[8] Doc. 1. Plaintiffs assert three claims

---

[7] Although federal law requires that employers provide free housing to both H-2A workers and U.S. farmworkers "who are not reasonably able to return to their residence within the same day," *see* 20 C.F.R. § 655.122(d)(1), the housing adjustment applies only to H-2A workers, *see* 90 Fed. Reg. at 47948–47949.

[8] Plaintiffs previously moved for a preliminary injunction and stay, which the Court denied. See Docs. 21, 51. The Court's prior order found that plaintiff United Farm Workers had associational standing to sue on behalf of its members. *See* Doc. 51 at 21–23. Defendants do not raise standing in their motion for summary judgment. *See* Doc. 73. They note in their opposition to plaintiffs' motion for summary judgment that they "believe that Plaintiffs have not established standing but recognize that this Court has already found standing to exist," and they incorporate

for relief: (1) the IFR is "not in accordance with the law," 5 U.S.C. § 706; (2) the IFR is "arbitrary [and] capricious," 5 U.S.C. § 706; and (3) the IFR failed to demonstrate good cause to bypass notice-and comment rulemaking, 5 U.S.C. § 533. Doc. 1 at 37–43. Plaintiffs request that the Court find the IFR unlawful, remand the matter to DOL so that it can generate a new methodology for calculating AEWRs, and order DOL to require employers to provide backpay for the period between the Court's order and the date that DOL issues a new rule for calculating AEWRs. *See* Doc. 72 at 28–30.

The parties filed cross-motions for summary judgment on July 1, 2026. *See* Docs. 72, 73. Both parties filed oppositions to the others' cross-motion for summary judgment, *see* Docs. 83, 84, and replies in support of their own motions for summary judgment, *see* Docs. 94, 95.[9]

## II. LEGAL STANDARD

The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action[,] . . . to judicial review thereof." 5 U.S.C. § 702. Under the APA, a reviewing court must set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project* ("*Prometheus*"), 592 U.S. 414, 423 (2021). At a minimum, the agency must have considered relevant data and articulated an explanation that shows a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n,* 476 U.S. 610, 626 (1986). An agency action is arbitrary and capricious if:

---

by reference their prior arguments on standing. Doc. 83 at n.1. Given that defendants do not further address standing, the Court incorporates by reference its prior finding that plaintiffs established that at least one plaintiff has standing. *See* Doc. 51 at 21–23. The Court also finds that plaintiffs have established standing for the reasons set forth in their motion for summary judgment's standing discussion, which defendants do not meaningfully address. *See* Doc. 72 at 14–17.

[9] The Court permitted several groups of amici curiae to file briefs in support of plaintiffs' motion for summary judgment: (1) former U.S. Secretaries of Labor Julie Su, Martin J. Walsh, Thomas E. Perez, Hilda Solis, and Robert Reich; (2) the States of California, Minnesota, Colorado, Delaware, Maine, Michigan, New Jersey, New Mexico, Nevada, New York, Oregon, Washington, and Wisconsin; and (3) U.S. Senator Alex Padilla, U.S. Senator Adam Schiff, and U.S. Representative Zoe Lofgren. *See* Docs. 74, 78, 85.

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Prometheus*, 592 U.S. at 423.

**III. ARBITRARY AND CAPRICIOUS CHALLENGE**

Plaintiffs challenge the IFR as arbitrary and capricious. They assert that four components of the IFR deliberately lower AEWRs to the point that they no longer track relevant market rates, and that DOL did not reasonably consider whether this comports with its statutory obligation to protect U.S. farmworkers from the adverse effects of hiring H-2A workers. The four challenged components of the IFR are: (1) the tier system; (2) the housing adjustment; (3) the use of the OEWS; and (4) the greater than 50% rule. The Court evaluates each challenged component in turn.

**A. <u>The Tier System</u>**

For decades, DOL set the AEWR for a given state or region at the mean wage for all workers in that state or region. 88 Fed. Reg. at 12774. DOL previously reasoned that "[s]etting the AEWR below the mean . . . may have a depressive effect on the wages of workers in the United States similarly employed." *Id.*

The IFR agrees with the general proposition that AEWRs must be "market-based." *See* 90 Fed. Reg. at 47920, 47928, 47931. But the IFR states that setting AEWRs at the mean would "would tend to overstate wages for similarly employed American agricultural workers with less experience and understate wages for similarly employed American agricultural workers with more experience." *Id.* at 47934. The IFR attempts to address this issue by creating a tier system. Plaintiffs acknowledge that "using the mean wage for a particular job category to set a single AEWR for H-2A jobs in that category may not be a perfect solution—potentially exceeding the market rates for certain jobs and falling below the market rates for certain others." Doc. 84 at 11.

But they challenge the IFR's specific tier system as arbitrary and capricious.

The IFR requires that each H-2A job be assigned an SOC code, and the IFR then divides each SOC code into two tiers: Skill-Level I and Skill Level II. A Skill Level I AEWR is assigned to "entry-level positions [for which] workers need no formal education or specialized training credentials." 90 Fed. Reg. at 47932. A Skill Level II AEWR is assigned to positions for workers "who possess, either through education, training, or experience, demonstrated skills or knowledge to perform the work." *Id.* A Skill Level II position "may normally require some formal education[,] training credentials[,] certificates[,]" or "work-related experience." *Id.*

The IFR asserts that a tier system is appropriate because "material wage differentials exist within" SOC codes, and these wage differentials are likely attributable to differences in skill, education, and experience. *Id.* at 47932–47936. To demonstrate that wages vary within each SOC code, the IFR includes a table which shows a range of wages for SOC code 45-2092 (farmworkers and laborers, crop, nursery, and greenhouse workers) within several states.[10] *Id.* at 47935. The IFR states that "recent data suggests" that work experience, skills, education, and the complexity of the required tasks contribute to wage differences within SOC codes. *See id.* at 47934 n. 123–126. Given the wage ranges, the IFR concludes that a single AEWR based on the mean wage "is not sufficiently precise to reflect market-based wages paid to U.S. workers similarly employed, resulting in a wage floor that is either artificially too high or too low in relation to the nature of the employer's qualifications." *Id.* at 47936.

Plaintiffs correctly point out that DOL previously criticized such a tier system. *See* Doc. 72 at 19 n.10. In a 2010 final rule, DOL stated that "the notion of meaningful skill differences among agricultural workers is unfounded." 75 Fed. Reg. 6884, 6900 (Feb. 12, 2010). "Most of the occupations and activities relevant to the H-2A program involve skills that are readily learned in a very short time on the job, skills peak quickly, rather than increasing with long-term experience, and skills related to one crop or activity are readily transferred to other

[10] For example, in Florida, the wages for SOC code 45-2092 range from $12.64 at the 10th percentile to $16.19 at the 75th percentile, and in New York, the wages range from $15.78 at the tenth percentile to $21.98 at the 75th percentile. *Id.* at 47935.

crops or activities." *Id.* In the 2010 final rule, DOL made a prediction about how a tier system would operate in practice—that it would result in nearly all H-2A workers being classified in the lowest tier. *See id.* Plaintiffs point out that the 2010 final rule's prediction has proven true: the IFR predicts that 92% of H-2A workers will be classified as Skill Level I. *See* Doc. 72 at 19–20 (citing 90 Fed. Reg. at 47955).

Plaintiffs argue that "DOL previously offered compelling, substantive arguments for why the IFR's tier system would adversely affect U.S. farmworker wages, and DOL has done little to explain why its prior reasoning was flawed." Doc. 95 at 7. But DOL adequately explained why a single AEWR would overstate the wages for certain workers and understate the wages for others, and that adopting a tier system could address this problem. While DOL's prior observation that a tier system might result in most H-2A jobs being classified in the lowest tier has proven true, the problem is not the use of a tier system generally. As plaintiffs acknowledge, the use of two tiers could conceivably be a reasonable choice if the AEWRs for Skill Level I and Skill Level II reflected market-based wages.

The problem is that the IFR's tier system ensures that the AEWRs for Skill Level I and Skill Level II will *not* reflect market-based wages. The IFR states that Skill Level I, which is the AEWR paid to *92%* of H-2A workers, will equal *the 17th wage percentile* for all workers, rather than the mean. *Id.* at 47932–47933, 47937.

The IFR attempts to justify this choice by asserting that a Skill-Level I AEWR at the "17th percentile" is "similar to the" entry-level wage rate for other "visa programs administered by the Department[,]" such as the H-1B program. *Id.* But the H-1B program uses a *four-tier* system in which only the prevailing wage for the lowest of the four tiers is set to the 17th percentile. 90 Fed. Reg. 45986, 45990 (Sept. 24, 2025). In addition, approximately 60% of all H-1B workers fall into the bottom two tiers of the H-1B program's four-tier system. 86 Fed. Reg. 3608, 3642 (Jan. 14, 2021). In contrast, the IFR has only two tiers, and 92% of all H-2A workers fall into the lowest tier, yet the AEWR for that entire tier is set at the 17th percentile. These are significant distinctions between the H-1B program's tier system and the IFR's tier system, and the IFR fails to explain how the H-1B program's tier system is a valid reference point given these

distinctions. *See* 90 Fed. Reg. at 47932–47933, 47937. The court agrees with plaintiffs that DOL "cannot set the bottom tier AEWR to the 17th wage percentile simply because the H-1B program . . . uses that percentile for the bottom tier of its four-tier system." Doc. 95 at 9.

Moreover, the IFR fails to reasonably explain how a wage set to the 17th percentile could represent a "market-based" wage when 92% of workers will receive that wage. DOL previously explained that incorporating H-1B's four-tier system into the H-2A's companion program, the H-2B program, would result in "almost 75 percent of [H-2B] jobs" being "classified at a Level I wage." 76 Fed. Reg. 3452, 3463 (Jan. 19, 2011). And basing the prevailing wages for all those jobs on the 17th percentile would "adverse[ly] impact . . . those U.S. workers performing the same tasks and engaged in the same jobs" by "artificially lower[ing] that wage to a point that it no longer represents a market-based wage for that occupation." *Id.* DOL's prior reasoning applies with even more force here, given that 92% of H-2A jobs are classified at Level I.

The IFR also fails to reasonably explain DOL's choice to set the AEWR for Skill Level II positions at the 50th wage percentile. Skill Level II positions are those that require special skills, education, or experience, and would presumably merit a higher-than-average wage. *See* 90 Fed. Reg. at 47932–47933. The IFR, however, simply concludes that because the H-1B program's four-tier system sets the wages for workers in its third tier at the 50th percentile of all wages, it will be appropriate to do so for Skill Level II in the H-2A program's two-tier system. *See id.* at 47932–47933, 47937. Considering the significant differences between the H-1B program's four-tier system and the H-2A program's two-tier system, this is not a reasonable justification. The IFR anticipates that the Skill Level II tier for the H-2A program will apply to only the top 8% of workers, yet it inexplicably sets the AEWR for the Skill Level II tier at the 50th percentile for such workers. *Id.* at 47955.

In sum, while DOL's choice to separate H-2A workers into two tiers is not inherently unreasonable, its choice to set the Skill Level I AEWR at the 17th percentile and the Skill Level II AEWR at the 50th percentile is unreasonable and arbitrary and capricious.

The statute requires that DOL ensure the hiring of H-2A workers will not "adversely affect the wages and working conditions of workers in the United States similarly employed."

8 U.S.C. § 1188(a). By setting the AEWRs for the vast majority of H-2A workers well below the relevant market wages through its use of the tier system, the IFR failed to reasonably consider whether its methodology could fulfill DOL's statutory duty.

**B. The Housing Adjustment**

Plaintiffs next challenge the IFR's "housing adjustment." A DOL regulation requires agricultural employers to "provide housing at no cost to the H-2A workers and those [U.S.] workers in corresponding employment who are not reasonably able to return to their residence within the same day." 20 C.F.R. § 655.122(d)(1). This is consistent with the statutory requirement that "[e]mployers shall furnish housing in accordance with regulations." 8 U.S.C. § 1188(c)(4). The IFR states that this "free housing" policy creates a "disparity in compensation" between H-2A workers and U.S. farmworkers. *See* 90 Fed. Reg. at 47947–47950. The IFR creates a "housing adjustment" that deducts an amount sufficient to cover the cost of this free housing from the per-hour AEWR rate. *See id.* But defendants concede that the IFR does not purport to change the legal requirement that employers provide such free housing. Doc. 94 at 9.

The housing adjustment is arbitrary and capricious for three independent reasons. First, the IFR reasons that the free housing policy creates a disparity between H-2A workers and U.S. workers, but this is not entirely accurate. The regulation requires that employers provide free housing to both "the H-2A workers *and* those [U.S.] workers in corresponding employment who are not reasonably able to return to their residence within the same day." 20 C.F.R. § 655.122(d)(1). By applying the housing adjustment only to H-2A workers, the IFR ensures that H-2A workers are cheaper than those U.S. farmworkers "who are not reasonably able to return to their residence within the same day." *Id.* This will, in turn, incentivize agricultural employers to hire H-2A workers over those U.S. farmworkers. DOL made a "a clear error of judgment" by concluding that the free housing policy created a disparity between all H-2A workers and all U.S. farmworkers. *State Farm*, 463 U.S. at 43 (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)).

Second, the IFR's imposition of a housing adjustment to reduce the AEWRs for H-2A workers directly conflicts with the regulation at 20 C.F.R. § 655.122(d)(1), which requires

employers to provide free housing to such workers. The IFR effectively eliminates free housing for most H-2A workers by adjusting the AEWRs to offset their wages with the housing adjustment. And the IFR explicitly does so to eliminate the "disparity" purportedly created by the "free housing." *See* 90 Fed. Reg. at 47947–47950. In doing so, the IFR conflicts directly with § 655.122(d)(1).

And the IFR effectively eliminates the free housing requirement at § 655.122(d)(1) while denying it is making any such change to the regulation. *See id.* at 47950 ("The Department clarifies that this [housing adjustment] . . . is not inconsistent with § 655.122(d)(1)."). The IFR's failure to acknowledge that it is changing its free housing policy as set out at 20 C.F.R. § 655.122(d)(1) is a further APA violation. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television Stations*, 556 U.S. at 515. The IFR asserts that the housing adjustment "is not inconsistent with § 655.122(d)(1)" because it "does not authorize an employer to charge workers rent or otherwise deduct housing costs from the wages of H-2A workers[.]" 90 Fed. Reg. at 47950. But the IFR *does* deduct housing costs from the wages of H-2A workers. It deliberately lowers AEWRs—the minimum wage that H-2A workers must be paid—to account for those housing costs. The housing is now provided at a cost that comes directly from H-2A workers' wages, and the IFR contravenes the regulation's requirement that agricultural employers "provide housing *at no cost* to [] H-2A workers[.]" 20 C.F.R. § 655.122(d)(1) (emphasis added).

Third, the housing adjustment exceeds the value of the housing that many H-2A workers receive. The calculation of the housing adjustment assumes a 40-hour work week to arrive at the per-hour rate, and the housing adjustment is deducted from each hour worked. *See* 90 Fed. Reg. at 47949. For example, if the value of housing were $40 per week, the housing adjustment would be $1 per hour. But DOL's own data shows that many H-2A workers work more than 40 hours per week. *See* AR024, FLC H-2A Disclosure data, FY 2025, Q3 (analysis of column CF "ANTICIPATED_NUMBER_OF_HOURS"). So, in the example above, if an H-2A worker worked 60 hours per week, the housing adjustment would require that $60 per week be deducted from her pay, resulting in the worker overpaying for her housing by $20 per week. The housing

adjustment therefore incentives employers to hire more H-2A workers working more than 40 hours per week, because those workers would overpay for the housing that employers would provide. This would make those workers more attractive to employers than U.S. farmworkers and likely have a depressive effect on U.S. farmworkers' wages. The IFR did not consider or address this issue.

In creating the housing adjustment, DOL failed to reasonably consider whether it could satisfy its statutory obligation to ensure that the hiring of H-2A workers will not "adversely affect" U.S. farmworkers' wages.[11]

### C. **<u>OEWS Data</u>**

Plaintiffs next challenge the IFR's selection of the OEWS as a new data source to calculate AEWRs. DOL had traditionally used the FLS to set AEWRs because the FLS captures data from farm establishments, while the OEWS does not. The IFR acknowledges that the OEWS has this shortcoming. *Id.* at 47928–47929, 47931–47932 (noting concern that the OEWS "may not survey a sufficient cross-section of agricultural workers to represent market-based wages"). Based on the OEWS's failure to capture data from farm establishments, DOL noted in prior rulemakings that the OEWS is generally "not an appropriate data source." 75 Fed. Reg. at

---

[11] Plaintiffs also challenge the IFR's use of Department of Housing and Urban Development ("HUD") data in setting the housing adjustment. Plaintiffs point out that the housing adjustment is calculated using HUD housing cost estimates, known as "Fair Market Rents" ("FMRs"), which are calculated by taking a certain percentile of the "gross rents for standard quality units within a metropolitan area or nonmetropolitan county." *See HUD Fair Market Rents*, HUD User, https://perma.cc/VWA9-FNES. Plaintiffs argue that the housing adjustment is arbitrary and capricious because HUD units are higher quality than H-2A units, and DOL therefore should not have relied on that data. But "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). The agency may rely on any data source so long as its choice to do so is reasonably explained. *See id.* at 426. DOL explained that it was relying on the HUD data because it "represents the most comprehensive and reliable data on housing rental costs" and is "published annually[.]" 90 Fed. Reg. at 47949. HUD "provides estimates for FMRs for all OMB-defined Metropolitan Statistical Areas (MSAs) and any non-metropolitan area counties, which provides the Department with the most comprehensive set of data upon which to estimate the average rental payments for housing." *Id.* "[P]recise and local market-based data specific to the costs of temporary agricultural housing in rural areas is limited, [so DOL] believes that the FMRs serve as a reasonable proxy for estimating housing costs." *Id.* Given that this Order finds the housing adjustment to be arbitrary and capricious on other grounds, the Court need not resolve plaintiff's challenge to the IFR's use of the HUD data.

6901.

The IFR explains that DOL selected the OEWS as its new data source because USDA discontinued the FLS. It notes "that the 'FLS and the OEWS are the only data sources currently available that provide state- or region-level wage estimates for agricultural occupations.'" 90 Fed. Reg. at 47930 (quoting Elizabeth Weber Handwerker, *Measuring Wages in the Agricultural Sector for the H-2A Visa Program*, Congressional Research Service (2024)). The IFR concluded that the OEWS was the "best available alternative [data] source" to the FLS.[12] *See id.* at 47931. The IFR notes that the OEWS surveys farm labor contractors, which accounted for 42% of all H-2A jobs from fiscal year 2020–2023, and concludes it could use this data to set AEWRs that reflect a market-based wage for all farmworkers. *See id.* at 47931–47932.

Plaintiffs identify two problems with using data from farm labor contractors to calculate AEWRs. First, although the IFR notes that farm labor contractors employ 42% of all H-2A workers, H-2A workers made up only 16% of all farmworkers in 2024. Elizabeth Weber Handwerker, *Work Authorization Among Hired Agricultural Workers*, Congressonal Research Service (2025). Thus, the data from farm labor contractors represents a minority of H-2A workers, and an unspecified percentage of all farmworker jobs.

Second, and more importantly, those employed by farm labor contractors are not representative of most farmworkers. As DOL noted in a prior rulemaking, those employed by farm labor contractors "are less educated[,] less likely to be U.S. citizens than employees of farm establishments[,] [and] typically have substantially lower wage rates[.]" 75 Fed. Reg. at 6901.[13] Therefore, relying on wage data from farm labor contractors to set AEWRs for all farmworkers would likely result in an AEWR that is lower than the true market rate. The IFR does not acknowledge or address this issue, so it "entirely failed to consider an important aspect of the

---

[12] Although at some points the IFR appears to conclude that the "OEWS is a superior data source to the FLS[,]" *see* 90 Fed. Reg. at 47926, at other points it appears to acknowledge that the OEWS is not superior, *see id.* at 47931 (concluding that the OEWS is the "best available alternative [data] source" to the FLS).

[13] Defendants acknowledged at oral argument that farmworkers employed by farm labor contractors typically earn lower wages than those employed by farm establishments.

problem." *State Farm,* 463 U.S. at 43.

Plaintiffs proffer several alternatives that the IFR could have employed. For example, the IFR "could [have taken] the most recent AEWRs generated using the prior [FLS] data source and [applied] an upward adjustment to account for the anticipated year-over-year increase in AEWRs."[14] Doc. 84 at 16. "Or it could [have used] OEWS data, but [applied] an upward adjustment to account for the degree to which wages for farmworkers employed through [farm labor contractors] are lower than wages earned by other farmworkers." *Id.* Such temporary measures would bridge the gap until DOL adds farm labor establishments to the OEWS data. As the IFR indicates, the OEWS will begin to survey farm establishments this year (although that data will not be available until some time in 2027). *Id.*

Defendants highlight that plaintiffs' proposed alternatives have their own flaws, such as requiring DOL to rely on "stale data gathered more than two years ago." Doc. 94 at 11. But regardless of whether plaintiffs' proposed alternatives are ideal solutions, "[a]gencies must consider feasible alternatives[.]" *Nat'l TPS All. v. Noem*, 166 F.4th 739, 772 (9th Cir. 2026) (Mendoza, J., concurring for a majority) (citing *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)). Plaintiffs' alternatives appear to be feasible efforts to address the fact that the OEWS underestimates the market wages for most farmworkers. The IFR's selection of the OEWS, without adequate consideration of the problems engendered by that data source, and without consideration of reasonable alternatives to adjust that data source to more accurately reflect actual farmworker wages, is arbitrary and capricious.

Defendants point out that courts have previously rejected APA challenges to DOL's reliance on the OEWS in prior rules. But one of the cases they cite demonstrates why the IFR is arbitrary and capricious. In *United Farm Workers v. Solis*, 697 F. Supp. 2d 5 (D.D.C. 2010), the court rejected a challenge to DOL's 2008 final rule, 73 Fed. Reg. 77110 (Dec. 18, 2008), which

---

[14] In their reply brief, defendants argue that plaintiffs "fail to specify what methodology, percentage, or time period should be used to calculate the adjustment." Doc. 94 at 11. At oral argument, plaintiffs explained that DOL could determine the year-over-year increase by looking to OEWS data from farm labor contractors, determining what percentage wages rose for employees of farm labor contractors during the relevant period, then applying an upward adjustment based on that percentage to FLS data.

also substituted OEWS data for FLS data. The plaintiffs in that case argued that the 2008 final rule failed to consider reasonable alternatives. The *Solis* court rejected that argument because the 2008 final rule "explained in detail why it rejected continued use of the FLS data." *Solis*, 697 F. Supp. 2d at 10 (citing 73 Fed. Reg. at 77173). In addition, the 2008 final rule was promulgated after a notice-and-comment rulemaking process in which members of the public were permitted to offer alternative methodologies. As the 2008 final rule considered and reasonably addressed why it rejected those alternative methodologies, the rule was not arbitrary and capricious. *See id.* (citing 73 Fed. Reg. at 77172, 77174). In contrast, here, the IFR did not consider alternatives, much less explain why it rejected them—perhaps because it bypassed notice-and-comment process, depriving the public of the opportunity to suggest reasonable alternatives.[15]

To reasonably rely on the OEWS data to calculate AEWRs, DOL must consider alternatives, including alternatives to adjust the OEWS data to address the undercalculation of farmworker wages reflected in that data, and DOL must "provide an explanation for rejecting those alternatives." *Solis,* 697 F. Supp. 2d at 10 (citing *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C. Cir. 1983)). Its failure to do so here "render[s] its ultimate decision arbitrary and capricious[.]" *Id.*

**D. <u>Greater Than 50% Rule</u>**

Finally, plaintiffs challenge the IFR's use of the "greater than 50%" rule to determine the relevant SOC code. Under this "greater than 50%" rule, if an H-2A job involves duties that fall

---

[15] The other two decisions defendants cite dealt with far different circumstances than those presented here. Both examined challenges to DOL's 2023 final rule, 88 Fed. Reg. 12760 (Feb. 28, 2023). That rule employed the OEWS for a far more limited purpose than the IFR. It used the FLS to set AEWRs "[f]or the vast majority of H-2A job opportunities represented by the six Standard Occupational Classification (SOC) codes comprising the field and livestock worker (combined) wages reported by USDA," but used the OEWS to set AEWRs "[f]or all other SOC codes[.]" 88 Fed. Reg. at 12760. It did so because "the SOC codes not included in FLS field and livestock worker (combined) data collection generally account for more specialized or higher paid job opportunities[,]" such as truck drivers and construction workers. *Id.* at 12761. The courts in *USA Farm Lab., Inc. v. Su*, 694 F. Supp. 3d 693, 707–09 (W.D.N.C. 2023), and *Teche Vermilion Sugar Cane Growers Ass'n Inc. v. Su*, 49 F. Supp. 3d 697, 723–25 (W.D. La. 2024), rejected arguments that this use of the OEWS exceeded DOL's statutory authority under 8 U.S.C. § 1188(a). The nature of the 2023 final rule and the challenges in those cases was far different than the challenge plaintiffs make here.

under multiple SOC codes, the entire job will be subject to the SOC code that applies to the tasks the worker will perform for the majority of his time. *See* 90 Fed. Reg. at 47937–47940. For example, if a worker spends three days per week packaging fruit (which falls under SOC code 53-7064 (Packers and Packagers, Hand)) and two days per week driving tractor-trailer trucks (which falls under SOC code 53-3032 (Heavy Truck and Tractor-Trailer Drivers)), then SOC code 53-7064 would apply to that worker's entire job. *Cf.* 90 Fed. Reg. at 47943 (explaining a similar example). In 2024, the median wage for SOC code 53-7064 (Packers and Packagers, Hand) was $17.10, while the median wage for SOC code 53-3032 (Heavy Truck and Tractor-Trailer Drivers) was $27.62. *See id.* at 47935. Thus, for the worker in this example, the "greater than 50%" rule would result in a substantially lower hourly wage rate.

The "greater than 50%" rule could, in turn, adversely affect U.S. farmworkers' wages. As DOL previously explained, such a rule may "encourage employers to intersperse higher-skilled, higher-paying work among many workers so that the higher-paying work is never a duty 'primarily' performed by any one employee." 85 Fed. Reg. 70445, 70461 (Nov. 5, 2020). "This would permit the employer to gain the benefit of that work without having to hire a U.S. worker at a higher wage to provide that work." *Id.* "Such an approach would undermine the Department's goal of preventing the misclassification of workers and encourage employers to combine work from various SOCs." *Id.* "Ultimately, this approach runs an intolerable risk of adversely affecting the wages of workers in the United States similarly employed." *Id.* The IFR did not address these significant concerns and failed to reasonably consider whether its "greater than 50%" rule was consistent with its statutory obligation to protect U.S. farmworkers' wages from the adverse effects of hiring H-2A workers.

The IFR explains that it chose this approach in response to concerns raised about the 2023 final rule. The 2023 final rule required that jobs involving duties that fall under multiple SOC codes be subject to the "highest AEWR across all the applicable SOC codes, regardless of the amount of time [the worker] spent performing such duties[.]" *Id.* at 47937. For example, if a worker spent 39 hours per week packaging fruit and one hour per week driving tractor-trailer trucks, that worker would receive the AEWR applicable to SOC code 53-3032 (Heavy Truck and

Tractor-Trailer Drivers) for all the hours she worked. The 2023 final rule thus resulted in some H-2A workers being overpaid. *See id.* at 47938.

But DOL's rejection of the 2023 final rule's approach did not require it to select the greater than 50% rule. Plaintiffs point out a reasonable alternative: DOL could simply require H-2A employers to compensate farmworkers based on the relevant AEWR for the hours worked in that SOC code category. Doc. 84 at 18. For example, if an H-2A worker "spends 49% of his time on heavy truck driving and the rest of his time on ranch work—the employer can compensate him for the time spent on truck driving based on the AEWR applicable to that task, and then compensate him for the remaining time based on the AEWR applicable to ranch work." *Id.* DOL did not consider this alternative. *See* 90 Fed. Reg. at 47937–47940. Its failure to consider such an alternative—and its failure to consider whether the greater than 50% rule is consistent with its statutory duty to protect U.S. farmworkers' wages from the adverse effects of hiring H-2A workers—renders its decision arbitrary and capricious.[16]

**IV. GOOD CAUSE EXCEPTION**

Plaintiffs also argue that the IFR failed to follow the APA's procedural requirements. Before a rule may go into effect, the APA requires that agencies publish a notice of proposed rulemaking and "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments[.]" 5 U.S.C. § 553(b), (c). This requirement may be bypassed only if the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). "Because '[t]he good cause exception is essentially an emergency procedure,' it is 'narrowly construed and only reluctantly countenanced[.]'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 777 (9th Cir. 2018) (quoting *United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)). To "successfully invok[e] the good cause exception[,]" the agency must "'overcome a high bar' and show that 'delay would do real harm' to life, property, or public safety." *Id.* (quoting *Valverde*, 628 F.3d at 1164–65). The agency "must

[16] Having found that the challenged components of the IFR are arbitrary and capricious, the Court need not reach plaintiffs' alternative argument that they are contrary to law.

'make a sufficient showing that good cause exist[s].'" *Id.* at 777 n.16 (quoting *Nat. Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 912 (9th Cir. 2003)).

The IFR concluded that there was good cause to bypass notice-and-comment for two "[s]eparate and [i]ndependent" reasons. 90 Fed. Reg. at 47919. First, the IFR explained that the rule in effect at that time required DOL to use the FLS to calculate AEWRs, but USDA discontinued the FLS on August 11, 2025, and DOL faced a deadline to "publish updated AEWRs on or before December 31, 2025." 90 Fed. Reg. at 47925. Second, the IFR asserted that immigration enforcement had created a labor shortage because growers rely on undocumented workers, who typically work for lower wages. *Id.* at 47920–25. The IFR also asserted that there were insufficient U.S. workers to fill those roles and that many growers were priced out from participating in the H-2A program due to the prior methodology for calculating AEWRs. *Id.* According to the IFR, this, in turn, created a threat to the food supply and to the American agricultural industry's ability to compete in the global market. *Id.*

The IFR properly invoked the good cause exception to select a new data source, based on the discontinuation of the FLS. "[N]otice and comment on a rule may be found to be 'impracticable' when 'the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.'" *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 766 (4th Cir. 2012) (quoting *Nat'l Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 384–85 (2d Cir. 1978)). The rule in place at the time required DOL to use the now-discontinued FLS, and DOL faced a year-end 2025 deadline to publish new AEWRs, so it would have been impracticable to follow the notice-and-comment rulemaking process to select a new data source.

But the IFR fails to demonstrate good cause for emergency rulemaking as to the other challenged components. The two-tier system, the housing adjustment, and the greater than 50% rule are insufficiently connected to the specific need for a new data source to replace the FLS. To the extent DOL attempts to justify the choice for these additional provisions by asserting that agricultural employers are experiencing a labor shortage due to immigration enforcement, the IFR does not provide evidence of a widespread shortage. *See* 90 Fed. Reg. at 47920–25; *cf. Tenn. Gas*

*Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992) (finding good cause not established where IFR's "justification rests on the regulator's prediction" for which it "provided little factual basis").

And even assuming a significant agricultural labor shortage, the IFR fails to explain why it was necessary to immediately *lower* AEWRs to address the shortage. The IFR's argument that AEWR wages needed to be *lowered* to ensure more H-2A workers is not economically rational. The H-2A program is not capped. *See United States v. Eury,* No. 1:14CR39-1, 2015 WL 1861807, at *2 (M.D.N.C. Apr. 23, 2015). Assuming agricultural employers needed to replace undocumented workers, the IFR fails to explain why they could not have hired H-2A workers at the previous, higher AEWR wage rates.

Although the IFR asserts that agricultural employers have been priced out of participating in the H-2A program, it does not cite evidence to support that point. *See id.* at 47920–25. In fact, it notes that H-2A hiring has "quadrupled" over the last decade, which suggests the opposite is true. *See id.* at 47922. In 2025, the agricultural industry recorded one of the most profitable years in recent history, which undermines the IFR's claim that agricultural employers were unable to hire more H-2A workers at the then-current AEWRs. *See* Office of the Chief Economist, *USDA Agricultural Projections to 2035*, U.S. Dep't of Agric. (Feb. 2026), at 66 (showing that farm net income increased from $127.8 billion in 2024 to $179.8 billion in 2025) (available at https://perma.cc/GQ7U-F9HT); AR090, Stephanie Rosch & Christine Whitt, 2023 and 2024 Farm Sector Profitability: Issues for Congress (Nov. 21, 2024) (showing that the average for the years roughly 2011 through 2021 was about $124.1 billion in 2024 dollars).

The IFR fails to show why hiring more H-2A workers at then-current AEWRs was not feasible, and it fails to demonstrate good cause for bypassing notice and comment with the tier system, housing adjustment, and greater than 50% rule. Those components of the IFR should have gone through the notice and comment process.

**V. REMEDIES**

Given that the IFR is substantively and procedurally defective, the Court must determine the appropriate remedy. Plaintiffs request two distinct remedies. First, they request that the

Court find the IFR invalid and remand the matter to DOL so it can generate a new methodology for calculating AEWRs. *See* Doc. 72 at 28–29. Second, they request that the Court compel DOL to require employers to provide farmworkers with backpay for the period between the Court's order and the date that DOL issues a new rule for calculating AEWRs. *Id.* at 29–30. The Court considers each remedy in turn.

**A. <u>Remand</u>**

Under the APA, the court may "hold unlawful and set aside agency action . . . found to be . . . arbitrary[] [and] capricious[.]" 5 U.S.C. § 706(2)(A). When a court finds an agency action unlawful under the APA, "vacatur and remand is the default remedy under the APA[.]" *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). The point of a vacatur is to "return the world to the status quo" preceding the rule's release. *Nat'l TPS All. v. Noem*, 166 F.4th 739, 760 (9th Cir. 2026); *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) ("[A] vacatur does nothing but re-establish the status quo absent the unlawful agency action." (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)). But here, the status quo would be the rule in effect prior to the IFR—the 2010 final rule—which required the use of the now-discontinued FLS. *See* 90 Fed. Reg. at 47919 (noting that 2010 rule was in effect when IFR was issued).

While plaintiffs initially requested that the Court immediately vacate the IFR, at the hearing plaintiffs agreed that the Court should find the IFR invalid but exercise its equitable authority to remand the matter to DOL without immediately vacating the IFR. While defendants maintained that the IFR was valid, they likewise agreed that if the Court found the IFR invalid, remand without immediate vacatur would be appropriate.

The Court "retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Montana Wildlife Fed'n*, 127 F.4th at 50 (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). This includes situations in which vacatur could cause "disruptive consequences[.]" *Id.* (quoting *California Communities Against Toxics v. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012)). Here, vacating the IFR would likely result in the current AEWRs being vacated, resulting in an absence

of AEWRs and likely disruption, as the AEWRs typically provide the relevant wage floor. Considering the significant disruption that might attend vacating the IFR immediately, the Court holds the IFR unlawful and orders remand for defendants to produce a new methodology for calculating AEWRs for H-2A workers, without vacating the IFR at this time.

The Court may also compel defendants to issue new regulations on remand. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (noting that a court may issue "a judicial decree under the APA requiring the prompt issuance of regulations," even if there is no basis to issue a "judicial decree setting forth the content of those regulations"). Defendants do not dispute the Court's authority to issue such relief. *See* Docs. 72, 73, 83. The Court will compel defendants to promptly issue a new rule on remand setting the methodology for calculating AEWRs.

**B. <u>Backpay</u>**

Plaintiffs also request that the Court order defendants to require employers to provide farmworkers with backpay for the period between the date of this Order and the date on which DOL generates a new methodology for calculating AEWRs. Doc. 72 at 29–31. The Ninth Circuit has held that district courts "retain broad equitable powers" in APA cases. *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680–81 (9th Cir. 2007). A "district court, as a court of equity conducting judicial review under the APA, has broad powers to order mandatory affirmative relief[.]" *Powers v. McDonough*, 163 F.4th 1162, 1196 (9th Cir. 2025) (internal citations and quotations omitted) (emphasis added). This includes the equitable "authority to grant any ancillary relief necessary to accomplish complete justice." *Nw. Env't Def. Ctr.*, 477 F.3d at 680 (internal citations and quotations omitted). "In determining the scope of injunctive relief, '[t]he district court must weigh the competing claims of injury . . . and the effect on each party of granting or withholding of the requested relief.'" *Powers*, 163 F.4th at 1196 (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)). In *United Farm Workers v. United States Dep't of Lab.*, No. 1:20-cv-01690-DAD-JLT, 2021 WL 1946696 (E.D. Cal. May 14, 2021), the court enjoined a 2020 rule establishing AEWRs and ordered relief similar to what plaintiffs request here.

Defendants argue that the Court lacks the authority to order such relief. Citing *Palisades*

*General Hospital Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005), defendants argue that "the D.C. Circuit has rejected attempts by plaintiffs to secure retroactive payments" along with an order invalidating an agency rule. Doc. 83 at 18. In *Palisades*, after prevailing on its APA challenge, the plaintiff hospital sought an order requiring the Department of Health and Human Services to provide an adjusted reimbursement reflecting the sum it would have received had the agency not erred. *See id.* at 402–03. The D.C. Circuit held that the district court did not have authority to order this retroactive equitable relief. It explained that "a district court reviewing final agency action" is "[u]nlike a district court managing a garden variety civil suit." *Palisades*, 426 F.3d at 403. "[A] district court reviewing a final agency action 'does not perform its normal role' but instead 'sits as an appellate tribunal.'" *Id.* (quoting *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1011 (D.C. Cir. 1999)). "Thus, 'under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.'" *Id.* (quoting *Shalala,* 192 F.3d at 1011). The district court did not have the authority, under the APA, to order the retroactive "make-whole relief" that the plaintiff sought. *Id.*

But plaintiffs are not seeking retroactive equitable relief for the period prior to this Order. Rather, they seek prospective equitable relief for the period after the date this Order declares the IFR invalid. In a separate line of cases, the D.C. Circuit has held that this form of equitable relief is appropriate: "[E]quitable restitution is the proper remedy . . . when funds have been either paid or withheld pursuant to an invalid administrative edict." *Frederick Cnty. Fruit Growers Ass'n, Inc. v. Martin* ("*FCFGA*"), 968 F.2d 1265, 1272 (D.C. Cir. 1992) (internal citations and quotation omitted); *see Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 485 F.2d 786, 824–26 (D.C. Cir. 1973) ("[A] party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby. This principle . . . is no less applicable to erroneous orders of an administrative agency than to those of a court." (internal quotation marks omitted)); *Williams v. Washington Metro. Area Transit Comm'n*, 415 F.2d 922, 939–43 (D.C. Cir. 1968).

One of the main authorities in this line of cases involved similar circumstances to those presented here. In *FCFGA*, a district court invalidated a regulation that allowed growers to require that H-2 workers be more productive before the workers were eligible to earn wages higher than the AEWR, thereby effectively reducing the workers' wages. *See FCFGA*, 968 F.2d at 1266–68 (noting that the "H-2" program at issue was subsequently renamed "H-2A"). After the regulation was invalidated, however, the growers continued to pay the lower rate set by the regulation. *Id.* The district court ordered the growers to make equitable restitution to the H-2 workers who were paid that lower rate, and the D.C. Circuit affirmed. *See id.* at 1272–75. The D.C. Circuit held that after a rule has been invalidated, courts must ensure that restitution is provided to those who continue to be adversely affected by the rule. *Id.* at 1273. "To do otherwise . . . 'would be to give legal effect to the [agency's] invalid order.'" *Id.* (quoting *Williams*, 415 F.2d at 943).

Plaintiffs seek this form of equitable relief. "Plaintiffs are not asking DOL to require growers to provide backpay for the entire period in which the unlawful IFR was in place." Doc. 95 at 15. "The backpay request is narrower: it requires backpay only for the time period in which DOL is generating a new methodology to replace one that this Court [has] found unlawful." *Id.* The Court finds that it has the authority to order plaintiffs' requested relief.

Ultimately, however, any award of backpay will depend on the new AEWRs that DOL issues after it generates a new methodology for calculating AEWRs. Given that this comparison point does not yet exist, the Court declines to decide the backpay issue at this time. The Court will instead order DOL to notify growers that they may be required to provide backpay for the period between the entry of this Order and the date on which DOL publishes new AEWRs. The issue of whether backpay should be awarded, and in what amount, is reserved until DOL issues new AEWRs.

## VI. <u>CONCLUSION</u>

For the reasons set forth above, the Court:

1. **HOLDS UNLAWFUL** the Interim Final Rule *Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-*

*Range Occupations in the United States*, 90 Fed. Reg. 47914 (Oct. 2, 2025) (the "IFR"). The IFR is not vacated at this time.

2. **ORDERS** defendants, on remand, to promptly produce a new methodology for calculating Adverse Effect Wage Rates ("AEWRs") for H-2A workers that is consistent with this Order, and to promptly publish new AEWRs under that methodology.

3. **RETAINS JURISDICTION** over this matter and directs the parties to submit an initial status report in two weeks detailing the initial steps defendants have taken with respect to producing the required new methodology, defendants' anticipated timeline for issuance of the new methodology, and the parties' proposed schedule for the filing of further status reports.

4. **ORDERS** defendants to notify state workforce agencies, employers, and the public within seven (7) days of the entry of this Order of the following:

   a. Employers who hired or otherwise utilized H-2A labor that was governed by AEWRs published under the IFR between the date on which the notice required hereunder was sent and the date on which a new AEWR methodology is issued pursuant to this Order (the "backpay period") may be required to make wage adjustment payments to qualifying H-2A workers and U.S. farmworkers in corresponding employment who worked during the backpay period, if those workers received an hourly wage below the new, applicable AEWRs generated under the new methodology.

5. After DOL issues new AEWRs, the parties shall propose a supplemental briefing schedule to address the issue of the award of backpay.

IT IS SO ORDERED.

Dated: August 25, 2026

UNITED STATES DISTRICT JUDGE